UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CHARLES COLLINS;<br>TRACY ADAMS,<br>on behalf of her minor child, D.A.;<br>CALEB ROBERTS;<br>STEPHEN JANSEN;<br>GREGORY CHAMBERS;<br>ALICIA SILVESTRE;<br>DAVID CROWLEY; JEREMY BROWN;<br>and JERIMIAH OLIVAR, individually<br>and on behalf of a class of all others<br>similarly situated,<br><br>     Plaintiffs,<br><br>     v.<br><br>THE CITY OF MILWAUKEE,<br>WISCONSIN; THE MILWAUKEE FIRE<br>AND POLICE COMMISSION; and<br>EDWARD FLYNN, in his official<br>capacity as Chief of the Milwaukee Police<br>Department,<br><br>     Defendants. | No. 17-cv-234-JPS<br><br>AMENDED<br>CLASS ACTION<br>COMPLAINT<br>FOR DECLARATORY<br>AND INJUNCTIVE<br>RELIEF<br><br>(Violation of Rights<br>under the Fourth and<br>Fourteenth Amendments<br>to the U.S. Constitution<br>and 42 U.S.C. § 2000d et<br>seq.) |

## INTRODUCTION

1.     This civil rights action challenges the unconstitutional, suspicionless

stop-and-frisk program of the Milwaukee Police Department ("MPD" or

"Department"), which violates the rights of the named Plaintiffs and a class of

similarly situated individuals under the Fourth and Fourteenth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI").

2.     Since 2008, Defendant City of Milwaukee ("City" or "Milwaukee"), through the MPD, has engaged in an unlawful policy, practice, and custom of conducting a high-volume, suspicionless stop-and-frisk program. This program authorizes MPD officers to stop people without objective and articulable reasonable suspicion of criminal conduct, and to frisk people without reasonable suspicion that the person is armed and dangerous, as required under the Fourth Amendment. Under this program, the MPD also conducts pervasive stops and frisks that are motivated by race and ethnicity in violation of the Fourteenth Amendment and Title VI.

3.     The MPD's unconstitutional, suspicionless stop-and-frisk program was adopted as part of a so-called "broken windows" policing strategy purportedly devised to deter crime. The strategy includes blanketing certain geographic areas in which residents are predominantly people of color with "saturation patrols" by MPD officers, who conduct high-volume, suspicionless stops and frisks throughout the area. Over time, the MPD's program has developed into a formal and informal quota system that requires patrol officers to meet numerical targets for stops on a regular basis.

4. As a result, the combined number of MPD traffic and pedestrian stops skyrocketed from just 66,657 in 2007 to 196,434 in 2015—a staggering, nearly threefold increase.

5. Overwhelmingly, the victims of the MPD's suspicionless stop-and-frisk program are Black and Latino people. Though implemented citywide, the MPD's program has been largely concentrated in neighborhoods of color, including Milwaukee Police Districts Three, Five, and Seven, all of which are located in predominantly Black neighborhoods in the northern half of the City.

6. In addition, data reflect that Black and Latino people are more likely than white people to be stopped and frisked throughout Milwaukee, including in mixed-race and predominantly white neighborhoods. A 2011 Milwaukee Journal Sentinel analysis of MPD traffic stop data found that Black drivers citywide were seven times more likely—and that Hispanic drivers were five times more likely—to be targeted for a traffic stop than white drivers. Moreover, Black non-Hispanic people made up 72% of the targets of MPD stops conducted between 2010 and 2012 that were documented in an MPD database, even though they made up an estimated 34% of the City's total population at the time, according to U.S. Census figures.

7. The MPD's high-volume, suspicionless stop-and-frisk program has created and deepened public fear of and alienation from the MPD, particularly

among Black and Latino residents. Black and Latino people throughout Milwaukee—including children—fear that they may be stopped, frisked, or otherwise treated like criminal suspects when doing nothing more than walking to a friend's house or home from school, driving to and from the homes of loved ones, running errands, or simply taking a leisurely walk or drive through the City. No matter where they are in the City, Black and Latino people face the constant fear that they and their children may be subjected to police harassment even if they are doing nothing wrong.

8.     Plaintiffs Charles Collins, Tracy Adams, on behalf of her minor child D.A., Caleb Roberts, Stephen Jansen, Gregory Chambers, Alicia Silvestre, David Crowley, Jeremy Brown, and Jerimiah Olivar are all victims of the MPD's suspicionless stop-and-frisk program. Each Plaintiff was stopped at least once, if not multiple times, as a pedestrian or driver (or both) by an MPD officer, while engaged in routine, lawful activities, and under circumstances that did not give rise to objective and articulable reasonable suspicion of criminal activity. Each was detained by an MPD officer and subjected to questioning. In addition, D.A., Ms. Silvestre, Mr. Crowley, and Mr. Olivar were frisked and/or searched under circumstances that did not give rise to objective and articulable reasonable suspicion that they were armed or dangerous. The Plaintiffs, each of whom is

Black or Latino, also suffered the humiliation and indignity of being wrongfully branded as criminal suspects due to their race or ethnicity.

9.     The policies, practices, and customs that establish the MPD's suspicionless stop-and-frisk program directly and proximately caused the violation of Plaintiffs' rights. These policies, practices, and customs are implemented and enforced by Defendant Edward Flynn, who serves as Chief of the MPD, and have been ratified and endorsed by Defendant Milwaukee Fire and Police Commission ("FPC"), the civilian body charged with MPD oversight. Defendants Flynn and FPC are Defendant Milwaukee's final policymakers with respect to the policies, practices, and customs that establish the MPD's high-volume, suspicionless stop-and-frisk program.

10.     Defendants Milwaukee, Flynn, and FPC are aware, and/or should be aware, that the MPD's suspicionless stop-and-frisk program has caused, and continues to cause, routine and suspicionless stops and frisks, in violation of clearly established Fourth Amendment rights, as well as stops and frisks that are routinely based on race and ethnicity, in violation of rights clearly established under the Fourteenth Amendment and Title VI. Defendants nevertheless persist in implementing, enforcing, and sanctioning the MPD's high-volume, suspicionless stop-and-frisk program.

5

11.     Indeed, when questioned about racial disparities in MPD traffic stops, Defendant Flynn publicly acknowledged, "Yes, of course, we are going to stop lots of innocent people. The point is, do folks understand what their role is as a cooperative citizen in having a safe environment." Ben Poston, "Racial Gap Found in Traffic Stops in Milwaukee," Milwaukee Journal Sentinel, Dec. 4, 2011.

12.     Defendants Milwaukee, Flynn, and FPC have acted with deliberate indifference to the constitutional rights of Plaintiffs, and those similarly situated, by: (a) failing to properly train MPD officers; (b) inadequately monitoring and supervising MPD officers' practices related to pedestrian and traffic stops and frisks; (c) failing to properly discipline MPD officers who engage in unconstitutional conduct; and (d) encouraging, sanctioning, and failing to rectify the MPD's unconstitutional practices, despite being fully on notice that such violations were occurring.

13.     As a result, Plaintiffs, all of whom are Black or Latino and are current residents of or frequent travelers to Milwaukee, face a substantial threat that they will again be stopped or stopped and frisked by MPD officers in violation of their constitutional and civil rights. All Plaintiffs reside in, or frequently travel to, neighborhoods that are routinely targeted for large numbers of MPD suspicionless stops. D.A., who is 17 years old, has already been subjected to at least three unlawful MPD stops, the first of which took place when he was only 11 years old

and included an illegal frisk. Mr. Chambers has been stopped at least three times without reasonable suspicion of criminal conduct, both as a pedestrian and a motorist. Mr. Olivar has been subjected to at least two unlawful stops, once as a pedestrian and another time while riding a bicycle. The Plaintiffs' fear of future unconstitutional MPD stops and frisks is well founded.

14. By and through their attorneys, and on behalf of a Main Class and Subclass of similarly situated individuals, Plaintiffs bring this action under 42 U.S.C. § 1983 and 42 U.S.C. § 2000d et seq. to seek a declaration that the Defendants' policies, practices, and customs violate the Fourth and Fourteenth Amendments and Title VI, and an injunction requiring the Defendants to immediately and permanently suspend such policies, practices, and customs.

## JURISDICTION & VENUE

15. This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343(a)(3), as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

16. This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because the Eastern District of Wisconsin is the judicial district in which a

7

substantial part of the events or omissions giving rise to the claim occurred, and in which the Defendants reside.

## PARTIES

<u>Plaintiffs</u>

18.     Plaintiff Charles Collins is a 67-year-old Black man, military veteran, and long-time Milwaukee resident. Mr. Collins previously worked as a Certified Nursing Assistant at the Milwaukee County Mental Health Complex and is currently retired.

19.     Plaintiff Tracy Adams is a Black woman and long-time Milwaukee resident, who brings this lawsuit on behalf of her minor child, D.A., who is a 17-year-old Black child and long-time Milwaukee resident.

20.     Plaintiff Caleb Roberts is a 24-year-old Black man, born and raised in Milwaukee, who recently graduated from college and lived in Milwaukee until August 2016. He currently resides in Austin, Texas, where he is pursuing a graduate degree. Mr. Roberts returns to Milwaukee frequently throughout the year to visit family and friends. He plans to apply for postgraduate employment opportunities in Milwaukee.

21.     Plaintiff Stephen Jansen is a 29-year-old Black man and Milwaukee resident, who recently graduated with a master's degree in public administration

8

from the University of Wisconsin-Milwaukee. He works for Goodwill as a Job Coach, assisting individuals in seeking and maintaining employment.

22.     Plaintiff Gregory Chambers is a 32-year-old Black man and Milwaukee resident. He was born and raised in Milwaukee.

23.     Plaintiff Alicia Silvestre is a 60-year-old Latina woman and long-time Milwaukee resident. She has worked for the Milwaukee Public Schools ("MPS") in various capacities for over 30 years, and currently serves as a high school secretary.

24.     Plaintiff David Crowley is a 31-year-old Black man who was born and raised in Milwaukee.  Mr. Crowley was recently elected to the Wisconsin State Assembly to represent Milwaukee residents in the state's 17th Assembly District. Mr. Crowley's legal home address is in the City of Milwaukee, although because of his duties in the State Assembly, he spends some nights during the legislative session in Madison, Wisconsin.

25.     Plaintiff Jeremy Brown is a 28-year-old Black man and long-time Milwaukee resident.

26.     Plaintiff Jerimiah Olivar is a 19-year old Latino teenager and long-time Milwaukee resident.

27.     Defendant City of Milwaukee is a municipality of the State of Wisconsin. The City has established and maintains the MPD as a municipal agency of the City under Wisconsin law. At all relevant times, the City, acting through the MPD, was responsible for the policy, practice, supervision, implementation, and conduct of all MPD matters and was responsible for the appointment, training, supervision, and conduct of all MPD personnel. In addition, at all relevant times, the City was responsible for ensuring that all MPD personnel obey the laws of the United States. The City receives a substantial amount of federal financial assistance for law enforcement activities.

28.     Defendant Edward Flynn is the Chief of Police for the City of Milwaukee, and exercises supervisory authority over all MPD officers and operations. Defendant Flynn is the City's final policymaker with respect to law enforcement activities and the promulgation of MPD standard operating procedures, rules, and guidelines, pursuant to Wisconsin Statute § 62.50 and Milwaukee City Charter Ordinance § 312.

29.     Defendant Milwaukee Fire and Police Commission is a municipal agency of the City under Wisconsin law. Pursuant to Wisconsin Statute § 62.50 and Milwaukee City Charter Ordinance § 314, the FPC oversees all aspects of MPD operations and policies, identifies systemic problems with the MPD,

10

disciplines employees for misconduct, and evaluates MPD policies, practices, and customs relating to stops, frisks, and searches of civilians. Defendant FPC is the City's final policymaker with respect to law enforcement oversight, training, supervision, discipline, and monitoring.

30.     At all times relevant herein, Defendant Flynn and/or Defendant FPC have served and continue to serve as Defendant Milwaukee's final policymakers for the policies, practices, and customs challenged by Plaintiffs, and are responsible for the foreseeable consequences of those policies, practices, and customs.

## FACTUAL ALLEGATIONS

### A. Historical Background

31.     Defendant Milwaukee has a long history of police encounters that have ended with death or injury to Black people, causing Black and Latino communities to fear the MPD. A number of these incidents have occurred since 2008.

32.     Derek Williams, a Black man, died in 2011 while handcuffed in the back of an MPD vehicle after officers ignored his repeated requests for medical attention.

33.     In 2012, a number of MPD officers were investigated and criminally charged for conducting illegal strip searches and body cavity searches, in public, primarily of young Black men from around 2008 to 2012.

34.     In 2014, an MPD officer shot and killed Dontre Hamilton, an unarmed Black man, in Milwaukee's Red Arrow Park, after initiating a pedestrian stop of Hamilton, who was asleep on a park bench and had already been contacted and cleared by other MPD officers in the area.

35.     In August 2016, Sylville Smith, a young Black man, was shot and killed by an MPD officer as he fled on foot following a traffic stop.

36.     Against this historical backdrop, since 2008, the MPD's high-volume, suspicionless stop-and-frisk program has amplified Black and Latino people's fear of, and feeling of alienation from, the MPD.

**B. Allegations of Named Plaintiffs**

*Charles Collins*

37.     One evening in late spring 2014, Mr. Collins and his wife were driving home on North 27th Street in Milwaukee following a visit to their son's home. At around 6:30 pm, just as it was getting dark, Mr. Collins turned left from North 27th Street onto West Atkinson Street.

38.     Without any basis to formulate objective and articulable reasonable suspicion that Mr. Collins had engaged in, or was about to engage in, criminal

conduct, an MPD patrol car pulled up behind Mr. Collins' car, which was then on West Atkinson Street between North 28th and North 29th Streets.

39.     One of the two uniformed MPD officers in the patrol car got out and approached Mr. Collins, who remained seated in the driver's seat of his car.

40.     The MPD officer asked Mr. Collins for his driver's license, which Mr. Collins promptly provided.

41.     Mr. Collins asked the officer why he had been stopped and whether there were any problems with the car.

42.     The MPD officer responded, "We're not the ticket police."

43.     When Mr. Collins opened his wallet to remove his driver's license, the officer saw that Mr. Collins also carried a concealed weapon permit. The MPD officer asked Mr. Collins if he had a gun in the car; Mr. Collins responded that he did not.

44.     The MPD officer took Mr. Collins' driver's license back to the patrol car, presumably to conduct a warrant search. After the officer returned, he permitted Mr. Collins and his wife to leave the scene without charging or citing them for any violation.

*Tracy Adams, on behalf of D.A.*

45.   D.A. is a Black male teenager who has been stopped without reasonable suspicion of criminal conduct on at least three occasions by MPD officers over the last several years.

<u>2010</u>

46.   One stop took place in or around October 2010, when D.A. was a fifth-grade student at the Milwaukee German Immersion School, which is located in Milwaukee near North 82nd Street and West Capital Drive.

47.   At around noon on that day, D.A. walked several blocks from his home to the home of his friend, J.H., which was located near the school. D.A. was wearing headphones while walking. When D.A. reached J.H.'s house, he stepped onto the porch and rang the doorbell. When J.H. did not immediately come to the door, D.A. called him using the cell phone his mom had given him to use in case of emergency.

48.   Without any basis to formulate objective and articulable reasonable suspicion that D.A. had engaged in, or was about to engage in, criminal conduct, an MPD officer driving a patrol car pulled into the alley next to J.H.'s house.

49.   The MPD officer stepped out of the patrol car and told D.A. to "come here." The officer walked towards D.A., put his arm around D.A.'s shoulders, and escorted D.A. from the porch to the patrol car. The officer immediately began

questioning D.A. in an accusatory manner and forcibly removed D.A.'s phone from his hand.

50.     The officer asked D.A. what he was doing at that location. D.A. explained that he was visiting a friend.

51.     The officer patted D.A. down from his chest to his legs, and patted down each arm individually. The officer instructed D.A. to put his hands on the hood of the patrol car and D.A. complied.

52.     J.H.'s father, who is white, came out of the house shortly thereafter, and asked the officer what was going on and why D.A. was being searched when "he's a little kid." He explained to the officer that D.A. and his son, J.H., were going to hang out in J.H.'s room.

53.     The MPD officer told J.H.'s father that he was making sure that nothing was wrong. The MPD officer asserted that he was trying to be cautious.

54.     The MPD officer then left without charging or citing D.A. for any violation.

55.     When D.A.'s mother, Tracy Adams, learned about this incident, she was upset and frustrated. Ms. Adams called the MPD's District Seven station and spoke to a sergeant.

56.     Ms. Adams asked why her son—who was just a child—had been stopped and frisked by the police for no reason. The sergeant explained that MPD officers have "a policy to stop young men walking through alleys."

57.     Ms. Adams was disturbed by the sergeant's response. She had worked for Milwaukee Public Schools for more than 25 years and had never heard of such a policy or practice, particularly as it relates to children. Ms. Adams told the officer that the policy described did not sound right to her and that she would like to file a complaint.

58.     The officer informed Ms. Adams that she had a right to file a complaint, and explained that Ms. Adams had to come to the police station in District Seven to pick up and complete the relevant forms, so that the MPD could look into the complaint and forward it to the Milwaukee Fire and Police Commission to determine if "there was something."

59.     Ms. Adams took the initial steps to file a formal complaint, but ultimately decided not to do so, based upon the lack of cooperation and guidance from MPD officials that she had already encountered by phone and in person.

60.     Upon information and belief, the officer who conducted the unlawful stop was never disciplined, reprimanded, or otherwise held accountable for his actions.

61.     D.A. was again stopped and searched by MPD officers in 2013, when he was a seventh-grade student at the Milwaukee School of Languages, located on West Burleigh Street in Milwaukee.

62.     Following school that day, D.A. and three classmates stopped briefly at the home of one of the boys, B.C., which was located a few blocks from the school. While waiting on the porch of B.C.'s home, D.A. noticed a marked MPD vehicle make a U-turn and park on the curb facing B.C.'s house.

63.     Shortly after leaving B.C.'s house, D.A. and his classmate, E.W., walked towards D.A.'s house, taking a shortcut through a nearby alley.

64.     Without any basis to formulate objective and articulable reasonable suspicion that D.A. had engaged in, or was about to engage in, criminal conduct, an MPD patrol car pulled up next to D.A. and E.W. Upon coming to a stop, two officers got out of the car and approached D.A. and E.W.

65.     The officers asked D.A. and E.W. to remove their hands from their coat pockets because they "might have weapons."

66.     The officers asked D.A. and E.W. what they were doing. D.A. explained that they were walking to his house.

67. One officer asked D.A. and E.W. for identification. The boys gave their names, which one of the officers wrote down, but they were too young to have identification cards.

68. One officer returned to the MPD patrol car, presumably to check the boys' names for arrest warrants. The other officer instructed D.A. and E.W. to sit on the hood of the patrol car.

69. At one point, D.A. and E.W. asked if they could leave, but one of the MPD officers told them to wait so that the officers could verify their identity.

70. The officer who conducted the identification check returned to where D.A. and E.W. were waiting. He asked D.A. what was in his backpack. D.A. explained that his backpack contained homework.

71. One officer warned the boys not to walk through alleys because it "makes you look suspicious."

72. The officers then drove away without charging or citing D.A. or E.W. with any violation.

73. After the officers let them go, D.A. and E.W. continued walking to D.A.'s house.

74. B.C. later called D.A. to tell him that a police officer had come to his house to ask him if he knew D.A. and E.W.

18

75.     D.A. was also stopped by an MPD officer during September or October 2016, when he was walking alone on his way to the bus stop early in the morning to attend high school.

76.     At approximately 9 a.m., D.A. was walking along West Nash Street in Milwaukee. He then crossed onto the east side of North 96th Street, next to the schoolyard fence of the Ninety-Fifth Street School. Almost immediately, an MPD officer on a motorcycle drove up West Nash Street and pulled up next to him.

77.     Without any basis to formulate objective and articulable reasonable suspicion that D.A. had engaged in, or was about to engage in, criminal conduct, the MPD officer stopped D.A. and asked whether he lived in the area. The officer mentioned a report of a stolen car. D.A. responded that he did not know anything about a stolen car.  D.A. did not believe that he was free to end the encounter and leave the scene.

78.     After a few more minutes of questioning, the officer rode away without charging or citing D.A. for any violation, and D.A. continued on his way to the bus stop.

### Caleb Roberts

79.     On July 5, 2011, Mr. Roberts, who was then an 18-year-old college student, left a Summerfest concert in Milwaukee with friends and relatives by car

sometime between 11:30 p.m. and 12:30 a.m. Mr. Roberts was driving a black minivan, with slightly tinted back side windows, and was accompanied by five passengers.

80.     After dropping one friend off at North 71st Street and West Center Street, Mr. Roberts drove to North 60th Street and West Hampton Avenue to drop off his cousin, J.B.

81.     Driving on North 60th Street, Mr. Roberts turned left at a stoplight onto West Hampton Avenue, less than a block from J.B.'s home, and saw two MPD patrol cars driving in the opposite direction.

82.     Without any basis to formulate objective and articulable reasonable suspicion that Mr. Roberts or any of the minivan passengers had engaged in, or were about to engage in, criminal conduct, the two MPD patrol cars made a U-turn, activated their emergency lights, and directed Mr. Roberts to pull over just as he approached the front of J.B.'s house.

83.     Four uniformed officers emerged from the MPD patrol cars, two from each vehicle, and descended upon the minivan. Two officers approached each side of Mr. Roberts' minivan, raised their flashlights, and drew their guns.

84.     Mr. Roberts had already lowered the window of the driver's side door before the officers approached. Upon reaching the minivan, one of the officers

opened the driver's side door, while the other officers directed the passengers to open the remaining three doors of the minivan.

85.     The MPD officer positioned at the driver's side door told Mr. Roberts to put his hands on the steering wheel and to show his driver's license. Mr. Roberts complied. The officers also obtained identification cards from the other three male passengers (but not from the sole female passenger).

86.     The officers asked Mr. Roberts and the passengers about where they were coming from and whether there were weapons or alcohol in the vehicle. Mr. Roberts explained that they were on their way home from the Summerfest concert and that there were no weapons or alcohol in the minivan.

87.     At least one officer returned to the patrol car, presumably to run the minivan's license plate number and the identification cards obtained for warrants.

88.     One MPD officer, who remained at the minivan, directed J.B. to get out of the minivan. Once J.B. exited the minivan, he was frisked, handcuffed, and made to sit on the curb on West Hampton Avenue, directly in front of his own home.

89.     Mr. Roberts, J.B., and another passenger, D.L., each asked one of the MPD officers to provide the reason for the traffic stop. One officer told Mr. Roberts that the vehicle's registration was faulty. A second officer told J.B. that J.B. had appeared to be reaching for something on the floor or under the seat. A

third officer told D.L. that J.B., who had been seated in the middle seat of the last row in the minivan, had not been wearing a seatbelt before they were pulled over, even though the back seat of the minivan is not visible from the outside because of the tinted side rear windows.

90.     After conducting the warrant check, the MPD officers returned the identification cards to Mr. Roberts and the other passengers, and permitted them to leave without being charged or cited for any violations.

### Stephen Jansen

91.     At around 12:30 a.m. on May 14, 2016, Mr. Jansen left the University of Wisconsin-Milwaukee campus, where he was a graduate student obtaining a master's degree in public administration, to return home after studying for a final exam. Mr. Jansen walked west on East Locust Street, then south on North Humboldt Boulevard, keeping to the sidewalk on the east side of the street.

92.     When Mr. Jansen approached the corner of North Humboldt Street and East Center Street, two MPD officers on bicycles rode swiftly past Mr. Jansen going in the same direction.

93.     Without any basis to formulate objective and articulable reasonable suspicion that Mr. Jansen had engaged in, or was about to engage in, criminal conduct, the MPD officers looked at Mr. Jansen, turned around and rode back in his direction. They stopped at the northeast corner of the intersection of North

Humboldt Street and East Clarke Street, where they began circling their bicycles and talking to each other. Mr. Jansen continued to walk south on North Humboldt Boulevard, towards the officers.

94.     As Mr. Jansen started to cross East Clarke Street, one of the MPD officers, whom Mr. Jansen later learned was named Officer Macrae, rode towards him.

95.     Officer Macrae appeared to call out to him, but Mr. Jansen could not hear the officer well because he was wearing earbuds and listening to music.

96.     Mr. Jansen stopped and removed his earbuds. Officer Macrae stated, "We didn't smell any marijuana until we passed you. Do you have any weed on you?"

97.     Mr. Jansen did not believe that he could continue walking without responding to Officer Macrae. He responded that he did not have any marijuana.

98.     Officer Macrae then asked if Mr. Jansen if he had anything in his backpack or anything "on him."

99.     Mr. Jansen again felt that he could not leave the scene without answering the question. He responded, "No. I don't smoke marijuana. Anything else?" Officer Macrae smirked and replied, "No."

100.    The officers then left the scene without charging or citing Mr. Jansen for any violation, and he continued to walk home.

101. Mr. Jansen was upset following his interaction with the MPD officers and felt that he had been wrongfully targeted because of his race.

102. Mr. Jansen told his girlfriend about the encounter, and called MPD's District Five station to complain. He spoke to an officer, and was then transferred to an MPD Supervisor who introduced himself as "Jake."

103. Mr. Jansen complained that two MPD officers had stopped and questioned him without articulable reasonable suspicion of criminal activity. During this conversation, Mr. Jansen learned that Officer Macrae was one of the two officers involved in the stop.

104. Upon information and belief, the May 14, 2016 stop was not investigated by MPD, Defendant FPC, or any other oversight authority.

### Gregory Chambers

105. Mr. Chambers is a young Black man who has been stopped without reasonable suspicion of criminal conduct by MPD officers on at least three occasions.

<u>2014</u>

106. At approximately 6:00 a.m., in or around January or February 2014, Mr. Chambers was driving home after dropping his wife off at work. Before reaching home, Mr. Chambers decided to refuel at a gas station located at Miller Park Way and Greenfield Avenue in Milwaukee.

107.   Without any basis to formulate objective and articulable reasonable suspicion that Mr. Chambers had engaged in, or was about to engage in, criminal conduct, an MPD patrol car tailed Mr. Chambers down Miller Park Way and followed him as he made a legal U-turn and pulled into the gas station. When Mr. Chambers pulled up to the first gas pump, the patrol car pulled up directly behind Mr. Chambers' car. As Mr. Chambers got out of his car, the patrol car's siren was activated. Mr. Chambers stopped abruptly and stood by the gas pump.

108.   One officer commented on Mr. Chambers' "nice car" and asked whether it belonged to him. Mr. Chambers responded that it was his wife's car and that he had just dropped her off at work.

109.   The two MPD officers got out of the patrol car and approached Mr. Chambers. The officer who had commented on Mr. Chambers' car asked to see his driver's license, which Mr. Chambers provided.

110.   The officer took Mr. Chambers' license back to the patrol car and got inside, where he presumably checked for warrants. The second officer stood by the hood of the patrol car and stared directly at Mr. Chambers for approximately ten minutes without uttering a word.

111.   When nothing problematic was found, the officers returned Mr. Chambers' driver's license. The officers again asked Mr. Chambers whether the

car belonged to him. Mr. Chambers stated that if he was not being detained, he would like to go.

112.   The officers permitted Mr. Chambers to leave the scene without charging or citing him for any violation.

<u>2015</u>

113.   In August 2015, Mr. Chambers was driving to his home in Milwaukee in a beige 2011 Chevy Malibu, which he had purchased about a week earlier. At the time, the car was still equipped with temporary dealer plates, while Mr. Chambers waited for the permanent license plates to arrive in the mail.

114.   Mr. Chambers was driving down South 27th Street and turned onto West Mitchell Street. As Mr. Chambers drove east and reached South 13th Street, near West Forest Home Avenue, he noticed that an MPD patrol car was following him.

115.   Several minutes later, as Mr. Chambers pulled up in front of his apartment building at West Mitchell Street and South 6th Street, the officers activated their car siren.

116.   Two MPD officers approached Mr. Chambers' car, one on each side of the vehicle.

117.   The MPD officer on the driver's side told Mr. Chambers that the dealer tag on the car did not match the car registration that they had on file. He

asked to take down Mr. Chambers' vehicle identification number, which Mr. Chambers permitted. The officer also asked Mr. Chambers for his driver's license, which Mr. Chambers provided, and returned to the patrol car, presumably to conduct a check for any outstanding warrants.

118.   Meanwhile, the MPD officer on the passenger side peered into Mr. Chambers' car and stared at him, while keeping his hand on his gun. The gun was in its holster, but the holster was unsnapped. Eventually, the officer snapped the strap closed, securing the gun in the holster.

119.   After several minutes, the other officer returned to Mr. Chambers' car. Following another series of questions, the officers eventually told Mr. Chambers that he was free to go.

120.   The officers watched Mr. Chambers get out of his car and enter his apartment building before leaving the scene. They did not charge or cite him with any violation.

<u>2016</u>

121.   On a Sunday evening in March 2016, after driving into downtown Milwaukee, Mr. Chambers parked his car and went for a walk on North Water Street.

122.   At approximately 9:00 p.m., as Mr. Chambers was returning to his car, an MPD patrol car activated its emergency lights and pulled up at the curb

alongside him. Mr. Chambers had been walking on the sidewalk on the west side of the street, next to a large fountain near the entrance to the Marcus Center for the Performing Arts.

123.  Two MPD officers got out of the car and approached Mr. Chambers. They asked what he was doing. Mr. Chambers responded that he was taking a walk. The officers asked Mr. Chambers for his identification, which he provided.

124.  The officers then asked Mr. Chambers for his age. When Mr. Chambers stated that he was 31 years old, the officers replied that they did not believe him.

125.  One officer took Mr. Chambers' driver's license to the patrol car, while the second officer stayed with Mr. Chambers. When nothing problematic was found, the first officer returned Mr. Chambers' driver's license and permitted Mr. Chambers to leave the scene without charging or citing him for any violation.

### Alicia Silvestre

126.  One evening in or around 2015, Ms. Silvestre dropped off some food for her son, who lived on South Aldrich Street in Milwaukee at the time. She left her son's home by car at around 10 p.m. Her then four-year-old granddaughter was in the back seat.

127.  Without any basis to formulate objective and articulable reasonable suspicion that Ms. Silvestre had engaged in, or was about to engage in, criminal

conduct, MPD officers in a patrol car activated the car's emergency lights and pulled up behind Ms. Silvestre's car just after she turned left from East Homer Street onto South Kinnickinnic Avenue.

128. Two MPD officers approached Ms. Silvestre's car on either side. The officer on the driver's side asked Ms. Silvestre for her driver's license. Ms. Silvestre responded that she had accidentally left it at home in her purse.

129. The officer then aggressively questioned Ms. Silvestre in a threatening manner, which made Ms. Silvestre extremely nervous. He asked Ms. Silvestre how old she was, and expressed disbelief when Ms. Silvestre fumbled her response before providing the correct answer.

130. The officer asked Ms. Silvestre why she was nervous. Ms. Silvestre explained that he was making her feel nervous.

131. The officer then asked if he would find "anything" if he searched Ms. Silvestre's car. Ms. Silvestre responded that the officer would not find anything. The officer then ordered Ms. Silvestre out of the car, so that they could search her person. She stood up and said "Search me," but the officer did not do so. Instead, he leaned into the car, over the driver's seat, and shined a flashlight into the interior.

132. Ms. Silvestre's granddaughter remained in the back seat, crying.

133. The officer instructed Ms. Silvestre to get back into her car, and informed her that they were going to follow her home to confirm that she had a valid driver's license. The officer told Ms. Silvestre that after arriving at her home, she should wait for permission to get out of her car and should "not run."

134. Ms. Silvestre drove home with the MPD officers following behind her in the patrol car.

135. When Ms. Silvestre arrived at home, she waited in her car as instructed. An officer opened the driver's side door and let Ms. Silvestre out of the car. Ms. Silvestre opened the rear passenger door to let her granddaughter out of the back seat of the car.

136. As they walked towards the house, the MPD officer asked Ms. Silvestre where her driver's license was located inside of the house. Ms. Silvestre explained that she had left her purse on the dining room table and that she kept her driver's license in an outside pocket of the purse.

137. Once at Ms. Silvestre's front door, the two MPD officers followed Ms. Silvestre into the house without asking her permission. As Ms. Silvestre walked towards the dining table to get her purse, the same MPD officer told her to stop, grabbed the purse himself, unzipped the main compartment, and dumped the contents of the bag onto the dining table without asking permission.

138.   Ms. Silvestre was frightened by this intrusive behavior. She began crying. Her granddaughter, whom Ms. Silvestre had sent to an adjacent room, continued to cry as well. Ms. Silvestre asked the officer why he was treating her this way.

139.   The MPD officer asked Ms. Silvestre if she knew that she had been in an area known for drugs and produced a small piece of foil with burn marks, which he claimed to have found in her car, and which Ms. Silvestre had never seen before. The officer said it was heroin and the reason why he had been treating her aggressively.

140.   Ms. Silvestre responded that she did not know anything about heroin.

141.   Both MPD officers left without charging or citing Ms. Silvestre for any violation. Neither officer explained why she had been stopped and searched in the first instance.

142.   The next day, Ms. Silvestre called MPD's District Six station to file a complaint. An officer told her that she had been stopped because she had failed to stop at a traffic light. There is no traffic light, however, at the intersection on South Kinnickinnic Avenue where the MPD officers initially stopped Ms. Silvestre.

143.   Ms. Silvestre also filled out a written Citizen Complaint Form soon after the incident and submitted it to the FPC. Upon information and belief, the

officers who conducted the unlawful stop, car search, and home entry were never disciplined, reprimanded, or otherwise held accountable for their actions.

### *David Crowley*

144.  At around 10 p.m. one evening during the late summer or early fall of 2012 or 2013, Plaintiff Crowley and his godbrother, D.C., were walking south on North 10th Street in Milwaukee, between West Concordia Avenue and West Ring Street, when they heard gun shots.

145.  Mr. Crowley and D.C. turned right onto West Ring Street, going west, away from the sound of the gun shots, then headed south again on North 11th Street, in order to distance themselves further from the direction from which they heard the shots. Eventually, they walked through a field near the intersection of 11th and Ring, towards the alley between North 11th and North 10th Streets and facing the nearby LaFollette School.

146.  Without any basis to formulate objective and articulable reasonable suspicion that Mr. Crowley or D.C. had engaged in, or was about to engage in, criminal conduct, two MPD officers who were driving through the alley pulled up to Mr. Crowley and D.C., flashed the patrol car's white lights on them, jumped out of the car with guns drawn, and shouted for them to put their hands up "right now."

147.  Mr. Crowley and D.C. were terrified and immediately put their hands in the air.

148. One MPD officer asked "Where you guys coming from?" Without waiting for a response and without any basis to formulate objective and articulable reasonable suspicion that Mr. Crowley or D.C. were armed and dangerous, the officers immediately approached Mr. Crowley and D.C., and frisked them both, patting them down and searching their pants pockets. After taking Mr. Crowley's and D.C.'s wallets out of their pockets, the officers pulled out their identification cards. The officers did not ask for identification or consent to search prior to frisking and searching Mr. Crowley and D.C.

149. As the officers searched Mr. Crowley and D.C., one of the officers asked if they had thrown a gun into the field, and whether they had heard gun shots. Mr. Crowley responded that they had heard the shots and walked down North 11th Street to avoid trouble.

150. The MPD officers then returned Mr. Crowley's and D.C.'s identification and permitted them to leave without charging or citing them for any violation.

### Jeremy Brown

151. One morning in March or April 2012, Mr. Brown was spending time with his partner, S.O., their children, and other family members at her home, when he decided to go to a local food market to purchase cigarettes. Mr. Brown left for the store at around 11 a.m. while S.O. stayed at home with the children.

152.    After purchasing the cigarettes, Mr. Brown walked back to S.O.'s home along North 25th Street.  Without any basis to formulate objective and articulable reasonable suspicion that Mr. Brown had engaged in, or was about to engage in, criminal conduct, an unmarked MPD vehicle pulled up beside him. The officer driving the vehicle, who was in uniform at the time, rolled down a window and asked Mr. Brown, "Who are you?"

153.    Mr. Brown was confused by the question.  He responded, "What do you mean, who am I?" The officer again asked, "Who are you?" Mr. Brown remained confused as to why the officer was asking for his name. He replied, "Why do you want to know who I am?"

154.    The officer heatedly replied, "I know everyone around here except you. You're a new face. I need to know who you are." The officer pulled his vehicle into a driveway directly in front of Mr. Brown, cutting off his path to S.O.'s home.

155.    The officer exited the vehicle and directed Mr. Brown to stand against an adjacent fence. The officer demanded Mr. Brown's identification, instructed him to drop the cigarettes in his hand, and asked what he was carrying. Mr. Brown complied with the officer's instructions and responded that he was not carrying anything.

156.    While the officer detained and questioned Mr. Brown on North 25th Street, S.O. became worried that it was taking Mr. Brown a long time to return after what was supposed to be a quick trip to the store. S.O. left her children with her mother and another family member on the porch of her home and walked down to where the officer was detaining Mr. Brown.

157.    When S.O. arrived, she asked the officer why he had stopped Mr. Brown. The officer replied, "He's a new face. I know everyone else here. I need to get to know him."

158.    When S.O. then asked Mr. Brown why he was being detained, the officer became verbally abusive towards her. The officer called her "Black bitch," and told her, "Mind your own business, bitch."

159.    A second MPD officer arrived at the scene in a police vehicle and observed the first officer as he continued to speak derogatorily towards S.O.

160.    The first officer handcuffed Mr. Brown and placed him in the second officer's vehicle.  The first officer asked S.O., "How does it feel to see your man going to jail?"

161.    S.O.'s mother, who had remained with the children on the porch of S.O.'s home, became concerned that S.O. had been gone for some time. She left the children on the porch with another family member, and walked over to where MPD officers were detaining Mr. Brown and verbally harassing S.O.

162.    After S.O.'s mother arrived, S.O. and her mother left the MPD officers and returned to S.O.'s home.

163.    As they arrived at S.O.'s home, the first officer drove by in his vehicle and shouted out of his window at S.O. The officer threatened S.O. that he would report her to Milwaukee Child Protective Services because she had left her kids on the porch alone.

164.    The second officer transported Mr. Brown to MPD's District Five station, where he was left in a room for several hours.  The first officer eventually arrived and released Mr. Brown after issuing him a $185 ticket for disorderly conduct.

165.    As a result of his hours-long detention, Mr. Brown almost missed work.

166.    Mr. Brown appeared in Milwaukee Municipal Court on May 8, 2012, for a hearing concerning the disorderly conduct charge.  When he arrived in court, however, he learned that the officer who ticketed him had not filed any citation with the court. Mr. Brown contacted the court several times over the next two years to inquire about the citation. On each occasion, Mr. Brown was informed that no such citation was ever filed.

*Jerimiah Olivar*

167.   Mr. Olivar is a Latino teenager who has been stopped without reasonable suspicion of criminal conduct on at least two occasions by MPD officers over the last several years.

<u>2015</u>

168.   One stop took place in July or August 2015, when Mr. Olivar was only 17 years old.

169.   At around 2 p.m. on that day, Mr. Olivar and his friend, L., who is Black, were riding their bicycles eastward on West National Avenue towards South 16th Street in order to meet up with another friend.  At first, they rode in the designated bicycle lane, but later moved to the sidewalk because Mr. Olivar had been told, including by police officers, that bicycles belonged on the sidewalk.

170.   As Mr. Olivar and L. rode their bicycles eastward on West National Avenue, they saw two officers in an MPD van driving towards them on the opposite side of the street.  After the MPD van passed Mr. Olivar and L., Mr. Olivar heard the van make a U-turn.

171.   The MPD van drove past Mr. Olivar and L. and hastily pulled over to the right side of the road, parking the van in front of them at an angle to the curb.

172.   Without any basis to formulate objective and articulable reasonable suspicion that Mr. Oliver or L. had engaged in, or were about to engage in,

criminal conduct, two MPD officers exited the van and approached them on the sidewalk. As the officers approached head-on, Mr. Olivar and L. stopped cycling and stood facing the officers and straddling their bicycles. One officer stood in front of Mr. Olivar's bicycle and placed his hands on the handlebars. The other officer did the same to L. Mr. Olivar did not believe that he was free to leave.

173. Without any basis to formulate objective and articulable reasonable suspicion that Mr. Olivar or L. were armed and dangerous, both officers gestured to Mr. Olivar and L. to raise their arms. When Mr. Olivar and L. complied, the officers immediately proceeded to frisk them.

174. The officer who frisked Mr. Olivar started by checking the waist band of Mr. Olivar's pants and proceeded to pat down his front and back pockets, his legs down to the ankle, and the sleeves of his shirt.

175. The second officer frisked L. and asked, "What are you guys doing over here?" Mr. Olivar responded, "Riding to a friend's house."

176. The same officer replied, "There was just a robbery in the neighborhood. We are just checking around." Mr. Olivar responded, "We don't know anything about that."

177. The officer frisking L. reached into the small front pocket of L.'s pants and pulled out a multi-tool. That officer asked, "What are you doing with this?" L. responded that he uses the tool from time to time.

178. The same officer who had been questioning the young men asked them for their identification. Mr. Olivar and L. complied by providing their identification cards. The officer took the cards, instructed Mr. Olivar and L. to sit on the curb, and returned to the police van, presumably to conduct a warrant check. Mr. Olivar and L. put their bicycles down on the sidewalk and sat on the curb, while the other officer watched them.

179. The officer who had conducted the warrant check returned Mr. Olivar his identification card and said, "You're in the clear to go." The same officer returned L. his identification card, and told him that he had several unpaid tickets that he should take care of.

180. L. asked for his multi-tool back. The officer who had confiscated it refused to return it.

181. The officers permitted Mr. Olivar and L. to leave the scene without charging or citing them for any violation.

<u>2016</u>

182. At around 2 p.m. one afternoon in the late winter or early spring of 2016, Mr. Olivar and L. were walking westward on West Lapham Boulevard on their way to a friend's house when an MPD vehicle passed them and pulled over to the right side of the road in front of them. When the vehicle pulled over, Mr. Olivar

and L. were on the north sidewalk on West Lapham Boulevard, close to South Division High School.

183. Without any basis to formulate objective and articulable reasonable suspicion that Mr. Olivar or L. had engaged in, or were about to engage in, criminal conduct, when Mr. Olivar and L. reached the MPD vehicle, an officer rolled down the passenger-side window and asked, "What's your business in the area?"

184. Mr. Olivar felt that he had to answer the officer's question and could not continue on his way. He responded, "We are going to a friend's house."

185. The officer stated, "There have been a lot of robberies around here. Do you know anything about that?"

186. Mr. Olivar responded that they did not.

187. The officers permitted Mr. Olivar and L. to leave the scene without charging or citing them for any violation.

## C. The MPD's High-Volume, Suspicionless Stop-and-Frisk Program

188. The named Plaintiffs' experiences of being stopped, frisked, and searched by MPD officers without legal justification are far from isolated incidents. They are the result of the MPD's high-volume, suspicionless stop-and-frisk program, which violates both the Fourth Amendment prohibition on

unreasonable searches and seizures and the prohibition against racial and ethnic profiling under the Fourteenth Amendment and Title VI of the Civil Rights Act.

189.    Upon assuming control of the MPD in 2008, Defendant Flynn ushered in a "broken windows policing" strategy involving "proactive policing" and so-called "saturation patrols." As part of this strategy, Defendant Flynn directs MPD officers to increase the number of traffic and pedestrian stops, also known as "field interviews" and "field contacts," throughout the City, and particularly in neighborhoods that are economically depressed and/or perceived as suffering from social disorder. Defendant Flynn has publicly suggested that saturating these neighborhoods with police and ramping up the number of stops made by MPD officers will disrupt and deter crime, whether or not the stops lead to arrest or prosecution.

190.    Defendant Flynn has acknowledged that a significant number of the stops conducted by MPD officers are of law-abiding individuals. When questioned about this phenomenon, Defendant Flynn stated, "Yes, of course we are going to stop lots of innocent people." Ben Poston, "Racial Gap Found in Traffic Stops in Milwaukee," Milwaukee Journal Sentinel, Dec. 4, 2011.

191.    The result is the MPD's high-volume, suspicionless stop-and-frisk program, which is predicated on a policy, practice, and custom of authorizing and encouraging MPD patrol officers to conduct large numbers of traffic and

pedestrian stops that are unsupported by objective and articulable reasonable suspicion of criminal activity.

192.    The MPD's suspicionless stop-and-frisk program also includes a policy, practice, and custom of authorizing and encouraging MPD patrol officers to escalate stops to include frisks that are unsupported by reasonable suspicion that an individual is armed and dangerous.

### 1.  Citywide Impact of the MPD's Suspicionless Stop-and-Frisk Program

193.    The MPD's high-volume, suspicionless stop-and-frisk program has led to a dramatic increase in MPD traffic and pedestrian stops citywide. The combined number of MPD traffic and pedestrian stops multiplied nearly threefold from just 66,657 in 2007 to 196,434 in 2015.

194.    The fact that MPD conducted 196,434 traffic and pedestrian stops in 2015 alone is, in and of itself, staggering in light of the City's 2015 population of 599,498, according to U.S. Census figures.

195.    According to the MPD's 2015 Annual Report, MPD officers conducted 149,604 traffic stops and 46,830 subject (pedestrian) stops in 2015, compared to 52,399 traffic stops and 14,258 subject stops in 2007. These figures may even underrepresent the extent to which the City's high-volume, suspicionless stop-and-frisk program has increased police stops in Milwaukee because MPD officers fail to document every traffic and pedestrian stop conducted.

196.   Even though the combined number of pedestrian and traffic stops has decreased slightly in recent years, that number has remained consistently high since 2009, based on data presented in the MPD's 2015 Annual Report.

197.   Upon information and belief, the MPD's high-volume, suspicionless stop-and-frisk program continues to serve as the driving force behind the large numbers of traffic and pedestrian stops citywide.

198.   In 2015, the U.S. District Court for the Eastern District of Wisconsin expressed concern that MPD officers routinely conduct suspicionless stops in the context of a lawsuit resulting in a jury verdict finding that officers lacked reasonable suspicion to conduct a stop and frisk. The Court order upheld the jury verdict and observed: "[I]t is apparent that MPD has opted to continue the sort of illegal stops that Mr. Hardy was subject to. MPD Chief Edward Flynn has made clear that one of his prerogatives is encouraging large amounts of pedestrian stops, regardless of the reasons. In criticizing *Floyd v. City of New York*, the Southern District of New York case finding the New York Police Department's stop-and-frisk tactics illegal, Chief Flynn stated, 'That's what worries us about what's happening in New York. It would be a shame if some people decided to put us back in our cars just answering calls and ceding the streets to thugs.'" Order, *Hardy v. City of Milwaukee*, 88 F. Supp.3d 852, 881 at n.19 (E.D. Wis., Feb. 27, 2015) (citing Heather MacDonald, "How to Increase the Crime Rate Nationwide,"

The Wall Street Journal (Jun. 11, 2013)) ("*Hardy* order"). The Court noted that "even the most routine police stop has the possibility of escalating quickly" and that "police stops of citizens should not be taken lightly." *Id.* at 881.

## 2. The MPD's Suspicionless Stop-and-Frisk Program Targets Black and Latino People

199. The MPD's high-volume, suspicionless stop-and-frisk program is also predicated on a policy, practice, and custom of authorizing and encouraging MPD patrol officers to base stops and frisks on race and ethnicity, in violation of the Fourteenth Amendment and Title VI of the Civil Rights Act.

200. In 2011, a report by the Milwaukee Journal Sentinel ("MJS Report") analyzed data provided by the MPD to the Wisconsin Office of Justice Assistance on MPD traffic stops conducted from January 2011 to April 2011. The MJS Report found that Black drivers throughout Milwaukee were seven times more likely to be stopped by MPD officers than white drivers, and that Hispanic drivers were five times more likely to be stopped than white drivers. *See* Ben Poston, "Racial Gaps Found in Traffic Stops in Milwaukee," Milwaukee Journal Sentinel, Dec. 4, 2011.

201. The MJS Report also found that Black drivers were twice as likely as white drivers to have their cars searched after the initiation of a stop, even though the rate at which searches resulted in the seizure of contraband was comparable for Black and white drivers.

202.   When questioned about the MJS Report findings, Defendant Flynn publicly stated that such racial disparities are to be expected. Defendant Flynn told the Milwaukee Journal Sentinel, "If we are going to heavily engage with those communities that are both victimized and from whence a significant majority of our offenders come, we are going to generate disparities because of where we're physically located." Defendant Flynn also stated, "The disparities we are generating, we believe, are well within what we would expect given the victimization data and the offender data."

203.   MPD's targeting of Black and Latino drivers for stops is not limited, however, to discrete geographic areas in which the MPD purports to engage with Black and Latino communities based on "victimization data" and "offender data." In fact, the MJS Report found that the greatest racial discrepancies in traffic stops occurred in Milwaukee Police Districts One and Six, which have predominantly white populations. *See* Ben Poston, "Racial Gaps Found in Traffic Stops in Milwaukee," Milwaukee Journal Sentinel, Dec. 4, 2011. In predominantly white District One, which encompasses downtown and the east side of Milwaukee, Black drivers were stopped 12.6 times as often as white drivers, and Hispanic drivers were stopped four times as often as white drivers. In addition, Black drivers were searched nearly five times as often as white drivers in District One.

Case 2:17-cv-00234-JPS   Filed 05/24/17   Page 45 of 91   Document 19

204. Over the last several years, the American Civil Liberties Union of Wisconsin and other local civil rights groups have received numerous letters, emails, phone calls, and social media posts from Black and Latino people complaining that they were subjected to stops, frisks, and searches that were legally unsupported and motivated by race and ethnicity. At town halls organized by civil rights groups, Black and Latino Milwaukee residents have expressed that they feel threatened, rather than protected, by the MPD. These feelings of fear and mistrust are the result, in part, of being unlawfully targeted for police stops and frisks—sometimes on multiple occasions.

205. In December 2015, following the killing of Dontre Hamilton, the U.S. Department of Justice's Community Oriented Policing Services ("COPS") Office commenced a Collaborative Reform Initiative for Technical Assistance of the Department to assess MPD policies and practices pertaining to community-oriented policing, use of force, deadly force, and accountability, among other things. At a January 2016 COPS town hall meeting, numerous Milwaukee residents, including Black and Latino people, expressed concern that MPD officers engage in suspicionless stops and racial and ethnic profiling.

### D. Elements of the MPD's Policy, Practice, and Custom of Conducting Police Stops and Frisks Without Reasonable Suspicion and/or Impermissibly Motivated by Race and Ethnicity

206. The MPD's high-volume, suspicionless stop-and-frisk program involves at least three component policies, practices, and customs of the Defendants that directly and proximately lead to violations of the Fourth and Fourteenth Amendments and Title VI.

#### 1. Pervasive Stops and Frisks in Expansive, So-Called "High-Crime" Areas

207. First, Defendants maintain a policy, practice, and custom of directing and encouraging MPD patrol officers to aggressively use traffic and pedestrian stops and frisks by conducting the aforementioned "saturation patrols" in so-called "high-crime areas."

208. These "high-crime areas" may include discrete locations designated by MPD as "hot spots" where crime has previously been reported. But, as noted above, the targeted areas expand far beyond the boundaries of any discrete crime "hot spots" to engulf large swaths of Milwaukee Police Districts Three, Five, and Seven, which are all located in the northern half of the City, in largely Black neighborhoods.

209. While purportedly motivated by a desire to disrupt and deter crime, there is no evidence that the MPD's high-volume, suspicionless stop-and-frisk

program achieves these goals or adequately responds to specific crime complaints by residents of targeted areas.

210.   Defendant Flynn addressed the Defendants' policy, practice, and custom of directing and encouraging MPD patrol officers to aggressively use traffic and pedestrian stops and frisks in designated areas in a 2011 video on Milwaukee Police Traffic Stops ("2011 Traffic Stops Video"). Videotape: Milwaukee Police Traffic Stops (Milwaukee Police Department, Nov. 21, 2011), https://www.youtube.com/watch?v=Hu8q8WONzFI. Defendant Flynn asserted: "We needed this department to be visible and we needed it to be active. We started to take more calls over the phone, and started to create more foot patrols, and more bicycle patrols and time for officers to do directed patrol missions, which means, that hot spot over there, I want you to stop cars and talk to people. I want you to disrupt the environment, because the cops are here now."

211.   The 2014 testimony of MPD officer Jacob Knight in a federal lawsuit challenging an MPD strip search demonstrates the Defendants' directive to MPD patrol officers to conduct large numbers of stops as part of saturation patrols targeted at so-called "high-crime" areas: "My take on what Compstat was . . . that they wanted dots on a map to show that police work was being done. Like say there's a violent—you know, say there's a shooting in a specific area. Compstat wanted dots on a map to say that crime is being taken care of. So they wanted

traffic stops and [field interview] stops in that area so they could say that something was being done about it." Deposition of Jacob Knight, *Bohannon v. City of Milwaukee*, No. 2:13-cv-01224-JPS (E.D. Wis., Aug. 11, 2014), ECF. No. 65-5. Officer Knight explained that "dots on a map" referred to field interviews. When asked whether these field interviews involved pat-downs or searches, the officer responded that "it would depend" but "yes, the more stops you make, the likelihood of conducting a pat down or search of some nature would increase, yes."

212. Compstat, which is short for "computer statistics," is the term applied to a combination of data-driven computer programs and management practices used by police departments to track crime statistics and craft corresponding policing strategies.

## 2. *Formal and Informal Stop Quotas*

213. Second, Defendants maintain a policy, practice, and custom of pressuring MPD patrol officers to conduct suspicionless stops and frisks by using productivity measures related to the number of stops and by sanctioning officers who fail to meet formal and informal stop quotas.

214. The number of stops conducted by each officer, squad, and unit are tracked and evaluated at weekly Compstat meetings where commanders and patrol officers are questioned about their statistics by supervisors, including Defendant Flynn.

215.   MPD officers have a strong incentive to stop Milwaukee residents for whom there is no objective and articulable reasonable suspicion of criminal activity because Compstat meetings and performance metrics make clear that officer productivity is measured in part by the number of stops conducted, rather than by ensuring that all stops and frisks are legally supported.

216.   According to a 2013 report of the U.S. Department of Justice's Bureau of Justice Assistance and the Police Executive Research Forum ("PERF Report"), MPD holds regular Compstat meetings that involve a comparison of "individual officer activity (including . . . traffic and subject stops) with district-wide and agency-wide activity. This information is available during the Compstat meetings and on the agency's intranet, where all officers can view it." According to the PERF Report, Defendant Flynn stated, "I want officers to know that the chief is seeing their name, whether they're doing well or need to improve their performance."

217.   Defendant Flynn and supervising MPD officers' emphasis on the number of stops sends patrol officers the clear message that the quantity of stops matters more than whether the encounters are supported by reasonable suspicion and are not motivated by race or ethnicity.

218.   Over the years, Defendants' policy, practice, and custom of pressuring MPD patrol officers to conduct increased stops has solidified into an implicit

and/or explicit quota system requiring a certain number of stops per month for each MPD officer. On information and belief, MPD officers who fail to meet the productivity standards face adverse employment consequences. In their effort to satisfy these productivity standards, MPD officers across the Department routinely conduct suspicionless stops and frisks, like the ones to which the named Plaintiffs were subjected.

219. On May 5, 2016, Milwaukee Police Association President Michael Crivello wrote a letter to Defendant FPC protesting the imposition of an "absolute quota" requiring MPD officers to conduct at least two traffic stops per day. Letter from Michael V. Crivello, President, Milwaukee Police Association to Fire and Police Commission, May 5, 2016, http://www.city.milwaukee.gov/ImageLibrary/Groups/cityFPC/agendas5/160728_III_D.pdf ("Crivello Letter"). Referring to the "quota like mandate" announced at MPD's March 2016 Compstat meeting, Crivello's letter stated, in pertinent part: "Police officers were clearly directed that the norm, *or average*, was two traffic stops per day. The requirement therefore moving forward, was that everyone would be required to produce two stops every day. For those that did not comply, they could expect progressive discipline up to and including termination. Ultimately, this places our officers in a very difficult situation; basically, stops must be made to preserve employment, rather than to facilitate public safety."

220. Crivello's letter also noted: "Roll Call guidance specifically directed those who were not meeting the requirement should stop vehicles on the way to assignments. The information relayed: that while on the way to a Priority 3 *or* 4 assignment, traffic stops would be acceptable/encouraged. This should raise great concern . . . assignments can easily be under prioritized relative to insufficient information; or more likely, the longer it takes the officer to arrive – the more likely the assignment will evolve to greater concern, *i.e.*, Priority 1 *or* 2 seriousness."

221. Crivello's letter protested that "it is simply wrong, inappropriate, and without value to mandate *quantity* of stops **over** *quality*."

222. In July 2016, the Milwaukee Journal Sentinel reported that at an FPC meeting earlier that month, Mr. Crivello "testified that he had spoken with a police officer who said he had been transferred to another office after failing to make a certain number of stops." Hannah Schwarz, "MPD Officials Say No Traffic Stop Quota Exists," Milwaukee Journal Sentinel, July 28, 2016. At the meeting, MPD Assistant Police Chief James Harpole admitted that MPD officers were being encouraged to increase the number of traffic stops and that the March 2016 meeting had "featured a video with a two stop per officer model." *Id.*

223. Despite being placed on notice about informal and/or formal stop quotas for MPD officers, upon information and belief, Defendants Flynn and FPC

have taken no corrective action to ensure that MPD officers conduct stops in compliance with the Fourth and Fourteenth Amendment and Title VI.

### 3. Targeting So-Called "Known Offenders" for Suspicionless Stops and Frisks

224.   Third, Defendants have a policy, practice, and custom of directing and encouraging MPD officers to repeatedly stop people with any past involvement in the criminal justice system, including a citation for a minor infraction, as a purported crime deterrence strategy. This policy, practice, and custom encourages MPD patrol officers to stop people simply because of alleged past conduct, leads directly to stops unsupported by reasonable suspicion of criminal activity, and encourages MPD officers to conduct frisks of those they have stopped, even absent individualized and objective reasonable suspicion that the person is armed and dangerous.

225.   Defendant Flynn has directed MPD officers to target so-called "known offenders" and "frequent fliers" for stops and frisks. He has made numerous statements encouraging officers to stop people with criminal histories, regardless of the specific circumstances in which police officers encounter them. His statements fail to acknowledge that stops must be supported by reasonable suspicion of criminal activity, and send the message that reasonable suspicion is not required.

226.   For instance, in the 2011 Traffic Stops Video, Chief Flynn stated: "If we know 10% of our offenders are responsible for 50% of the crime . . . we've got to target those guys. We've got to drive around looking for people. And if we see them, we have to encounter them and engage them. Most of the time, they are not carrying anything bad. But once we get inside their head, we're hoping we're gonna affect their behavior."  Videotape: Milwaukee Police Traffic Stops (Milwaukee Police Department, Nov. 21, 2011), https://www.youtube.com/watch?v=Hu8q8WONzFI.

227.   In the 2011 Traffic Stops Video, Defendant Flynn encouraged MPD officers to "develop the social antenna to know who's who." He further explained: "Twenty-four people well-known to us have been stopped 293 times. Now why do you think we are doing that? Because we know the guy! Ok, we know the guy is a bad guy. If I know a guy's been arrested several times for drugs or burglary and I see him driving slow around the neighborhood, what do you want us to do?"

228.   The Defendants' policy, practice, and custom of targeting people with a past citation or other criminal history also leads to disproportionate stops and frisks of Black and Latino people because these groups are more likely to have past involvement with the criminal justice system, due, in no small part, to saturation policing of their neighborhoods and consequent citations for low-level offenses. These citations are themselves frequently the result of the City's policy, practice,

and custom of targeting of Black and Latino people for stops and frisks that are not supported by reasonable suspicion.

**E. Evidence of Stops and Frisks That Lack Reasonable Suspicion**

229.  MPD public record disclosures indicate that the MPD's high-volume, suspicionless stop-and-frisk program has led to routine and pervasive MPD stops and frisks that are unsupported by reasonable suspicion.

230.  On April 14, 2014, the American Civil Liberties Union of Wisconsin Foundation and the American Civil Liberties Union Foundation (collectively, "ACLU") submitted a request under the Wisconsin public records law, Wisconsin Statute § 19.31-39, to Defendant Milwaukee and the MPD for MPD policies, guidelines, training documents, and specific data on all stops and frisks conducted by MPD between January 1, 2008 and the date of the request ("Records Request").

231.  On November 7, 2014, in response to the Records Request, the MPD provided data from the MPD's Tiburon Records Management System (hereinafter "Tiburon disclosure").  The Tiburon disclosure includes data on traffic and pedestrian stops conducted between January 1, 2010 and December 31, 2012, which were recorded in the Tiburon Records Management System ("Tiburon Data").  Putting aside small numbers of records with missing data, Tiburon Data provides the following information for each recorded stop: the stop location; a

designated "Reason Code," which provides information concerning the basis for the stop; and the race, age, and gender of the person stopped.

232. As part of a preliminary analysis of the Tiburon Data, 34,920 stops documented in the data were successfully matched to a specific location in Milwaukee and geocoded, yielding a scientifically acceptable geocoding hit rate ("Tiburon Geocoded Stops").

233. The Tiburon disclosure strongly suggests that MPD officers routinely lack the reasonable suspicion required to conduct a stop.

234. At least 42% of the 34,920 Tiburon Geocoded Stops lack any identified reason that could plausibly show that an MPD officer had individualized, objective, and articulable reasonable suspicion of criminal activity to justify the stop. Specifically, 14,759 of the stops are marked with the Reason Code "Other," "Null," "Suspicious Circumstances," "Suspicious Person," or "Suspicious Vehicle." None of these "reasons," without more information, amount to individualized, objective, and articulable reasonable suspicion of criminal activity that would justify stopping the person in question. Neither the Tiburon disclosure nor any other information disclosed by MPD in response to the Records Request contains any additional facts about the circumstances of these 14,759 Tiburon Geocoded Stops that would demonstrate that the officer had reasonable suspicion of any criminal activity prior to making the stop.

235.   On information and belief, no other documentation exists to demonstrate that there was reasonable suspicion for each of the 14,759 Tiburon Geocoded Stops associated with the ambiguous reasons listed above, which were conducted between 2010 and 2012.

236.   On December 5, 2014, in response to the Records Request, the MPD disclosed data on traffic and pedestrian stops from the MPD's Traffic and Criminal Software module ("TraCS disclosure"). The TraCS disclosure includes data on stops conducted between January 1, 2011 and December 31, 2013, which were recorded in TraCS ("TraCS Data").  Putting aside small numbers of records with missing data, the TraCS Data provides the following information for each recorded stop: the stop location; broad information concerning the basis for the stop; additional information concerning the basis for the stop; and the race, age, and gender of the person stopped.

237.   As part of a preliminary analysis, TraCS Data on 507,006 stops were successfully matched to a specific location in Milwaukee and geocoded, yielding a scientifically acceptable geocoding hit rate ("TraCS Geocoded Stops").

238.   The TraCS disclosure strongly suggests that MPD officers often lack the reasonable suspicion required to conduct lawful stops.

239.   At least 41,117 records, or 8.1% of the TraCS Geocoded Traffic Stops, lack any information that would plausibly demonstrate that an MPD officer

had individualized, objective, and articulable reasonable suspicion of any criminal activity prior to making the stop. Of the 507,006 TraCS Geocoded Stops, some 16,049 stop records were marked only with the term "FIELD INTERVIEW STOP" as the Reason Code and had no additional details in either of the two "reason" fields where officers could have recorded additional information about the basis of the stop. Similarly, of the 507,006 TraCS Geocoded Stops, some 25,068 stop records were marked only with the term "TRAFFIC STOP" as the Reason Code for the stop, and had no additional details in either of the two "reason" fields where officers could have recorded additional information about the basis of the stop. Neither the TraCS disclosure nor any other information disclosed by MPD in response to the Records Request contains any additional facts about the circumstances of these 41,117 TraCS Geocoded Stops that would demonstrate that the officer had reasonable suspicion of any criminal activity prior to making the stop.

240.   On information and belief, no other documentation exists to demonstrate that MPD officers had individualized, objective, and articulable reasonable suspicion to conduct the 41,117 TraCS Geocoded Stops conducted between 2011 and 2013, as discussed above.

241.   In 2015 and 2016, the ACLU submitted requests to the MPD under the Wisconsin public records law, Wisconsin Statute § 19.31–39, for all MPD

documents concerning each of the Plaintiffs. The MPD did not disclose any records setting forth the reason why any of the Plaintiffs were subjected to the stops or frisks described in this Complaint.

242. Additionally, as a matter of practice and custom, MPD officers routinely and systematically fail to document frisks and the basis for frisks in a manner that would permit supervisors to identify frisks that are unsupported by reasonable suspicion that a person is armed and dangerous and/or are motivated by race or ethnicity. Neither the Tiburon Data nor the TraCS Data indicate whether any of the pedestrian and traffic stops documented in these databases involved a frisk or a search, much less the basis of any frisk or search.

243. The Records Request sought information on all MPD frisks conducted between January 1, 2008 and April 14, 2014, including the total number of frisks and the reason for which each frisk was conducted. The MPD failed to disclose any information concerning frisks and stated that "the Milwaukee Police Department does not keep statistical data on 'frisks.'" August 1, 2014 Letter from Vickie Gagliano, MPD, to Nusrat Choudhury, American Civil Liberties Union, at 3.

## F. Evidence of Stops and Frisks Motivated by Race and Ethnicity

244. Data on MPD stops and analysis of that data provide further evidence that the MPD's high-volume, suspicionless stop-and-frisk program has resulted in

stops and frisks that have a discriminatory impact on Black and Latino people and are motivated by race or ethnicity.

245.  The 2011 MJS Report addressed four months of 2011 traffic stop data demonstrating that, compared to white drivers, Black drivers were seven times more likely and Hispanic drivers were five times more likely to be subjected to traffic stops throughout Milwaukee. It also concluded, "Wider disparities emerge when the stop rates are compared to Milwaukee's driving population, based on the number of licensed drivers by race and ethnicity."

246.  Census estimates for the period 2010–2014 suggest that Black non-Hispanic residents made up 34.3% of Milwaukee's total population at that time.

247.  Preliminary analysis of Tiburon Geocoded Pedestrian Stops from January 1, 2010 to December 31, 2012, reveals that Black non-Hispanic people represented 72% of those stopped even though they made up an estimated 34% of the City's total population at the time, according to U.S. Census figures.

248.  Preliminary analysis of TraCS Geocoded Stops from January 1, 2011 to December 31, 2013, reveals that Black non-Hispanic people represented 62.7% of those subjected to traffic and pedestrian stops, even though they made up an estimated 34% of the City's total population at the time, according to U.S. Census figures.

249. Locating (geocoding) individual records from Tiburon Data and TraCS Data permitted connecting data on MPD stops to information about the community in which the stop took place, and the calculation of MPD stop rates for Black non-Hispanic people and white non-Hispanic people. It also permitted an estimation of the net impact of race on MPD stop rates because this preliminary analysis controlled for the following factors: community socioeconomic status, community residential stability, community racial and ethnic composition, the surrounding level of police stop activity in nearby communities, and district level violent crime rates for the previous calendar year.

250. Preliminary analysis of the Tiburon Geocoded Stops found that from 2010 to 2012, in many areas of the city, the predicted MPD stop rate for Black non-Hispanic people was well over twice as high as the predicted MPD stop rate for white non-Hispanic people. This difference reflects the net impact of race because the analysis controlled for the various community and policing factors, as described above. This racial disparity in stop rates was sizable and statistically significant at the 99.9% confidence level, which means that such a disparity could have occurred just because of chance alone fewer than one time in a thousand.

251. Preliminary analysis of the TraCS Gecoded Stops conducted from 2011 to 2013 found that the predicted MPD stop rate for Black non-Hispanic people was well over twice as high as the predicted stop rate for non-Hispanic

white civilians. This difference reflects the net impact of race because the analysis controlled for the various community and policing factors, as described above. This racial disparity in stop rates was sizable and statistically significant at the 99.9% confidence level, which means that such a disparity would be expected to have occurred just because of chance alone fewer than one time in a thousand.

252.    Preliminary analysis of the TraCS Geocoded Stops conducted from 2011 to 2013 also found that a Black non-Hispanic person who is subjected to a stop faces significantly higher odds of being searched versus not searched, compared to the odds that a stopped, white non-Hispanic person will be searched versus not searched.  This difference reflects the net impact of race because the analysis controlled for the various community and policing factors, as described above. This racial disparity in stop rates was sizable and statistically significant at the 99.9% confidence level, which means that such a disparity could have occurred just because of chance alone fewer than one time in a thousand.

## G. Defendants' Knowledge of Widespread Rights Violations

253.    At the time that Plaintiffs were unlawfully stopped or stopped and frisked by MPD officers, Defendants were on notice that MPD officers were engaging in unlawful stops and frisks.

254. Defendant Flynn is tasked with overseeing the day-to-day operations of the MPD and is the final decision-maker with respect to the development and implementation of MPD law enforcement tactics and strategies.

255. Defendant Flynn's public statements, the 2011 MJS Report, the Crivello Letter, and the order of the U.S. District Court for the Eastern District of Wisconsin in *Hardy v. City of Milwaukee*, 88 F.Supp.3d 852 (E.D. Wis., Feb. 27, 2015), among other things, demonstrate Defendant Flynn's longstanding awareness that unlawful MPD stops and frisks have been commonplace.

256. As discussed above, Defendant Flynn nevertheless continues to implement and enforce the MPD's high-volume, suspicionless stop-and-frisk program even though he is aware, or should be aware, that the program results in the routine and pervasive violation of the constitutional and statutory rights of Milwaukee residents.

257. Defendant FPC is required by law to "[c]onduct a policy review of all aspects of the operations of the police and fire departments," and to "[u]se oversight authority to identify systemic problems within the police and fire departments, identify opportunities for improvement through organizational change, and delegate authority for follow-up to the respective chief." Milwaukee City Charter Ordinance § 314-3-1, 4. Defendant FPC is responsible for

investigating citizen complaints concerning the MPD and disciplining MPD employees for misconduct, among other things.

258. Broadly speaking, the FPC's oversight of the MPD is to be informed by, among other things, regular meetings with Defendant Flynn and his staff, research and analysis of relevant policies and procedures, and input from the general public.

259. As such, Defendant FPC is intimately familiar with MPD law enforcement strategies and complaints lodged by members of the public regarding the nature and impact of MPD's law enforcement activities, including stop-and-frisk practices.

260. Indeed, the Executive Director of Defendant FPC is required by law to "[e]valuate police and fire department policies, practices, and patterns, including but not limited to deployment of staff . . . search, seizure, [and] citizen interaction and communication." Milwaukee City Charter Ordinance § 314-5.

261. Defendant FPC is aware of, and has effectively ratified and sanctioned, the MPD's high-volume, suspicionless stop-and-frisk program, despite the fact that it knew or should have known—based in part on Defendant Flynn's public statements, the 2011 MJS Report, the Crivello Letter, and the *Hardy* order, among other things—that this strategy resulted in the pervasive and routine violation of the constitutional and statutory rights of Milwaukee residents.

**H. The Defendants Fail to Properly Train and Supervise MPD Officers**

262.    Defendants FPC and Flynn, as final policymakers for Defendant Milwaukee, fail to properly train and supervise MPD officers, knowing that such failures will result in violations of the Fourth and Fourteenth Amendments and Title VI.

263.    Defendant Flynn's responsibilities include the development and implementation of MPD rules and guidelines, and the identification of areas in which MPD officers should be trained and/or retrained.

264.    Because of its oversight responsibilities, Defendant FPC is intimately familiar with MPD training and supervision policies, including those that pertain to stop-and-frisk practices.

265.    As discussed above, Defendant FPC's responsibilities include identifying systemic problems with MPD practices that require policy reform and training, including through independent investigation and the monitoring of citizen complaints. In its oversight role, Defendant FPC is obligated to ensure that Defendant Flynn properly trains and/or retrains MPD staff to ensure that stops and frisks that are conducted are constitutional and comply with Title VI.

266.    Defendants Flynn and FPC have failed, and continue to fail, to properly train and supervise MPD officers, including supervisors, concerning the

legal and factual bases for conducting stops and frisks that comply with the Fourth and Fourteenth Amendments and Title VI.

267. Defendants Flynn and FPC have also failed, and continue to fail, to properly train and supervise MPD officers, including supervisors, concerning adequate documentation of the bases for stops and frisks in a manner that permits supervisors to ensure that stops are supported by reasonable suspicion of criminal activity, that frisks are supported by reasonable suspicion that a person is armed and dangerous, and that neither stops nor frisks are motivated by race or ethnicity.

268. The MPD's response to the Records Request provides evidence of Defendants Flynn and FPC's failure to train.

269. The Records Request sought "[a]ll records, including training materials, manuals, protocols, procedures, regulations, and guidelines, created since January 1, 2008, setting forth the MPD's policies concerning: a. the stop, frisk, search and arrest of pedestrians. . . ." In response, the MPD disclosed MPD Standard Operating Procedure 710 on Field Interview/Traffic Warning Cards ("SOP 710"), and MPD Standard Operating Procedure 085 ("SOP 085") on Citizen Contacts, Field Interviews, and Search and Seizure.

270. From the year 2000 through June 1, 2013, SOP 710 required MPD officers to document field interviews and minor traffic violations that did not lead to arrest on a Field Interview/Traffic Warning Card, but did not require officers to

document individualized, objective, and articulable reasonable suspicion of criminal activity supporting a stop on the Card or explain that such documentation would permit supervisory review for compliance with constitutional requirements.

271.    SOP 085 has been in force since June 2, 2013, and has been revised twice. SOP 085 has required, and continues to require, that MPD officers document information about field interviews that do not result in a citation or arrest in the Tiburon Field Interview Module. But SOP 085 has not instructed, and continues to fail to instruct, that officers who conduct stops should document sufficient information to demonstrate that the stop was supported by individualized, objective, and articulable reasonable suspicion of criminal activity so as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI.

272.    Moreover, Defendants have failed to promulgate any MPD policy, procedure, or guideline requiring officers who conduct frisks to document the bases of these encounters, so as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI. Neither SOP 710 nor SOP 085, in any of their past or current iterations, has instructed officers to document frisks or the basis for frisks. Form PF-4, which SOP 085 requires officers to complete to document field interviews that do not result in citation or arrest, does

not elicit information about whether a field interview included a frisk or the basis of any such frisk.

273.  Defendants' inadequate training and supervision of MPD officers who conduct stops and frisks and their supervisors is a direct and proximate cause of the MPD's rampant unconstitutional stops and frisks.

274.  As a direct and proximate result of Defendant FPC and Defendant Flynn's leadership and failure to train and supervise MPD officers, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race or ethnicity.

275.  By failing to properly train and supervise MPD officers, the Defendants have acted recklessly and with deliberate indifference to the constitutional rights of those who would come into contact with MPD.

## I.  The Defendants Have a Policy, Practice, and Custom of Failing to Monitor and Discipline MPD Officers

276.  The MPD's widespread abuses are also a direct and proximate result of Defendants' failure to properly and adequately monitor, discipline, and take necessary corrective action against MPD officers who engage in, encourage, or conceal unconstitutional practices. Among other things, Defendants Flynn and FPC, as final policymakers for Defendant Milwaukee, knowingly, deliberately, and recklessly have failed to:

a. take appropriate disciplinary action and corrective measures against MPD officers who have engaged in suspicionless stops and frisks;

b. take appropriate disciplinary action and corrective measures against officers who have engaged in stops or frisks that are motivated by race or ethnicity;

c. monitor adequately MPD officers who have incurred a substantial number of civilian complaints, even in instances where the number of complaints should have triggered monitoring under established departmental guidelines;

d. conduct adequate auditing to determine whether the stops and frisks conducted by MPD officers comply with any written policies prohibiting stops and frisks that are not based upon reasonable suspicion and that use race or ethnicity as a motivating factor in initiating police action;

e. take sufficient, if any, steps to curb MPD officers' non-compliance with departmental directives requiring PF-4 forms to be completed for each field interview that does not lead to a citation or arrest, and subsequent entry of data on PF-4 forms into the Tiburon Field Interview Module;

f. take sufficient, if any, steps to curb MPD officers' non-compliance with departmental directives requiring TraCS traffic stop data collection forms to be completed for each traffic stop, and subsequent entry of data on such forms into the Traffic and Criminal Software Module;

g. take sufficient corrective and remedial action against MPD officers who provide fabricated, false, or impermissible justifications for stops and frisks;

h. take sufficient corrective, disciplinary, and remedial action against command staff and supervising officers involved in the institution of a formal or informal numerical quota for stops and/or frisks; and

i. take sufficient corrective, disciplinary and remedial action against MPD officers who conceal or fail to report police misconduct.

277. Defendants have failed to properly and adequately monitor, discipline and take necessary corrective action against MPD officers as described above, knowing that such omissions would lead to Fourth Amendment, Fourteenth Amendment, and Title VI violations.

278. Defendants' inadequate monitoring of MPD officers who conduct stops and frisks and their supervisors, and failure to discipline those who engage in unconstitutional conduct is a direct and proximate cause of the MPD's rampant unconstitutional stops and frisks.

279. As a direct and proximate result of Defendant FPC and Defendant Flynn's leadership and inadequate monitoring and discipline of MPD officers and supervisors, tens of thousands of people have been subjected to unlawful stops and frisks, many times simply because of their race or ethnicity.

280. By such acts and omissions, they have acted recklessly and with deliberate indifference to the constitutional and statutory rights of those who would come into contact with the MPD.

## CLASS ACTION ALLEGATIONS

### Main Class

281. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent a Main Class consisting of all

persons who, since January 7, 2008, have been or will be stopped and/or stopped and frisked by MPD officers.

282.   The Main Class is sufficiently numerous such that joinder of all members is impracticable. Each year, MPD officers stop around 200,000 people in Milwaukee, thousands of whom are subjected to these encounters absent reasonable suspicion of criminal conduct.

283.   In addition, joinder is impracticable because, upon information and belief, many members of the Main Class are not aware that their rights under the U.S. Constitution and Title VI have been violated and that they have the right to seek redress in court. Many members of the Main Class are without the means to retain an attorney to represent them in a civil rights lawsuit. Moreover, many Main Class members who have been victimized by the MPD's unconstitutional policies, practices, and customs do not bring individual claims for fear of retaliation and reprisals by MPD officers. There is no appropriate avenue for the protection of the Main Class members' constitutional rights other than a class action.

284.   The Main Class members share a number of common questions of law and fact, including, but not limited to:

    a.  whether the Defendants maintain a policy, practice, and/or custom of targeting expansive geographic areas for large numbers of stops and frisks;

b. whether the Defendants maintain a policy, practice, and/or custom of measuring officer productivity according to informal or formal stop quotas and sanctioning officers who fail to meet those quotas;

c. whether the Defendants maintain a policy, practice, and/or custom of authorizing MPD officers to target people with criminal histories for repeated stops without regard for individualized, objective, and articulable reasonable suspicion of criminal conduct as required by the Fourth Amendment;

d. whether the Defendants maintain a policy, practice, and/or custom of authorizing and encouraging stops that are unsupported by individualized, objective, and articulable reasonable suspicion of criminal conduct as required by the Fourth Amendment;

e. whether the Defendants maintain a policy, practice, and/or custom of conducting frisks in the absence of objective and reasonable, articulable suspicion to believe that the person is armed and dangerous, as required under the Fourth Amendment;

f. whether Defendants have failed to properly train, supervise, monitor, and/or discipline MPD officers, and whether those failures have caused MPD officers to violate the Fourth Amendment rights of the Main Class members; and

g. whether Defendants have encouraged, sanctioned, acquiesced to, and/or failed to rectify unconstitutional stops and/or stops and frisks by MPD officers of which they were aware or should have been aware, and whether such acts and/or omissions have caused MPD officers to violate the Fourth Amendment rights of Main Class members.

285. The named Plaintiffs' claims are typical of the claims of the Main Class. Like the other members of the Main Class, each of the named Plaintiffs has been and likely will again be stopped and/or stopped and frisked by MPD officers.

286. The named Plaintiffs seek declaratory and injunctive relief under legal theories that are the same or similar to those on which all members of the Main Class will rely. The named Plaintiffs suffered harms that are typical of the harms suffered by the Main Class members.

287. The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Main Class, and will fairly and adequately protect the interests of the Main Class. All named Main Class members reside in Milwaukee or visit it frequently. So long as the Defendants' high-volume, suspicionless stop-and-frisk program continues, the named Plaintiffs remain at risk of being illegally stopped and/or stopped and frisked by MPD officers. Indeed, at least two of the named Plaintiffs have been stopped repeatedly by MPD officers. None of the named Plaintiffs is seeking compensatory or punitive damages.

288. By developing and maintaining a policy, practice, and custom of high-volume, suspicionless stops and frisks, the Defendants have acted or refused to act on grounds that apply generally to the Main Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

289.   Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs also seek to represent a Subclass consisting of Black and Latino members of the Main Class.

290.   This Subclass is sufficiently numerous such that joinder of all members is impracticable. A majority of those stopped and/or frisked in Milwaukee are Black or Latino. Annually, MPD officers stop more than 100,000 Black and Latino people in Milwaukee; upon information and belief, thousands of these encounters are impermissibly motivated by race and/or ethnicity.

291.   Members of the Subclass share a number of common questions of law and fact, including, but not limited to:

   a. whether the Defendants have a policy, practice, or custom of targeting predominantly Black and Latino neighborhoods for MPD saturation patrols;

   b. whether the Defendants maintain a policy, practice, and custom of targeting Black and Latino people for stops and frisks based on race and ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI;

   c. whether Defendants' policy, practice, and/or custom of conducting stops and frisks has an adverse effect on Black and Latino people and is motivated by race and ethnicity in violation of the Equal Protection Clause of the Fourteenth Amendment and Title VI;

   d. whether the Defendants have failed to properly train, supervise, monitor, and/or discipline MPD officers, and whether those failures have caused MPD officers to violate the constitutional and statutory rights of Subclass members; and,

e. whether the Defendants have encouraged, sanctioned, and/or failed to rectify unconstitutional stops and/or stops and frisks by MPD officers, and whether such acts and/or omissions have caused MPD officers to violate the constitutional and statutory rights of Subclass members.

292.   The claims of the named Plaintiffs, all of whom are Black or Latino people who were stopped by MPD officers on at least one occasion, are typical of the claims of the Subclass.

293.   The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Subclass, and will fairly and adequately protect the interests of the Subclass.

294.   By developing and maintaining a policy, practice, and/or custom of conducting stops and frisks that encourages, or otherwise causes, stops and frisks that are motivated by race and ethnicity, Defendants have acted or refused to act on grounds that apply generally to the Subclass, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Subclass as a whole.

295.   The named Plaintiffs are represented by the American Civil Liberties Union Foundation; the American Civil Liberties Union of Wisconsin Foundation; and Covington & Burling LLP. All counsel are experienced civil rights attorneys who have litigated a range of class action lawsuits, including matters involving systemic constitutional violations by law enforcement officials. Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action. Counsel for

the Plaintiffs know of no conflicts among members of the class or between the attorneys and members of the class.

296. The Plaintiff Main Class and Subclass should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the Main Class and Subclass, making class-wide declaratory and injunctive relief appropriate.

## LEGAL CLAIMS

### Claim 1

VIOLATION OF THE FOURTH AMENDMENT PROTECTION AGAINST
UNREASONABLE SEARCHES AND SEIZURES BY THE GOVERNMENT
Pursuant to 42 U.S.C. § 1983

297. Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

298. This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Main Class.

299. The Fourth Amendment of the United States Constitution protects the people from unreasonable searches and seizures by the government. As such, it prohibits police from subjecting a person to a stop in the absence of individualized, objective, and articulable reasonable suspicion of criminal activity. The Fourth Amendment also prohibits police from subjecting a person to a frisk in the absence

76

of individualized, objective and articulable reasonable suspicion to believe that the person is armed and dangerous.

300. The Defendants developed, implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of subjecting members of the Main Class to police stops without individualized, objective, and articulable reasonable suspicion of criminal activity, and frisking members of the Main Class without individualized, objective, and articulable reasonable suspicion that the person is armed and dangerous, as required by the Fourth Amendment.

301. Each of the named Plaintiffs suffered a violation of his or her clearly established right to be free from suspicionless police stops when stopped as a pedestrian or driver by at least one MPD officer while engaged in routine, lawful activities, and under circumstances that did not give rise to individualized, objective, and articulable reasonable suspicion of criminal activity. As a result, each Plaintiff was detained by an MPD officer, questioned, and made to suffer the humiliation and indignity of being wrongfully branded a criminal suspect on at least one occasion. D.A., Mr. Chambers, and Mr. Olivar were subjected to multiple unlawful MPD stops.

302. D.A., Ms. Silvestre, Mr. Crowley, and Mr. Olivar suffered the additional violation of their clearly established right to be free from suspicionless police frisks when at least one MPD officer frisked and/or searched them under

circumstances that did not give rise to individualized, objective, and articulable reasonable suspicion that they were armed or dangerous.

303.   The Defendants' policies, practices, and customs directly and proximately caused, and continue to cause, the violation of Plaintiffs' right to be free from unreasonable searches and seizures.

304.   As a result of the Defendants' policies, practices, and customs, all named Plaintiffs suffered harm, including humiliation, pain, physical injuries, emotional distress, loss of liberty, and/or violations of their constitutional and statutory rights.

305.   Defendants' conduct continues to violate the Fourth Amendment rights of individuals in Milwaukee on a daily basis, and is the proximate cause of widespread harm among members of the Main Class.

306.   These constitutional abuses were, and are, directly and proximately caused by policies, practices, and customs devised, implemented, enforced, encouraged, and sanctioned by the Defendants, including: (a) the saturation of expansive, so-called "high-crime" areas with suspicionless stops and frisks; (b) the adoption of informal and/or formal stop quotas for MPD officers; (c) the targeting of so-called "known offenders" for suspicionless stops; (d) the failure to properly train and supervise MPD officers, including supervisors; (e) the failure to properly and adequately monitor MPD officers; and (f) the overt and tacit encouragement

and sanctioning of, and failure to rectify, the MPD's high-volume, suspicionless stop-and-frisk program. The Defendants knew, or should have known, of the MPD's longstanding policy, practice, and custom of conducting suspicionless stops and frisks. Defendants' actions and inactions were deliberately indifferent to the clearly established constitutional rights of the Plaintiffs and members of the Main Class.

307. The Defendants have acquiesced to the well-settled, longstanding, and widespread suspicionless stops and frisks that have resulted and continue to result from the MPD's high-volume, suspicionless stop-and-frisk program. The MPD's practice of conducting suspicionless stops and frisks has therefore become policy, practice, and custom with the force of law, and reflects deliberate indifference on the part of the Defendants to the Fourth Amendment rights of the Plaintiffs and members of the Main Class.

308. All Plaintiffs reside in, and/or frequently travel to, the neighborhoods where they have been previously stopped or stopped and frisked, as described above, as well as neighborhoods that are routinely targeted for large numbers of MPD suspicionless stops, including Milwaukee Police Districts Three, Five, and Seven. In addition, D.A., Mr. Chambers, and Mr. Olivar have each been subjected to multiple unlawful MPD stops. As a result, Plaintiffs face not only a reasonable

likelihood, but a substantial threat, that they will again be subjected to unlawful stops and frisks by MPD officers in violation of the Fourth Amendment.

309.   The Defendants' policies, practices, customs, acts, and omissions place Plaintiffs at continuing and foreseeable risk of being subjected to suspicionless stops and frisks, and of experiencing the stigmatization and humiliation of being treated like criminal suspects. Plaintiffs, on behalf of themselves and the Main Class, seek prospective declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by being subjected to suspicionless stops and frisks in violation of their Fourth Amendment rights.

310.   Defendants act under color of state law when their actions, policies, practices, customs, and omissions create a real, imminent, and substantial threat that Plaintiffs will again be stopped and frisked in violation of their Fourth Amendment rights, and their acts and omissions can be fairly attributed to the City.

## Claim 2

### VIOLATION OF THE FOURTEENTH AMENDMENT
### EQUAL PROTECTION CLAUSE
Pursuant to 42 U.S.C. § 1983

311.   Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

312.   This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Subclass.

313.   The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that all people be treated equally under the law without regard for, among other things, their race or ethnicity. The Equal Protection Clause prohibits intentional discrimination on the basis of race or ethnicity. As such, it prohibits law enforcement officers from conducting racial and ethnic profiling in stop-and-frisk practices.  It also prohibits police from conducting stops and frisks in a manner that has a discriminatory effect on a racial or ethnic group, and that is motivated by a discriminatory purpose.

314.   The Defendants developed, implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of MPD stops and frisks of members of the Subclass that results in significant racial and ethnic disparities and that is motivated by race and ethnicity, rather than the reasonable suspicion required by the Fourth Amendment. Defendants' policy, practice and custom of high-volume, suspicionless stops and frisks involves racial and ethnic profiling.

315.   Each of the named Plaintiffs is Black or Latino, and suffered a violation of his or her clearly established right to equal protection of the law when he or she was subjected to a police stop, or stop and frisk, motivated by race and/or ethnicity, rather than the reasonable suspicion required by the Fourth Amendment.

As a result, each Plaintiff was detained by an MPD officer, questioned, and made to suffer the humiliation and indignity of being wrongfully branded a criminal suspect.

316. Defendants' policies, practices, and customs directly and proximately caused, and continue to cause, the violation of Plaintiffs' rights to equal protection under the law.

317. As a result of the policies, practices, customs, and conduct of the Defendants, all named Plaintiffs suffered harm, including humiliation, pain, physical injuries, and/or emotional distress, loss of liberty, and/or violations of their constitutional and statutory rights. Defendants' conduct continues to violate the Fourteenth Amendment rights of Black and Latino people in Milwaukee on a daily basis and is the proximate cause of widespread harm among members of the Subclass.

318. These constitutional abuses were, and are, directly and proximately caused by policies, practices, and customs devised, implemented, enforced, encouraged, and sanctioned by the Defendants, including: (a) the saturation of expansive, so-called "high-crime" areas with suspicionless stops and frisks; (b) the adoption of informal and/or formal stop quotas for MPD officers; (c) the targeting of so-called "known offenders" for suspicionless stops; (d) the failure to properly train MPD officers, including supervisors; (e) the failure to properly and

Case 2:17-cv-00234-JPS   Filed 05/24/17   Page 82 of 91   Document 19

adequately monitor MPD officers; and (f) the overt and tacit encouragement and sanctioning of, and failure to rectify, the MPD's high-volume, suspicionless stop-and-frisk program despite its adverse impact on Black and Latino people. The Defendants knew, or should have known, of the City's longstanding policy, practice, pattern, and custom of conducting suspicionless stops and frisks that are motivated by race or ethnicity. Their actions and inactions were deliberately indifferent to the clearly established constitutional rights of Plaintiffs.

319.    The Defendants have acquiesced to the well-settled, longstanding, and widespread stops and frisks that are motivated by race or ethnicity, which have resulted and continue to result from the MPD's high-volume, suspicionless stop-and-frisk program. The MPD's practice of conducting suspicionless stops and frisks that are motivated by race and ethnicity has therefore become policy, practice, and custom with the force of law, and reflects deliberate indifference to the rights of the Plaintiffs and members of the Subclass under the Fourteenth Amendment.

320.    All Plaintiffs are Black or Latino and reside in, and/or frequently travel to, the neighborhoods where they have been previously stopped, or stopped and frisked, as described above, as well as neighborhoods that are routinely targeted for large numbers of MPD suspicionless stops, including Milwaukee Police Districts Three, Five, and Seven. In addition, D.A., Mr. Chambers, and Mr.

Olivar have each been subjected to multiple unlawful MPD stops. As a result,

Plaintiffs face not only a reasonable likelihood, but a substantial threat, that they

will again be subjected to unlawful stops and frisks by MPD officers, in violation

of the Fourteenth Amendment.

321.   The Defendants' policies, practices, customs, acts, and omissions

place Plaintiffs at continuing and foreseeable risk of being subjected to stops and

frisks that are motivated by race or ethnicity, and of experiencing the

stigmatization and humiliation of being treated like criminal suspects. Plaintiffs, on

behalf of themselves and the Subclass, seek prospective declaratory and injunctive

relief because they have no adequate remedy at law to prevent future injury caused

by being subjected to stops and frisks that are motivated by race and ethnicity in

violation of their Fourteenth Amendment rights.

322.   The Defendants act under color of state law when their actions,

policies, practices, customs, and omissions create a real, imminent, and substantial

threat that the Plaintiffs will again be stopped and frisked in violation of their

Fourteenth Amendment rights, and their acts and omissions can be fairly attributed

to the City.

## Claim 3

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT
Pursuant to 42 U.S.C. § 2000d *et. seq*.

323.    Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

324.    This claim is brought by the named Plaintiffs on behalf of themselves and the members of the proposed Subclass.

325.    Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance, including law enforcement programs and activities. Title VI prohibits intentional discrimination on the basis of race or ethnicity. As such, it prohibits law enforcement officers from conducting racial and ethnic profiling in stop-and-frisk practices. It also prohibits police from conducting stops and frisks in a manner that has a discriminatory effect on a racial or ethnic group, and that is motivated by a discriminatory purpose.

326.    The Defendants are recipients of substantial amounts of federal financial assistance, including financial assistance for law enforcement activities.

327.    The Defendants developed, implemented, enforced, encouraged, and sanctioned a policy, practice, and custom of MPD stops and frisks of members of the Subclass that results in significant disparate impact on Black and Latino people

and that is motivated by race and ethnicity, rather than the reasonable suspicion required by the Fourth Amendment. Defendants' policy, practice and custom of high-volume, suspicionless stops and frisks involves racial and ethnic profiling.

328.   As a direct and proximate result of the above-mentioned policies, practices, customs, and acts, the named Plaintiffs and members of the Subclass have suffered injuries and have been deprived of their rights under Title VI of the Civil Rights Act. Without appropriate injunctive relief, these violations will continue to occur.

## RELIEF REQUESTED

Wherefore, the named Plaintiffs and other members of the Main Class and Subclass they seek to represent respectfully request that:

A. The Court assume jurisdiction over this action;

B. The Court issue an Order certifying this case as a class action pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, with the named Plaintiffs as representatives of the Main Class and Subclass;

C. The Court issue a class-wide judgment declaring that the Defendants' policy, practice, and custom of conducting suspicionless police stops and frisks, as challenged in this Complaint, violates the rights of the Main Class under the Fourth Amendment to the U.S. Constitution;

D. The Court issue a class-wide judgment declaring that the Defendants' policy, practice, and custom of conducting stops and frisks that are motivated by race or ethnicity, as challenged in this Complaint, violates the rights of the Subclass under the Fourteenth Amendment to the U.S. Constitution and Title VI of the Civil Rights Act;

E. The Court issue an Order for the following injunctive relief:

    a. Enjoining the Defendants Milwaukee, FPC, and Flynn from continuing the policy, practice, and custom of conducting police stops without reasonable suspicion of criminal activity;

    b. Enjoining the Defendants Milwaukee, FPC, and Flynn from continuing the policy, practice, and custom of conducting police frisks without reasonable suspicion that the subject of the frisk is armed and dangerous;

    c. Enjoining the Defendants Milwaukee, FPC, and Flynn from continuing the policy, practice, and custom of conducting stops and frisks that are motivated by race or ethnicity;

    d. Enjoining the use of formal or informal quotas for stops and frisks by MPD officers;

    e. Requiring Defendants Milwaukee, FPC, and Flynn to institute and implement improved policies and programs with respect to

training, supervision, monitoring, and discipline that will eliminate the policy, practice, pattern, and custom of suspicionless stops and frisks;

f.   Requiring the Defendants Milwaukee, FPC, and Flynn to institute and implement improved policies and programs with respect to training, supervision, monitoring, and discipline to eliminate the Defendants' policy, practice, and custom of suspicionless stops and frisks that are motived by race or ethnicity;

g.   Requiring Defendants Milwaukee, FPC, and Flynn to institute and implement appropriate and adequate supervision and discipline of MPD officers who conduct stops and frisks;

h.   Requiring the Defendants Milwaukee, FPC, and Flynn to implement appropriate measures to ensure that MPD officers document all stops and frisks, the basis for each stop and frisk, and demographic and location information related to each encounter, regardless of whether the encounter is followed by the use of force, consent search, citation, or arrest, and to do so in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act.

i. Requiring Defendants Milwaukee, FPC, and Flynn to implement appropriate measures to ensure that documentation of all traffic and pedestrian stops and frisks is retained in a single, up-to-date computerized database;

j. Requiring Defendants Milwaukee, FPC, and Flynn to make publicly available data on all stops and frisks conducted by the MPD on a semiannual basis, including information on the race, ethnicity, location, and reasons for stops and frisks;

k. Requiring Defendants Milwaukee, FPC and Flynn to monitor and audit MPD stop-and-frisk policies, practices, and customs, to ensure that stops and frisks comport with constitutional and statutory requirements, including by, among other things, periodically reviewing forms documenting stops and frisks and analyzing data on stops and frisks.

F. The Court award reasonable attorneys' fees to all Plaintiffs, pursuant to 42 U.S.C. § 1988;

G. The Court award costs of litigation to all Plaintiffs, pursuant to 42 U.S.C. §§ 1920 and 1988; and

H. The Court award such other and further relief as this Court may deem

appropriate and in the interests of justice.

Respectfully Submitted this 23rd day of May,

s/ Nusrat J. Choudhury

NUSRAT J. CHOUDHURY
N.Y. State Bar No. 4538302
JASON D. WILLIAMSON
N.Y. State Bar No. 4645529
Attorneys for Plaintiffs
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
Fax: (212) 549-2654
nchoudhury@aclu.org
jwilliamson@aclu.org

KARYN L. ROTKER
WI State Bar No. 1007719
LAURENCE J. DUPUIS
WI State Bar No. 1029261
Attorneys for Plaintiffs
American Civil Liberties Union of Wisconsin
Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Telephone: (414) 272-4032
Fax: (414) 272-0182
krotker@aclu-wi.org
ldupuis@aclu-wi.org

ANTHONY HERMAN
D.C. Bar No. 424643
SHANYA DINGLE
D.C. Bar No. 1035007

ELIZABETH SAXE
D.C. Bar No. 1010846
JUSTIN GOLART
VA State Bar No. 83929
KERREL MURRAY
VA State Bar No. 87844
JESSICA JENSEN
CA State Bar No. 308820
Attorneys for Plaintiffs
Covington & Burling LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Fax: (202) 662-6291
aherman@cov.com
sdingle@cov.com
esaxe@cov.com
jgolart@cov.com
kmurray@cov.com
jjensen@cov.com