# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

Charles Collins, *et al.*,

     Plaintiffs,

     v.

City of Milwaukee, *et al.*,

     Defendants.

Case No.
17-cv-00234-JPS

## SETTLEMENT AGREEMENT AND COURT ORDER

### I. INTRODUCTION

#### A. <u>Plaintiffs' Claims</u>

1. This class action lawsuit for declaratory and injunctive relief was filed on February 22, 2017, against the City of Milwaukee ("Milwaukee"), the Milwaukee Fire and Police Commission ("FPC"), and in his official capacity Alfonso Morales, the Chief of the Milwaukee Police Department ("MPD")[1] (hereinafter referred to individually and collectively as "Defendants") by named plaintiffs Charles Collins, Caleb Roberts,

---

[1] Plaintiffs' Class Action Complaint and Amended Class Action Complaint named as a defendant Edward Flynn in his official capacity as Chief of the MPD. Amended Class Action Complaint for Declaratory and Injunctive Relief ¶ 27 (May 24, 2017), ECF No. 19 ("Am. Compl."). Due to the retirement of Edward Flynn on February 16, 2018 and subsequent appointment of Alfonso Morales as Chief of the MPD, Alfonso Morales is automatically substituted for Edward Flynn as a defendant sued in his official capacity pursuant to Federal Rule of Civil Procedure 25(d).

Stephen Jansen, Gregory Chambers, Alicia Silvestre, David Crowley, Jeremy Brown, and Dallas Adams (hereinafter referred to individually and collectively as "Plaintiffs").[2] Plaintiffs allege that Defendants' policies, practices, and customs related to stops and frisks by the Milwaukee Police Department ("MPD") violate the United States Constitution by: (1) authorizing MPD officers to stop people without individualized, objective, and articulable reasonable suspicion of criminal conduct, in violation of the Fourth Amendment to the U.S. Constitution; (2) authorizing MPD officers to frisk people without individualized, objective, and articulable reasonable suspicion that the person is armed and dangerous, in violation of the Fourth Amendment to the U.S. Constitution; and (3) sustaining stops and frisks of Black and Latino people that involve racial and ethnic profiling, or are otherwise motivated by race and ethnicity, rather than reasonable suspicion of criminal conduct, in violation of the Fourteenth Amendment to the U.S. Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S. § 2000d et seq. ("Title VI").

B. **Defendants' Response**

1.      Defendants deny that their policies, practices or customs related to stops and frisks by the MPD violate the United States Constitution, and, in particular, the Defendants deny that they: (1) authorized MPD officers to stop people without individualized, objective, and articulable reasonable suspicion of criminal conduct, in violation of the Fourth Amendment to the U.S. Constitution; (2) authorized MPD officers

---

[2] Plaintiffs and Defendants are from time to time referred to hereinafter individually as a "Party" and collectively as the "Parties."

to frisk people without individualized, objective, and articulable reasonable suspicion that the person is armed and dangerous, in violation of the Fourth Amendment to the U.S. Constitution; and (3) sustained stops and frisks of Black and Latino people that involve racial and ethnic profiling, or are otherwise motivated by race and ethnicity, rather than reasonable suspicion of criminal conduct, in violation of the Fourteenth Amendment to the U.S. Constitution and Title VI.

### C. **Mutual Recognition of Principles**

1. The Parties to this Settlement Agreement and Court Order ("Agreement") recognize the need for compliance with the requirements and mandates of the Fourth and Fourteenth Amendments to the U.S. Constitution in the conduct of MPD stops and frisks. Accordingly, the Parties have agreed to the following binding provisions of this Agreement.

## II.　STANDING OF INDIVIDUAL PLAINTIFFS

1.　The Parties further agree that this Agreement shall be enforceable by the named individual Plaintiffs and that Defendants shall not object to standing, and that Defendants further will not object to the substitution of individual plaintiffs for the presently-named individual Plaintiffs during the time set forth below for the continuing jurisdiction of the Court.

## III. DEFINITIONS

1.　A "stop" is defined as a police encounter with a civilian in which, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he or she was not at liberty to ignore the

police presence and go about his or her business. *See McGann v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184–85 (7th Cir. 1993).

2.      For purposes of this Agreement, a "traffic stop" is defined as a stop of a driver or passenger in a vehicle that results in a warning, citation, summons, or arrest for a traffic or vehicle equipment offense.

3.      For purposes of this Agreement, a "field interview" is defined as any stop of a person by an MPD member, other than a traffic stop, in which a member obtains a person's name or identification, and questions that person about that person's actions or behavior. MPD documents may interchangeably refer to a "field interview," "Terry stop," or "subject stop." Solely the term "field interview" will be used in this Agreement.

   a.   A "vehicle field interview" is a field interview of a driver or passenger in a vehicle.

   b.   A "pedestrian field interview" is a field interview of a person who is not a driver or passenger in a vehicle, including but not limited to, people walking or otherwise moving on foot, cyclists, and people moving in assistive devices, such as wheelchairs.

4.      For purposes of this Agreement, a "no-action encounter" is defined as any situation in which an MPD member briefly questions a person about that person, or that persons' own actions or behavior, but does not obtain the person's name. A no-action encounter may include, but is not limited to, a situation in which an officer initially believed that there was reasonable suspicion or probable cause but quickly determined that there was not, and did not obtain that person's name. "No-action encounters" include

situations in which the person is a driver or passenger in a vehicle, a cyclist, or is walking or otherwise moving on foot or moving in assistive devices, such as wheelchairs. A "no-action encounter" shall not be considered a "traffic stop" or "field interview," but shall be documented in the Computer Aided Dispatch ("CAD") system in accordance with section IV.A. of this Agreement.

5.      A "frisk" is defined as a protective pat down to find weapons that a police officer reasonably believes or suspects are in the possession of the person who has been subjected to a stop. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) (citing *Terry v. Ohio*, 392 U.S. 1, 24 (1968)). For purposes of this Agreement, any police encounter with a member of the public involving a "frisk" shall be documented pursuant to the procedures detailed in paragraph IV.A.2 for the documentation of "traffic stops" or "field interviews" as appropriate based on the circumstances of the frisk.

6.      A "search" is defined as the examination of a person's body, property, or other area that the person would reasonably be expected to consider as private by a police officer for the purpose of finding evidence of a crime. For purposes of this Agreement, any police encounter with a member of the public involving a "search" shall be documented pursuant to the procedures detailed in paragraph IV.A.2 for the documentation of "traffic stops" or "field interviews" as appropriate based on the circumstances of the search.

7.      For the purposes of this Agreement, the "Consultant" shall be Crime and Justice Institute and shall implement the roles and responsibilities of the Consultant as set

forth in this Agreement.

## IV. POLICIES

1.    Defendants shall ensure that all MPD traffic stops, field interviews, no-action encounters, and frisks are conducted in accordance with the rights protected by the Constitution and laws of the United States and are carried out with fairness and respect.

2.    Defendants shall require that all MPD traffic stops, field interviews, and no-action encounters are supported by individualized, objective, and articulable reasonable suspicion of unlawful conduct.  Reasonable suspicion is evaluated "based on the totality of the circumstances known to the officer at the time the stop is made." *United States v. Uribe*, 709 F.3d 646, 650 (7th Cir. 2013).  Consequently, there may be instances in which an officer has individualized, objective, and articulable reasonable suspicion when initiating the encounter, but subsequent developments establish that the subject of the encounter is not or has not engaged in criminal activity or a traffic or vehicle equipment offense.

3.    Defendants shall require that all MPD frisks are supported by individualized, objective, and articulable reasonable suspicion that an individual is armed and poses a present danger to the officer or a member of the public.

4.    Defendants shall prohibit MPD officers from relying to any degree on an individual's race, ethnicity, national origin, religion, gender, age, gender identity or expression, sexual orientation, immigration status, limited English proficiency, disability, or housing status to establish reasonable suspicion or probable cause, in the absence of a specific suspect description.

5.     Subsequent to events complained of in this lawsuit, Defendants have announced generally to the members of the police department that there are no formal or informal quotas, or other numerical benchmarks, for traffic stops, field interviews, frisks, searches or arrests.  In addition to maintaining their written policies continuing to prohibit quotas and other numerical benchmarks, Defendants will repeat this policy during all MPD training programs concerning traffic stops, field interviews, no-action encounters, frisks, searches, and/or arrests, including, but not limited to, training for new police officers and re-training for officers identified through supervisory review, the complaint process, and/or EIP to have conducted unlawful traffic stops, field interviews, no-action encounters, frisks, searches, and/or arrests.

6.     The number of traffic stops, field interviews, no-action encounters, frisks and/or searches by any officer, squad, District, or other subunit of MPD, shall not be used as a performance indicator or in any other way to evaluate performance.

7.     Subject to the required process for proposal of amendments to MPD Standard Operating Procedures ("SOPs") and FPC approval, Defendants shall revise MPD policies and guidelines to make clear that officers shall not rely solely on generalized categories to determine individualized, objective and articulable reasonable suspicion or probable cause, including solely the: (1) "appearance or demeanor" of a person, (2) the "hour of the day or night," or (3) the alleged "inappropriate presence" of a person "in a neighborhood." These categories can be used in combination with other legally appropriate factors not articulated in this agreement to determine reasonable suspicion or probable cause.

8.      Defendants shall maintain the MPD policies which already make clear that the principles and constitutional standards set forth in paragraphs IV.1–7 apply to all traffic stops, field interviews, no action encounters, frisks, and searches conducted by MPD personnel, regardless of the tactical or strategic policing strategy being implemented.  The Parties agree that these principles and standards apply in situations including, but not limited to, an MPD officer who conducts a pretextual stop; engages in a directed or saturation patrol; participates in Data-Driven Approaches to Crime and Traffic Safety; serves as a member of the Neighborhood Task Force; polices in any so-called "high-crime area," "hotspot," or "flare spot"; identifies an alleged "commonly stolen vehicle"; engages in any "broken windows" or similar policing strategy; and/or enforces low-level offenses, including, but not limited to, enforcement related to parking and equipment violations and municipal ordinance violations.

9.      Defendants shall revise their policies and practices concerning directed and saturation patrols, including SOP 300–Directed Patrol Mission, to provide proper guidance to officers about the specific actions officers are expected to take in a directed or saturation patrol in order to achieve patrol objectives, and to clearly prohibit traffic stops, field interviews, no-action encounters, and frisks that are unsupported by the requisite reasonable suspicion or are based on race, ethnicity, national origin, or another prohibited characteristic identified in paragraph IV.4.

10.      To effectuate the principles and constitutional standards addressed in paragraphs IV.1–8, Defendants shall prepare the proposed revised policies detailed in this paragraph through procedures that conform with the requirements of Wisconsin State

law, and shall ensure that these proposed revised policies are ready for submission to the FPC for final approval within ninety (90) days of entry into this Agreement. Defendant Morales, with the City Attorney as appropriate, shall recommend that the FPC enact the proposed revised policies discussed herein. If the FPC does not enact any of the proposed revised policies prepared pursuant to this paragraph, the Parties and the Executive Director of the FPC shall meet and confer with each other to prepare another revision to the proposed revised policies for submission to the FPC for enactment.

    a. Defendants agree to amend MPD SOP 001 – Fair and Impartial Policing, as shown in the redlined document attached to this Agreement as Appendix A.

    b. Defendants also agree to work with Plaintiffs to amend the following MPD SOPs within sixty (60) days of entering into this Agreement to reflect provisions of this Agreement that pertain to policies, procedures, guidelines, and standards addressed in these specific SOPs. Should the Parties be unable to reach agreement, they agree to submit their proposed changes to Judge Lynn Adelman for his recommendation. Any of the following are subject to the process prescribed by Wis. Stats. § 62.50(3) for FPC approval in accord with its rules:

        i. SOP 085–Citizen Contacts, Field Interviews, Search and Seizure;

        ii. SOP 300–Directed Patrol Missions / Saturation Patrols;

        iii. SOP 440–Early Intervention Program;

        iv. SOP 450–Personnel Investigations;

        v. SOP 730–Mobile Digital Video / Audio Recording Equipment;

      vi.   SOP 747–Body Worn Camera; and

     vii.   SOP 990–Inspections.

11.     To effectuate the principles and constitutional standards addressed in paragraphs IV. 1–8, Defendants agree to formally withdraw the following MPD policy document: Memorandum No. 2009-28, "Traffic Enforcement Policy," Mar. 3, 2009. *See* Appendix B.

12.     All MPD non-supervisory officers assigned to the patrol bureau and engaged in patrol operations who conduct traffic stops, field interviews, no-action encounters, frisks, and searches shall wear body-worn cameras.

13.     MPD shall require that all patrol officers activate both body-worn cameras and mobile digital video recording devices at the initiation of any traffic stop, field interview, no-action encounter, frisk, or search, and shall not deactivate the cameras until the encounter has concluded, with specific exceptions to protect privacy rights as set forth in amended SOP 730–Mobile Digital Video Audio Recording Equipment, and amended SOP 747–Body Worn Camera. When a non-supervisory officer is transferred to a patrol assignment, MPD shall ensure that the member is provided with equipment necessary to comply with this paragraph within three (3) weeks.

14.     Defendants shall recruit, hire, and promote a diverse corps of police officers at all levels of the chain of command to reflect the diversity of Milwaukee communities. FPC will update the promotional testing procedures for positions subject to such testing to include questions and activities testing a candidate's ability to lead and direct community policing efforts.

**A. <u>Data Collection and Publication</u>**

1.  Defendants shall ensure that every traffic stop, field interview, no-action encounter, frisk, and search conducted by any member of the Milwaukee Police Department is documented in an electronic, digitized record regardless of the outcome of the encounter (e.g., citation, arrest, warning, or no action at all).

2.  The electronic records concerning each traffic stop, field interview, no-action encounter, frisk, and search shall be documented in one of the following systems: the Traffic and Criminal Software ("TraCS"); the Records Management System ("RMS"); or the Computer Aided Dispatch ("CAD") system.  Defendants shall promulgate clear guidelines delineating the type(s) of encounter(s) (e.g., traffic stop leading to a traffic citation, traffic stop leading to no action, field interview leading to a warning) documented in each electronic database.  Defendants shall ensure that:

   a.  all traffic stops are documented in TraCS;

   b.  all field interviews are documented in RMS;

   c.  all no-action encounters are documented in CAD; and

   d.  all frisks and searches are documented in either TraCS or RMS as appropriate, based on the whether the circumstances of the frisk or search are appropriately characterized as a traffic stop or field interview.

Defendants shall make clear when duplicate records exist within or between TraCS, RMS, and CAD.

3.  Whether stored in TraCS, RMS, or CAD the electronic, digitized record for each traffic stop, field interview, and no-action encounter shall include all of the

following information:

a. demographic information about the subject, including: (i) age; (ii) gender; and (iii) race and ethnicity selected from one or more categories in the following list: American Indian or Alaska Native, Asian, Black or African American, Hispanic or Latino, Native Hawaiian or Other Pacific Islander, and/or White;

   i. in RMS, TraCS, and CAD, compliance will require maintenance or creation of "hard fields" that will contain the demographic information identified above, with the sole exception that officers are not required to document the age of the subject in no-action encounters recorded in CAD;

b. the location of the stop, including the address and police district;

c. the date of the encounter;

d. the start time of the encounter;

e. a written narrative explaining the legal basis for the stop, as follows:

   i. in RMS: textual entry into a narrative field;

   ii. in TraCS: textual entry into a narrative field;

   iii. in CAD: transcription of officer's communication with dispatch concerning basis for the traffic stop into a narrative field;

f. whether a frisk (i.e., protective pat down) was conducted and a written narrative of the legal basis therefor;

g. whether a search beyond any frisk was conducted of the person or his or her effects, and if so, a written narrative explaining the legal basis therefor;

h.  whether any contraband, including weapons, was found during any frisk and/or search and if so, the type of contraband seized, which shall be designated as follows:

  i.  in RMS: selection of one or more of the following options from a drop-down menu: "firearm weapon," "non-firearm weapon," "drugs," "stolen property," "other," and "none"; and

  ii.  in TraCS: selection of one or more of the following options from the existing-drop-down menu: "illicit drug(s)/paraphernalia," "intoxicant(s)," "weapon(s)"; "evidence of a crime," "stolen goods," "excessive cash," "other," "none."

i.  whether the encounter resulted in a use of force, and if so, the type/level of force used and the stated justification for why the officer used force, with the information captured in a Use of Force Report in the Administrative Investigative Management System ("AIM") referencing the same CAD number as the corresponding record in RMS (field interviews), TraCS (traffic stops), or CAD (no-action encounters);

j.  whether the encounter resulted in no law enforcement action, a warning, citation, summons, or arrest, and if so, the violations, offenses, or crimes alleged or charged with the information captured as follows:

  i.  in RMS, in a drop-down menu permitting selection of one of the following options: "no law enforcement action," "citation," "warning," "summons," "arrest," and "none", and with a description of the

violations, offenses, or crimes alleged or charged in a narrative field;

  ii. in TraCS, through documentation of traffic stops leading to traffic citation, non-traffic citation, or warning in the applicable TraCS module, with a description of the violations, offenses, or crimes alleged or charged in a narrative field;

  iii. in CAD, the C-code outcome for "no action" shall be documented in a field designated for the inclusion of such information for no-action encounters.

 k. any relevant suspect description received by police prior to the encounter for any field interview documented in RMS only; and

 l. the names and identifying numbers of all officers actively involved on the scene during the encounter.

Defendants shall ensure that each traffic stop, field interview, and no-action encounter documented pursuant to this paragraph—whether in RMS, TraCS, or CAD—is assigned a unique stop identification number.

 4. A system will be created, if none currently exists, to ensure that all of the required information detailed in paragraph IV.A.3 is properly inputted into RMS, TraCS, and CAD.

 a. For example, the user interface of RMS may be set up to require the entry of information detailed in sub-paragraphs IV.A.3(a), (c), (e), (f), (g), (h), (i), and (j) into the electronic, digitized record in order for a traffic stop, field interview, or no-action encounter (and any frisks or searches conducted during

the course of the encounter) to be documented in the system.  If a user fails to

submit a piece of required information (e.g., race of the traffic stop subject),

the user interfaces of RMS shall prohibit submission of the record.

b.  Alternatively, a separate script may be run on records submitted to the back

end of each system every day in order to identify incomplete records and

email officers and their supervisors to resubmit the forms when they are

incomplete.

5.  There shall be a unique identifier (i.e., primary key) that bridges TraCS, RMS,

and CAD in order to permit analysis of all traffic stops, field interviews, no-action

encounters, frisks, and searches of a specific individual regardless of the database in

which the information is stored.  For example, the unique identifier may consist of a

name and date of birth.  Plaintiffs offer the assistance of data scientist Kathy Qian at no

cost to Defendants to assist in the configuration of TraCS, RMS, and CAD so that a

unique identifier is assigned to each subject of a traffic stop, field interview, no-action

encounter, frisk, and search documented in each data system (TraCS, RMS, and CAD).

6.  There shall be an identifier that permits direct correlation between every

traffic stop, field interview, no-action encounter, frisk, and search recorded in TraCS,

RMS, and CAD and any video associated with the encounter, whether captured through

police-vehicle video camera footage and/or officer body-worn camera footage.  This data

field may consist of a unique encounter identification number, for example, created

through the date and time of the encounter.

7.  The MPD database(s) of video footage from police-vehicle cameras and body-

worn cameras shall be searchable by CAD number with video to be produced one incident at a time, with such searches available for both types of video within one year from the date of this Agreement. Video footage concerning traffic stops, field interviews, no-action encounters, frisks, and searches shall be easily and quickly made available to the Consultant upon request, and no later than 7 calendar days from the date of the request.

8. Defendants shall require that any MPD officer who conducts a traffic stop, field interview, no-action encounter, frisk, or search complete and file a report or the information, including at least all of the information identified in paragraph IV.A.3, prior to the end of his or her tour of duty. If extenuating circumstances make that impossible, the report or information must be completed prior to end of the next tour of duty. Defendants shall require that, if multiple officers are involved in conducting a traffic stop, field interview, no-action encounter, frisk or search, at least one officer shall complete said report.

9. Defendants shall prohibit MPD from collecting, storing, disseminating, and/or publishing personally identifiable information about an individual who has been subjected to a traffic stop, field interview, no-action encounter, frisk, and/or search in any criminal intelligence database (with the exception of TraCS and RMS) if that individual is released without further legal action, unless MPD documents specific facts supporting individualized, objective, and articulable reasonable suspicion that the individual is involved in criminal conduct or activity and the information is relevant to that criminal conduct or activity. *See* 28 C.F.R. §§ 23.3, 23.20. The defendants will not destroy

properly documented records in TraCS and RMS.

10. Defendants shall ensure that MPD provides, on a quarterly basis, the electronic, digitized data on all traffic stops, field interviews, no-action encounters, frisks, and searches described in paragraph IV.A.3, with the exception of any personally identifiable information, to the FPC, Plaintiffs' counsel, and the Consultant. Defendants shall also provide explicit identification of primary keys, foreign keys, constraints, and indices in order to identify how the TraCS, RMS, and CAD datasets or tables link together and what types of duplicates can be expected. To the extent that any unique identifier (i.e., primary key) includes personally identifiable information, that unique key shall be transformed so that it is not readily readable.

11. Defendants shall ensure that MPD provides to the FPC, Plaintiffs' counsel, and the Consultant the manuals for police officer and supervisor use of TraCS, RMS, and CAD including examples aimed at clarifying the procedure for inputting into each system all of the information identified in paragraph IV.A.3 about traffic stops, field interviews, no-action encounters, frisks, and searches recorded in the system.

12. Defendants shall ensure that MPD provides to the FPC, Plaintiffs' counsel, and the Consultant the codebooks and data dictionaries for users of TraCS, RMS, and CAD that clearly define every variable captured in records of traffic stops, field interviews, no-action encounters, frisks, and searches, as well as all values that each variable can be assigned.

13. Defendants shall ensure that the FPC will publish on its website, on an annual basis, the electronic, digitized data on all traffic stops, field interviews, no-action

encounters, frisks, and searches described in paragraphs IV.A.1–3, with the exception of any personally identifiable information. The FPC will also post on its website any and all reports published by the Consultant pursuant to the Agreement.

**B. <u>Training</u>**

1. Defendants shall review and revise if necessary training materials for officers and supervisors on the policies, procedures, and constitutional requirements for conducting a traffic stop, field interview, no-action encounter, frisk, and search, and the ways that race, ethnicity, national origin, and other characteristics identified in revised SOP 001 can and cannot properly be used. *See* Appendix A. All training sessions for MPD officers and supervisors on these standards shall be taught by an instructor qualified under Wisconsin law in the following specified areas:

    a. Defendants shall adopt procedures to ensure that all officers are able to articulate, verbally and in writing, the constitutional standards for individualized, objective, and articulable reasonable suspicion and probable cause in conducting a traffic stop, field interview, no-action encounter, frisk, and search, and will provide appropriate remedial training where any officer is unable to do so. MPD will develop a training bulletin for all MPD officers reinforcing the requirements for a traffic stop, field interview, no-action encounter, and frisk, including with respect to establishing reasonable suspicion for the stop, field interview, or any frisk, which shall be reinforced through roll call training conducted by supervisors.

b.  Defendants shall continue the training begun in 2013 in fair and impartial policing through a program developed by Lorie Fridell, Ph.D and A. T. Laszlo.  Plaintiffs shall review the substance of this training program within six (6) months of the execution of this Agreement and shall suggest revisions or additions to this training program.  Said suggestions are to be incorporated into the training program only upon the approval of the aforementioned program developers, or by similarly-qualified individuals retained for that purpose by MPD. Similarly qualified individuals will include certified MPD trainers trained by Fridell or Laszlo. Similarly qualified individuals will also include trainers trained by Fridell or Laszlo, retained by MPD.

c.  Defendants and/or the trainers shall include testing or other mechanisms to ensure the content of the training is learned by participating MPD staff.

d.  MPD will require and train supervisors to ensure accuracy of traffic stop, field interview, no-action encounter, frisk, and search records documented pursuant to this Agreement, and to regularly review and analyze such records for patterns of individual officer, unit, and squad conduct to identify at an early stage trends and potential bias-based behaviors, including but not limited to racial and ethnic profiling and racial and ethnic disparities in the rates of traffic stops, field interviews, no-action encounters, and frisks made without sufficient legal justification.  Supervisors will be provided training developed by Lorie Fridell, Ph.D and A. T. Laszlo on identifying trends and patterns that give rise to potentially biased practices regarding traffic stops, field

interviews, no-action encounters, frisks, and searches of people and vehicles. Such training will be delivered by qualified individuals, who may include certified MPD trainers trained by Fridell or Laszlo, or by other certified trainers trained by Fridell or Laszlo and retained by MPD. Such training will be consistent with the aforementioned training on fair and impartial policing.

2.      Within twelve (12) months of the execution of this Agreement, and on an annual basis thereafter, MPD shall provide training for all MPD staff who conduct, supervise, document in TraCS, RMS, or CAD, and/or audit traffic stops, field interviews, no-action encounters, frisks, and searches. If Defendants show good cause for the need for an additional six months to complete this training, Plaintiffs will not unreasonably withhold agreement to such an extension. The topics of such annual training should include, but not be limited to:

a.  the MPD databases (TraCS, RMS, and CAD) containing the information identified in paragraph IV.A.3 on all traffic stops, field interviews, no-action encounters, frisks, and searches;

b.  what information about each traffic stop, field interview, no-action encounter, as well as frisks and searches conducted in the course of those encounters, must be documented in TraCS, RMS, and/or CAD;

c.  documentation and reporting responsibilities of officers who conduct traffic stops, field interviews, no-action encounters, frisks, and searches; and

d.  how to retrieve data on traffic stops, field interviews, no-action encounters, frisks, and searches from TraCS, RMS, and CAD in order to review encounter

reports for evidence of compliance with constitutional standards, this

Agreement, and MPD policies concerning the conduct of traffic stops, field

interviews, no-action encounters, frisks, and searches.

3. All training materials developed and/or approved by Defendants to comply with paragraphs IV.B.1 and IV.B.2 of this Agreement shall be provided to Plaintiffs within six (6) months of the execution of this Agreement for review.

4. Plaintiffs shall:

a. review all training materials developed and/or approved by Defendants to comply with paragraphs IV.B.1 and IV.B.2, and recommend any revisions necessary to make such training more effective; and

b. observe training sessions identified in paragraph IV.B.2 to ensure that the training complies with the requirements of this Agreement and promotes the goals of lawful traffic stops, field interviews, no-action encounters, frisks, and searches. Defendants shall provide the training calendar to Plaintiffs as soon as it is available. Plaintiffs will make every effort to attend in-service training sessions within the first two weeks and will do so no later than the first month that such training is provided. Two observers on behalf of Plaintiffs shall be allowed to observe any training related to this Agreement. In the event that an observer witnesses and documents training that is not consistent with the requirements of this Agreement, Plaintiffs are to bring any such deficiency to the prompt attention of Defendants. Defendants shall then be allowed to correct the erroneous training within three months. In the event that the

Defendants fail to do this, Plaintiffs may seek a remedial order from the Court and the Defendants shall be liable for all reasonable fees and expenses connected to any such motion.

5.      MPD shall have state-certified instructors, certified in the pertinent areas and employed at the MPD Academy, provide the training and re-training of officers and supervisors on the conduct, documentation, and supervision of traffic stops, field interviews, no-action encounters, frisks, and searches.

**C. <u>Supervision</u>**

1.      Within six (6) months of the execution of this Agreement, MPD shall establish and enforce policies requiring continuous supervision of officers who conduct traffic stops, field interviews, no-action encounters, frisks, and searches by appropriate, specified officers within the MPD.  Defendants shall provide for supervision in the following manner and within the following timeframes:

a.  All reports of arrests, which are documented in the RMS system, will be reviewed and approved by a supervisor within the time period prescribed by SOP 263–Records Management.  The supervisor will review the reports for various matters, including the lawful basis for any traffic stop or field interview that led to the arrest, and the lawful basis for any frisk or search conducted during the encounter.

b.  Within twelve (12) months of the date of this Agreement, MPD will achieve a practice of supervisory review, correction, and approval of 50% of all documentation of field interviews in RMS consistent with the timeframes set

forth in SOP 085.20.  Supervisors shall review for completeness, and shall review the stated basis for the field interview and any frisk and/or search conducted in the course of the field interview.  Prior to approving reports for submission to RMS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented.

c.  Within twelve (12) months of the date of this Agreement, MPD will achieve supervisory review, correction, and approval of every warning and citation issued by MPD officers in the course of a traffic stop or field interview, as recorded in TraCS within seven (7) days, consistent with the timeframe set forth in SOP 070. Supervisors shall review for completeness, and shall review the stated basis for the traffic stop, field interview, and any frisk and/or search conducted in the course of the traffic stop or field interview.  Prior to approving reports for submission to TraCS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented.

d.  Within twelve (12) months of the date of this Agreement, MPD shall achieve supervisory review, correction, and approval of every no-action encounter documented in CAD within fourteen (14) days.  Supervisors shall review for completeness and shall review the stated basis for the no-action encounter. Prior to approving reports as complete, supervisors shall ensure that officers

provide any missing information to ensure all information required by
paragraph IV.A.3 is documented.

Defendants shall require MPD supervisors to use the aforementioned data to identify and document any non-compliance by subordinate officers with constitutional standards and policy guidelines concerning the conduct and documentation of traffic stops, field interviews, no-action encounters, frisks, and searches, including SOP 085, SOP 070, SOP 001, SOP 300, and this Agreement.

2.      Defendants shall require MPD supervisors to counsel, train, or to refer for re-training, any officer who is found through supervisory review to have engaged in an unreasonable, race-or ethnicity-based, unreported, or insufficiently documented traffic stop, field interview, no-action encounter, frisk, or search.  Retraining, when appropriate, will be performed in accordance with SOP 082–Training and Career Development.

3.      Defendants shall require MPD command staff to counsel, train, or to refer for re-training, any supervisor (e.g., sergeant or lieutenant) who is found through supervisory review to have failed to properly review and correct patrol officers who conduct an unreasonable, race-or ethnicity-based, unreported, or insufficiently documented traffic stop, field interview, no-action encounter, frisk, or search, or to properly refer such officers to counseling, training, or re-training.  Appropriately qualified trainers from the Police Academy shall provide such re-training to the officer within thirty (30) days of such a finding.  Every six months, Internal Affairs will prepare a report for command staff of allegations of policy violations described above and any corrective actions taken.

4.      MPD will update the performance review process to ensure that it includes matters relating to compliance with legal requirements concerning traffic stops, field interviews, no-action encounters, frisks, and searches.

5.      Defendants shall continue the changes to the purpose and content of command staff meetings, including discussion and evaluation of community policing measures.

6.      MPD shall complete a twice per year community policing status report and forward that report to the FPC.

**D.  Procedures for Complaints from Members of the Public and Internally Generated Complaints Concerning MPD Conduct**

1.      Defendants shall amend SOP 450 on Personnel Investigations in order to improve procedures for initiating and investigating complaints from members of the public and internally generated complaints about MPD conduct, including traffic stops, field interviews, no-action encounters, frisks, and searches, and to foster transparency concerning the subject matter of complaints, the process for investigating complaints, and the resolution of complaints.  Pursuant to these amendments:

a.   Defendants shall make complaint forms for members of the public and instructions describing the separate processes for filing complaints with the MPD and FPC available in English, Spanish, Hmong, and other languages as the Parties may determine appropriate;

b.   Defendants shall continue to ensure that complaint forms for members of the public and instructions are available for download from the MPD and FPC

websites and are available, at a minimum, at all Milwaukee public libraries and police district stations;

c.  Defendants shall accept all complaints received from members of the public, whether submitted in person, by phone, by mail, or via email, or by any other means, and will work to develop online submission via the MPD and/or FPC websites to further facilitate the complaint process;

d.  Defendants shall ensure that supervisors are trained on their responsibilities under the new policy requiring acceptance of all complaints from members of the public. Defendants shall ensure that all MPD and FPC staff who accept complaints are trained not to, and in practice do not, discourage the filing of any complaint from a member of the public;

e.  Defendants shall not require that complaints from members of the public be notarized, but may require verification of identity at some appropriate time in the complaint proceedings, subsequent to an initial review of the complaint, to ensure that a complaint is not being filed simply for harassment or other similarly inappropriate reasons;

f.  Defendants shall maintain MPD's practice of requiring a supervisor to contact the complainant pursuant to SOP 450.35(A)(1) and (2);

g.  Defendants shall ensure that any Personnel Investigation stemming from a civilian complaint shall involve an interview of the complainant and that the interview will take place at a location other than police headquarters, provided that the complainant can be located with reasonable efforts and, with respect

to the location, except as to any complainant who is in custody of law enforcement authorities at the time of taking any such interview. If a person wishes or voluntarily agrees to be interviewed at a police facility, the interview may take place there.

h. MPD shall: (1) develop a protocol specifying an appropriate time frame for investigations of complaints by members of the public to be completed, and hold investigators and supervisors accountable for that time frame; (2) require supervisory review and approval for investigations open beyond ninety (90) days and every thirty (30) days thereafter; (3) develop specific guidelines and a checklist of requirements, including requirements for case file contents and the components of the investigative process; and (4) ensure that all plausible complaints are investigated;

i. Defendants shall ensure that MPD Internal Affairs investigators undergo training that addresses, and attempts to eliminate, biases in favor of police officers and against civilian complainants that arise in the course of complaint investigations; and

j. Defendants shall prohibit investigators from conducting investigations in a manner that may reflect biases against complainants, including asking hostile questions to complainants; applying moral judgments related to the dress, grooming, income, life-style, or known or perceived criminal history of complainants; giving testimony by officers greater weight than testimony by complainants; providing summary reports that disadvantage complainants and

are unrelated to facts developed in the investigation; issuing complaint

dispositions that are not justified by the facts developed in the investigation;

recommending inconsistent discipline for officer misconduct.

2.      MPD Internal Affairs investigators shall receive special training conducted

within one year from the execution of this Agreement in the investigation of complaints

by members of the public, including training on the amendments to SOP 450 required by

this Agreement.  The training shall be conducted by a supervisor of Internal Affairs with

expertise in complaint investigation and shall be consistent with those provisions of this

Agreement that relate to this subject.

3.      Defendants shall ensure that the MPD Internal Affairs Division:

a. Receives all complaints from members of the public for review and

determination for appropriate assignment; and

b. Reviews every internally generated complaint about MPD conduct.

4.      Defendants shall ensure that the MPD:

a. Maintains and enforces its policies requiring that an MPD supervisor or a

member of the MPD Internal Affairs Division reviews and investigates every

plausible complaint;

b. Continues to maintain a database that includes all civilian and internally-

generated complaints concerning MPD conduct received by the MPD, which

includes for each complaint: the complainant's name, address, and other

contact information; the complainant's race and ethnicity; the date, time, and

location of the incident; the name of the officer who is the subject of the

complaint; and the nature of the complaint, including whether it concerns a traffic stop, field interview, no-action encounter, frisk, and/or search, and/or an allegation of racial or ethnic profiling;

c. Maintains a list of the number and outcome of complaints received against each officer, regardless of the outcome of the complaint (which should be readily accessible through the AIM system);

d. Maintains the practice of the Early Intervention Program providing notice to captains of an individual officer receiving three or more complaints within a ninety (90)-day period, and also provides notice to captains of any individual officer receiving three (3) or more complaints over a rolling one year period; and

e. Ensures that complaint data are tabulated by citywide, district, unit, and peer groupings to help supervisors understand overall employee performance and the specific factors at issue within their district to allow for active and engaged supervision.

5. Defendants shall ensure that the FPC:

a. Maintains the FPC practice of investigating all plausible complaints from members of the public submitted to it;

b. Reviews every internally generated complaint about MPD conduct;

c. Creates and maintains a database of complaints from members of the public and internally-generated complaints about MPD conduct received by the FPC, which includes for each complaint: the complainant's name, address and other

contact information; the complainant's race and ethnicity; the date, time, and location of the incident; the name of the officer who is the subject of the complaint; and the nature of the complaint, including whether it concerns a traffic stop, field interview, no-action encounter, frisk, and/or search, and/or an allegation of racial or ethnic profiling;

d.  Maintains a list of the number of complaints received against each officer, regardless of the outcome of the complaint; and

e.  Provides to the Chief for further action, as discussed in this Agreement, the name of any officer receiving more than the same number of complaints within the same timeframe as set out in the Early Intervention Program, as discussed in paragraph IV.D.4.d.

**E.  <u>Audits</u>**

1.      Defendant FPC shall audit data, dashboard camera footage, and body camera footage on traffic stops, field interviews, no-action encounters, frisks, and searches, every six (6) months to identify:

a.  Officers who fail to conduct these encounters in compliance with constitutional standards and principles set forth in this Agreement;

b.  Officers who fail to properly document these encounters in accordance with the terms of this Agreement;

c.  Supervisors who fail to properly review subordinate officers' reports to identify officers who fail to conduct traffic stops, field interviews, no-action encounters, frisks, and/or searches in compliance with constitutional standards

and this Agreement, or to ensure that the encounters are properly documented in compliance with the terms of this Agreement; and

d.  Supervisors who fail to require re-training and/or discipline for subordinate officers who conduct unreasonable, unreported, or insufficiently documented encounters.

2.  In order to ensure that complaints from members of the public are appropriately investigated, the FPC, including through the work of any retained consultants, shall conduct an audit every six (6) months of: (a) complaints submitted by members of the public to the MPD, and (b) complaints from members of the public to the FPC.

3.  Defendant FPC shall be permitted to spend funds appropriated by Defendant Milwaukee to hire additional staff and/or employ experts or consultants to conduct the audits described in paragraphs IV.E.1 and 2.  The Consultant also shall review such audits for accuracy and, if the Consultant concludes that the audits are incomplete or inaccurate, conduct its own audits of these matters.  In addition, the Consultant shall provide training and technical assistance to Defendant FPC to develop the FPC's capacity to conduct such reviews and audits itself, in order to be able to fully and appropriately exercise its oversight obligations.

4.  Defendant FPC shall use audits to, *inter alia*, identify officers who need additional training on traffic stop, field interview, no-action encounter, frisk, and search policies and/or discipline for the conduct of unreasonable, unreported, or insufficiently documented encounters.  Defendants shall ensure that data and findings from the FPC

audits described in paragraphs IV.E.1. and IV.E.2 shall be incorporated into the MPD's AIM System, which is a database software program used to identify MPD member performance for the purpose of evaluation.

5. Defendant FPC shall publish on its website, on a quarterly basis, data on civilian complaints received, under investigation, or resolved during the previous quarter, including the number of complaints from members of the public broken down by number relating to traffic stops, field interviews, no-action encounters, frisks, and searches without legal justification and traffic stops, field interviews, no-action encounters, frisks, and searches based on race or ethnicity and whether the complaints remain open or have been closed.

6. Defendants shall ensure that the appropriate division within MPD audits data, dashboard camera footage, and body camera footage on traffic stops, field interviews, no-action encounters, frisks, and searches every six (6) months to identify:

    a. Officers who fail to conduct these activities in compliance with constitutional standards and principles set forth in this Agreement;

    b. Officers who fail to properly document these encounters in accordance with the terms of this Agreement;

    c. Supervisors who fail to properly review subordinate officers' reports to identify officers who fail to conduct traffic stops, field interviews, no-action encounters, frisks, and searches in compliance with constitutional standards and this Agreement, or to ensure that the encounters are properly documented in compliance with the terms of this Agreement; and

d. Supervisors who fail to require re-training and/or discipline for subordinate officers who conduct unreasonable, unreported, or insufficiently documented encounters.

7. Defendants shall ensure that the MPD Internal Affairs Division uses audits to, *inter alia*, identify officers who need additional training on traffic stop, field interview, no-action encounter, frisk, and search policies and/or discipline for the conduct of unreasonable, unreported, or insufficiently documented encounters. Defendants shall ensure that data and findings from the audits described in paragraphs IV.E.6 and IV.E.7 shall be incorporated into the MPD's Early Intervention Program.

### F. Counseling, Re-training, and Discipline

1. MPD will develop and maintain a system of benchmarks and alert notification triggers for any employee involved in three incidents of traffic stops, field interviews, no-action encounters, frisks, and searches that are insufficiently documented, legally unsupported, or based on racial or ethnic profiling over a rolling one (1)-year period.

2. Defendants understand that racial and ethnic profiling, and unlawful and inadequately-documented traffic stops, field interviews, no-action encounters, and frisks are a serious violation of the MPD rules and may subject the offending officer to progressive discipline, including counseling, retraining, suspension, or discharge as appropriate and consistent with the criteria of Wis. Stats. § 62.50.

3. Defendants shall ensure that discipline must occur when there is a sustained allegation that any MPD officer has conducted a traffic stop, field interview,

no-action encounter, or frisk that lacks the requisite reasonable suspicion and/or is the result of racial or ethnic profiling, or has failed to report or insufficiently document a traffic stop, field interview, no-action encounter or frisk, with such disciplinary measures progressing in severity as the number of such sustained violations increases. Nothing in this agreement precludes imposition of greater or additional discipline when the Chief determines such discipline is appropriate.

4.     Defendants shall amend SOP 450 to confirm that the matters described in paragraph IV.F.3 above are serious violations and to provide that any traffic stop, field interview, no-action encounter, and/or frisk conducted without the requisite legal basis or demonstrating an indication of racial or ethnic profiling shall be dealt with in a manner that is consistent with the criteria of Wis. Stats. § 62.50 and paragraph IV.F.3 above.

5.     MPD shall maintain those pertinent SOPs that require officers to adhere to the laws of the United States, the state of Wisconsin, and the City of Milwaukee.  MPD shall through training make clear to its officers that among these responsibilities are the responsibilities to conduct traffic stops, field interviews, no-action encounters, frisks and searches in a lawful manner and that an officer who fails to do so may be subject to appropriate measures, including counseling, additional training, discipline or discharge.

6.     An MPD supervisor who fails to properly supervise a subordinate officer to ensure that traffic stops, field interviews, no-action encounters, frisks, and searches comply with constitutional standards, are properly reported, and are sufficiently documented, including through the review of the subordinate officer's electronic reports concerning these encounters, may be subject to a Personnel Investigation and any

resulting counseling, retraining, and/or discipline, including the possibility of termination.

7.      Defendants shall require MPD supervisors to refer for investigation any officer identified through supervisory review to have engaged in four or more traffic stops, field interviews, no-action encounters, frisks, or searches that are unsupported by the requisite reasonable suspicion or probable cause, are not properly reported, or are insufficiently documented in a three-year period.  Such investigation shall be conducted by the MPD Internal Affairs Division, or by the commanding officer of the district, under the supervision of the MPD Internal Affairs Division.

8.      MPD shall maintain and enforce its Code of Conduct which provides that officers can face discipline for failing to familiarize themselves with department policies and also provides for progressive discipline; such enforcement will specifically include instances where an officer has been found to have engaged in unlawful traffic stops, field interviews, no-action encounters, frisks and/or searches; instances in which an officer has failed to document properly traffic stops, field interviews, no-action encounters, frisks, and/or searches; and instances in which a supervisor has failed to identify and refer for counseling, retraining, or discipline officers who fail to comply with traffic stop, field interview, no-action encounter, frisk, and search documentation and conduct requirements set forth in this Agreement and in a manner that is consistent with the criteria of Wis. Stats. § 62.50.  The Defendants acknowledge that unlawful and inadequately-documented traffic stops, field interviews, no-action encounters, frisks, and/or searches are a serious violation of the MPD rules.

9.      In determining the appropriate resolution and/or discipline to be imposed following any Personnel Investigation, the number, nature, and resolution of civilian and internally generated complaints against an officer shall be considered.

### G.  Community Engagement

1.      Defendants shall ensure that the MPD monthly crime and safety meetings, which MPD already conducts, will include on their agendas in all districts concerns, if they are raised, about the MPD's actions, including but not limited to policies and practices concerning traffic stops, field interviews, no-action encounters, and frisks.

2.      Defendants shall maintain the existing Milwaukee Collaborative Community Committee to seek community input on police department operations to improve trust between law enforcement and city residents. Defendants shall consult with Plaintiffs regarding any changes in or additions to the membership of this group. Defendants shall make reasonable efforts to ensure that the membership in this committee represents racially and ethnically diverse communities, persons with disabilities, LGBTQ persons, and other protected classes.

3.      Any revision of MPD policies or written procedures relating to traffic stops, field interviews, no-action encounters, frisks, and the enforcement of low-level offenses shall be addressed in the manner prescribed by FPC Rule IV, Board Procedure, a copy of which is attached hereto as Appendix C.

### V.  COMPLIANCE

1.      To achieve compliance with this Agreement, the MPD must demonstrate that it has:

a. incorporated all substantive requirements of this Agreement into policy;

b. hired and trained relevant personnel as necessary to fulfill their responsibilities pursuant to the requirements;

c. appropriated sufficient funds to ensure that such requirements are met; and

d. shown sustained and continuing improvement in constitutional policing based on:

    i. analysis of TraCS data demonstrating that fewer than 14% of records of traffic stops, frisks, and searches documented in TraCS during the previous six (6) months are missing any of the information required by paragraph IV.A.3 for inclusion in records;

    ii. analysis of RMS data demonstrating that fewer than 14% of records of field interviews, frisks, and searches documented in RMS during the previous six (6) months are missing any of the information required by paragraph IV.A.3 for inclusion in records;

    iii. analysis of CAD data demonstrating that fewer than 14% records of no-action encounters documented in CAD during the previous six (6) months are missing any of the information required by paragraph IV.A.3 for inclusion in records;

    iv. analysis of TraCS data on traffic stops demonstrates that fewer than 15% of traffic stop records documented during the previous six (6) months fail to show that the stops were supported by individualized, objective,

and articulable reasonable suspicion of criminal activity or a traffic or vehicle equipment violation;

v.   analysis of RMS data on field interviews demonstrates that fewer than 15% of field interview records documented during the previous six (6) months fail to show that the field interviews were supported by individualized, objective, and articulable reasonable suspicion of criminal activity or a traffic or vehicle equipment violation;

vi.   analysis of CAD data on no-action encounters demonstrates that fewer than 15% of records documented during the previous six (6) months fail to show that the traffic stops and encounters were supported by individualized, objective, and articulable reasonable suspicion of criminal activity or a traffic or vehicle equipment violation;

vii.   analysis of TraCS and RMS data on frisks demonstrates that fewer than 15% of frisks records documented during the previous six (6) months fail to show that the frisks were supported by individualized, objective, and articulable reasonable suspicion that the stop subject was armed and dangerous;

viii.   analysis of TraCS data on traffic stops demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to traffic stops after controlling for agreed upon benchmarks;

ix. analysis of RMS data on demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to field interviews after controlling for agreed upon benchmarks; and

x. analysis of CAD data on no-action encounters demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to no-action encounters after controlling for agreed upon benchmarks.

Compliance must be maintained for the time periods set forth below with the sole exception that Plaintiffs agree not to seek contempt sanctions should Defendants be unable to meet the numerical thresholds identified above within the first two years of enforcement of this Agreement. The parties agree, however, that Defendants shall work towards meeting these numerical standards as quickly as possible. Non-compliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute failure to achieve or maintain full compliance. At the same time, temporary compliance during a period of otherwise sustained noncompliance will not constitute compliance with this Agreement.

2. The U.S. District Court for the Eastern District of Wisconsin shall retain jurisdiction to enforce the terms of this Agreement and the Parties' obligations hereunder.

3. In determining whether Defendants are in compliance with constitutional standards concerning traffic stops, field interviews, no-action encounters, frisks, and

searches and with the terms of this Agreement, the Court may consider, among other factors:

    a.   The number, nature, and location of traffic stops, field interviews, no-action encounters, and frisks that do not comply with Fourth Amendment standards, disaggregated by the race and ethnicity of the subject;

    b.   All information regarding the legal basis provided for traffic stops, field interviews, no-action encounters, frisks, and searches, the resultant "hit-rates," including rates of contraband seizures, and information resulting from audits and surveys conducted by the Parties;

    c.   Racial and ethnic disparities in stops, frisks, and searches, after accounting, under professionally established statistical methods, for factors other than race and ethnicity as described in paragraph V.A.5 below.

## A.  **Role of the Consultant**

    1.     The Consultant shall provide the Parties with a written Report on an annual basis. The Report shall address Defendants' compliance with the terms of this Agreement based on: (a) the Consultant's annual review of MPD and FPC actions to determine whether they have timely completed tasks identified in this Agreement pertaining to policy formulation, data collection and reporting, training, supervision, the complaint process, discipline, and audits; (2) annual analysis of: MPD data on traffic stops, field interviews, no-action encounters, and frisks, including encounter-level data and aggregate data. Should the Consultant find that the Defendants are non-compliant

with any of the requirements of this Agreement, the Consultant shall submit a report within six (6) months determining whether Defendants have rectified the issue(s).

2.      In preparing any Report, the Consultant may solicit reports and input from the Parties and community members through customary means of public notice employed by the FPC, including its website and an opt-in email distribution list including members of the public who are participating in the ongoing process, managed by the City, FPC, and MPD, to elicit public input concerning MPD reforms related to the proposed recommendations by the U.S. Department of Justice Office of Community Oriented Policing Services.  Nothing in this paragraph shall prohibit the Parties from providing reports and input for the Consultant's consideration and the Consultant shall consider any such reports and input provided by the Parties when putting together a Report.  Any reports and input provided by the Parties to the Consultant shall be provided at the same time to the opposing Party's counsel.

3.      To measure Defendants' compliance with the Fourth Amendment in conducting traffic stops, field interviews, no-action encounters, and frisks, the Consultant will review randomly selected electronic incident reports concerning these encounters documented pursuant to paragraphs IV.A.1–IV.A.3 on an appropriate basis, as determined by the Consultant, but no less often than semiannually.  The following procedures will be used.

a.   Defendants shall ensure that the randomly selected electronic incident reports do not contain more than a single incident report concerning a particular police-civilian encounter.  Where multiple people are stopped and/or frisked

in one encounter, only one of these stops will be part of the randomly selected files for review.

b.  In each semi-annual review, the Consultant will screen the reported stops and frisks to separate out (1) "stops" that are either arrests at the location of the stop or are otherwise not forcible stops under the Fourth Amendment and (2) "frisks" that are searches (often incident to arrest).  In these cases, officers have filed reports even though the incident was not within the definition of a "traffic stop," "field interview," "no-action encounter," or "frisk" as set forth in this Agreement.  These incidents will not be included in the Fourth Amendment "reasonable suspicion" analysis.

c.  The category of "fruit of an illegal stop" will be used to signify where a frisk, though proper given the officer's observations, was made pursuant to a traffic stop or field interview conducted without reasonable suspicion.

d.  The Consultant shall conduct an analysis involving the tabulation of "hits" (i.e., the finding of weapons or contraband) to the number of frisks, disaggregated by race and ethnicity.

e.  There will be a designation of cases in which an officer marks "no frisk" and "no search" in cases in which a frisk or search was highly likely to have occurred (e.g., stop for a robbery investigation).

4.   To measure Defendants' compliance with the Fourteenth Amendment in conducting traffic stops, field interviews, no-action encounters and frisks, the Consultant will engage in several different analyses.

5.      *Regression Analysis Regarding Traffic Stops, Field Interviews, No-Action Encounters, and Frisks:*  The Consultant will compare actual traffic stop, field interview, no-action encounter and frisk rates by police district to those that would be expected based on census data, or other similarly-reliable and available data, on the racial composition for that police district.  This analysis will use race-specific and ethnicity-specific data comparing traffic stops, field interviews, no-action encounters, and frisks and the census population by race and ethnicity.  To determine the impact of suspect race and suspect ethnicity on the likelihood of a traffic stop, field interview, no-action encounter, or frisk, this analysis will control for factors that include the demography and crime rates of the police district.  A multivariate regression analysis will be used to assess the relationship among multiple variables simultaneously.  The following regressions will be used, with the dependent variable of "rate of traffic stops, field interviews, no-action encounters, and frisks":

a.   Subject race;

b.   Subject race, Latino status;

c.   Subject race, Latino status, sex;

d.   Subject race, Latino status, sex, age;

e.   Subject race, Latino status, sex, age, district racial composition;

f.   Subject race, Latino status, sex, age, district racial composition, district age composition;

g.   Subject race, Latino status, sex, age, district racial composition, district age composition, district employment rate;

h.  Subject race, Latino status, sex, age, district racial composition, district age composition, district employment rate, district crime rate;

i.  Subject race, Latino status, sex, age, district racial composition, district age composition, district employment rate, district violent crime rate; and

j.  Subject race, Latino status, sex, age, district racial composition, district age composition, district employment rate, district property crime rate.

6.  *Regression Analysis Regarding Reasonable Suspicion:* The Consultant shall conduct the same set of regressions described in paragraph V.A.5 where the dependent variable is whether there was reasonable suspicion for the traffic stop, field interview, no-action encounters, or frisk.  Since this variable is available only for the sample of the data that has been analyzed for reasonable suspicion pursuant to paragraph V.A.3, it will contain a smaller number of observations than the regressions described above in paragraph V.A.3.

7.  *Hit-Rate Analysis:*

a.  The Consultant shall conduct a hit-rate analysis to determine possible effects of race and ethnicity in traffic stops, field interviews, and frisks.  For example, because individualized, objective, and articulable reasonable suspicion that a person is armed and dangerous justifies a frisk, one type of hit rate that can be calculated is the share of frisks that result in the discovery of a weapon being discovered.  If hit-rates (e.g., rate of weapons seizure) for white people are higher than for Black people, there is a question as to whether the police are

employing different thresholds for reasonable suspicion to people of different races.

b. The Consultant shall conduct hit-rate analysis at the police-district level to test for the possibility that traffic stops, field interviews, or frisks may be higher for all people in heavily minority neighborhoods. In this analysis, there will be calculations of the police-district level traffic stop, field interview, and frisk rates per rates of reported crimes to determine whether these ratios are correlated with police-district racial demographics. The question in this context is whether, for example, there is a possible racial effect of stop and frisk practices if the crime rate in District One is five times the crime rate in District Two, but the stop rate is 10 times higher in District One. Should the Consultant determine that TraCS traffic crash data is to be considered in the analysis following consultation with the Parties' and their experts, such data shall be provided by Defendants to the Consultant and Plaintiffs' Counsel.

8. The following protocols will be followed in the regression analyses described in paragraphs V.A.5 and V.A.6:

a. The police district will be the geographical areas for data analysis. Defendants will provide Plaintiffs and the Consultant with the relevant police district population data.

b. Crime rates will be measured by the incidence of crime per relevant population (using lagged data, i.e., the crime rate from the previous Quarter or Year).

i. Defendants shall ensure that the Consultant and Plaintiffs' counsel are provided with crime data agreed upon by the Parties. At a minimum, Defendants shall make available crime data for the preceding year, including reported crimes, committed crimes, type of crime, police district of crime, and suspect race if known.

c. Economic and social data will be used as controls. The Parties shall endeavor to reach agreement about the economic and social factors used as controls. To the extent that there are differences in the economic and social regression factors used by each side, and to the degree there appear to be different conclusions based on different factors, the Parties' experts will determine which are the most relevant and reliable.

d. The Consultant may perform "robustness" checks beyond the regression analysis set forth above, and shall confer as to their usefulness.

e. The Consultant shall determine whether any differences in the racial and ethnic data analyzed in paragraphs V.A.5 and V.A.6 are statistically significant and meaningful.

i. If the effect of race or ethnicity is not statistically significant, it means that the effect of race or ethnicity is lower than the ability of the regression to detect. This relates to the power of the regression, which is affected by the sample size. If the sample size is large enough, a statistically insignificant coefficient indicates that the difference by race is statistically indistinguishable from zero (i.e., no race effect) to a high

degree of accuracy. Regression analysis provides measures for determining statistically significant racial and ethnic disparities and in the social sciences, the standard significance threshold for the likelihood of finding the same result is 95%, which corresponds to a p-value of .05. For some of the benchmarks, including analysis of gross rates of traffic stops, field interviews, no-action encounters, and frisks with regression for salient factors, there is no need for sampling as all of this data is available in the electronic databases (TraCS, RMS, and CAD) described in paragraph IV.A.1–6.

 ii. Even if the coefficient on race or ethnicity is statistically significant, the magnitude may be so small that it is not meaningful.

9. The Consultant shall issue the first Draft Report no later than 12 months after entry of this Agreement, and this Draft Report shall address the period of the preceding twelve (12) months.

 a. The Parties shall have thirty (30) days to serve each other and the Consultant with any objections to the Consultant's Draft Report.

 b. The Consultant shall have thirty (30) days to make any revisions to the Draft Report following receipt of the Parties' objections.

 c. The parties and the Consultant will not make public any Draft Report during the sixty (60)-day time period prescribed in paragraphs V.A.9.a. and V.A.9.b., above.

d. The Consultant's Final Report shall be filed with the Court and made publicly available on the FPC website.

10. Defendants shall provide the Consultant with data, documents, analysis, and information requested by the Consultant in the preparation of Reports, including, but not limited to, electronic data on crime rates, police deployment, and MPD traffic stops, field interviews, no-action encounters, and frisks, including all of the data identified in paragraph IV.A.3.

11. The Consultant may seek the advice and assistance of police practices experts and statistical experts in formulating the Reports. Defendants shall compensate the Consultant for any experts retained by the Consultant for their professional services and reasonable expenses.

## VI. FEES AND COSTS

1. Defendant Milwaukee shall pay the reasonable costs and fees of the Consultant.

2. Defendant Milwaukee shall pay reasonable attorneys' fees and costs to Plaintiffs' counsel and their experts for time spent to date on investigating and litigating this case. Counsel for Defendant Milwaukee agrees to recommend the payment of $1,900,000 for the total amount of Plaintiffs' reasonable attorneys' fees and costs herein.

3. Any disputes over fees and costs, including the reasonableness thereof, shall be submitted to the Court for adjudication in accordance with 42 U.S.C. § 1988.

## VII. TIME PERIOD

1. Defendants shall comply with the terms of this Agreement for a minimum

of five (5) years.

2.      If Plaintiffs' counsel finds or reasonably believes that any Defendant is not in substantial compliance with any term of this Agreement, Plaintiffs' counsel shall bring the issue to the attention of Defendants' counsel prior to filing a motion seeking appropriate relief with the Court.

## VIII.  MISCELLANEOUS

1.      Defendants agree to develop any comprehensive and agency-wide policies and procedures that are necessary to ensure consistency with, and full implementation of, this Agreement.  Unless otherwise noted, Defendants agree that all policies, procedures, and manuals shall be developed within six (6) months of the effective date.

2.      No amendments of this Agreement will be valid unless made in writing and signed by all of the signatories hereto.

3.      This Agreement may be executed in duplicate counterparts, each of which will be deemed an original, with the same effect as if the signatures thereto were on the same instrument.  Each signatory to the Agreement may execute this agreement by telefax or email of a scanned copy of the signature page, which shall have the same force and effect as if executed on an original copy.

4.      The Parties further agree to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement.

5.      If, after the date hereof, any provision of this Agreement is held to be illegal, invalid, or unenforceable, the remaining provisions shall continue in full force and

effect.

6.　　It is the intent of the signatories that no part of this Agreement is to be presumptively construed either against or in favor of any signatory because of the identity of the drafter.

7.　　Paragraph headings contained herein are for purposes of organization only and do not constitute a part of this Agreement.

8.　　Any communications or notices to be provided to legal counsel for the Parties pursuant to this Agreement will be sent in writing via email or addressed, via commercial overnight delivery service, to the attention of the persons identified below (or as the signatories may subsequently direct in writing).

This Agreement constitutes the entire agreement and understanding between and among the signatories with respect to the subject matter hereof and supersedes all other prior or contemporaneous oral agreements, understandings, undertakings and negotiations of the Parties.

It is so agreed.

**Counsel for Plaintiffs:**


_____      ___7-12-18___
Nusrat J. Choudhury                        Date
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel. (212) 519-7876
nchoudhury@aclu.org


_____      ___7-12-18___
Jason Williamson                          Date
American Civil Liberties Union Foundation
125 Broad Street, 17th Floor
New York, NY 10004
Tel. (212) 549-7340
jwilliamson@aclu.org


_____      ___7-13-18___
Karyn L. Rotker                           Date
American Civil Liberties Union of Wisconsin Foundation
207 East Buffalo Street, Suite 325
Milwaukee, WI 53202
Tel. (414) 272-4032
krotker@aclu-wi.org


_____      ___7-11-18___
Shanya J. Dingle                           Date
Covington & Burling LLP
850 Tenth Street, NW
Washington, DC 20001
Tel. (202) 662-6515
sdingle@cov.com

**Counsel for Defendants:**

_____          _____
Grant F. Langley                                        7/13/18
Milwaukee City Attorney                          Date
200 E. Wells Street
Room 800
Milwaukee, WI 53202
Tel. (414) 286-2601
glangl@milwaukee.gov

Approved and ORDERED by the Court.

_____       _____
The Honorable Joseph P. Stadtmueller                    Date
United States District Judge

# APPENDIX A



# MILWAUKEE POLICE DEPARTMENT

### STANDARD OPERATING PROCEDURE

### 001 – FAIR AND IMPARTIAL POLICING

| GENERAL ORDER: 2014-105<br>ISSUED: September 19, 2014 | EFFECTIVE: September 19, 2014 | REVIEWED/APPROVED BY:<br>Assistant Chief James Harpole<br>DATE: June 26, 2017 |
|---|---|---|
| ACTION: Amends General Order 2013-04 (February 8, 2013) | | WILEAG STANDARD(S): 1.7.8 |

## 001.00  PURPOSE

The work of our police members has a substantial and positive effect on crime and helps us pursue our mission of creating neighborhoods capable of sustaining civic life. We recognize that crime disproportionately impacts some of our neighborhoods, and police tactics, while proper and effective, can at times be perceived as frightening or alienating. An unfortunate paradox exists: the vulnerable neighborhoods most in need of police services are often inhabited by residents who sometimes feel unfairly targeted by police. We must be aware that the way our authority is used is equally as important as the result of its use.

To that end, this policy is intended to reaffirm this department's commitment to fair and impartial policing, to clarify the circumstances in which officers can consider race, color, ethnicity, national origin, economic status, sexual orientation, gender identity or expression, age, sexgender, and religion, immigration status, limited English proficiency, disability, and housing status when making law enforcement decisions, and to reinforce procedures that serve to ensure the public that we are providing service and enforcing laws in an equitable way.

## 001.05  POLICY (WILEAG 1.7.8)

Police members shall not rely to any degree consider on an individual's race, color, ethnicity, national origin, economic status, sexual orientation, gender identity or expression, age, sexgender, or religion, immigration status, limited English proficiency, disability, or housing status in carrying out law enforcement activities except when credible, locally relevant information links a person or people of specific characteristics/status, as listed above, to a specific unlawful incident, or to specific unlawful incidents, criminal patterns, or schemes.  This restriction on the use of race/ethnicity does not apply to law enforcement activities solely designed to strengthen the department's relationship with a diverse community.
(WILEAG 1.7.8.2)

Note: Biased based profiling by our police members is prohibited and is defined as the following: Police-initiated action that relies to any degree upon common traits associated with belonging to a certain group; such as race, color, ethnicity, national origin, ancestry, age, gender, gender identity or expression,

sexual orientation, religion, marital status, economic status, disability, political affiliation, cultural group, immigration status, limited English proficiency, disability, housing status or any other identifiable characteristics of an individual rather than the behavior of that individual, or credible information that leads the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity. (WILEAG 1.7.8.1)

Police members may use common traits as listed above in selecting whom they stop, when a person matches the specific description of an individual who is suspected of engaging in criminal behavior based on credible evidence. (WILEAG 1.7.8.2)

EDWARD A FLYNN
CHIEF OF POLICE

EAF:kmd

# APPENDIX B



City
of
Milwaukee

Police Department

Edward A. Flynn
Chief of Police

Memorandum No. 2009 – 28

March 3, 2009



RECEIVED
MAR 4 2009
FIRE AND POLICE COMMISSION

RE:  TRAFFIC ENFORCEMENT POLICY

It is abundantly clear that crime disproportionately afflicts some of our neighborhoods. It is an unfortunate paradox that the vulnerable neighborhoods that most need the police are often inhabited by racial and ethnic minorities who sometimes feel unfairly targeted by police. Yet experience tells us that the intelligent, assertive use of police authority to stop people and vehicles can be an invaluable tool that reduces crime and enhances safety in these same neighborhoods. Our challenge is to balance these very real considerations.

Few things we do on the public's behalf are without risk; stopping people for motor vehicle violations and suspicious behavior is no exception. One of these risks is the perception or accusation of racially biased behavior. We do not engage in this behavior. We engage in lawful, professional policing based on values, and for this you have my complete support.

Traffic enforcement will continue to be a key part of our policing strategy going forward. It is well known that traffic enforcement can save lives and reduce injuries by preventing motor vehicle crashes. In addition, academic studies have proven that over time traffic enforcement can cause decreases in non-traffic related crime, including motor vehicle thefts, robberies and firearm related crime. We have already experienced this impact in 2008 with a 16% reduction in motor vehicle thefts and a 10% reduction in robberies compared to 2007.

Success will not be measured by the quantity of citations issued, but rather the purposeful linkage of enforcement attention to areas prone to violent crime and disorder. Oftentimes warnings are just as – or even more – effective as citations, and are encouraged where appropriate. We will not, however, sacrifice our values for the sake of targeted enforcement. Traffic stops, just like everything else we do, must be principled by law.

The intelligent, non-biased use of police discretion will be an important part of our efforts to encourage voluntary compliance with the law, reduce fear, and reassure neighborhoods that we are responding to their concerns without alienating those very same neighborhoods through enforcement action experienced as being trivial. This use of discretion, guided by professional values, is essential.

MKE_0011850



It must be understood that proper police tactics can be experienced by innocent people as frightening and alienating. It must be recognized that many of the people we stop will be released without further action. In this context, how our authority is employed is as important as the results of its use.

The act of stopping an unknown subject frequently occurs under ambiguous and dangerous circumstances. The Milwaukee Police Department is committed to officer safety. One of the strongest guarantees of officer safety is community support and acceptance. This past year we have seen both due directly to your efforts to protect our residents. But there is still work to do.

The Milwaukee Police Department will continue to work to build effective partnerships with all of our constituencies. It also is committed to the development of training, tactics, and timely intelligence that enhances officer effectiveness and increases officer safety.

Our integrity demands of us that we reject expedient tactics. The Milwaukee Police Department will continue to focus its energies on smart policing strategies based on data, accurate and timely intelligence, reasonable suspicion, probable cause, the judicious use of police discretion, and partnerships with the community, while rejecting any tactics even partly based on assumptions about race or ethnicity.

This order is intended to reflect Department policy, not procedures. Members should reference applicable Standard Operating Procedures and previous training for further details regarding specific procedures.

Edward A. Flynn

EDWARD A. FLYNN
CHIEF OF POLICE

MKE_0011851

# APPENDIX C

# R U L E S

## of the

## BOARD OF FIRE AND POLICE COMMISSIONERS

## CITY OF MILWAUKEE

Milwaukee, Wisconsin

Revised July 26, 2001

Most Recent Amendment:  March 15, 2018

| RULE | TABLE OF CONTENTS | PAGE |
|------|-------------------|------|
| I. | DEFINITION OF TERMS | I - 1 |
| II. | SCOPE OF AUTHORITY | II - 1 |
| III. | ADMINISTRATION | III -1 |
| IV. | BOARD PROCEDURE | IV - 1 |
| V. | CLASSIFICATIONS | V - 1 |
| VI. | QUALIFICATIONS | VI -1 |
| VII. | APPLICATION PROCEDURES | VII - 1 |
| VIII. | EXAMINATIONS | VIII - 1 |
| IX. | TESTING PROCEDURES | IX - 1 |
| X. | ELIGIBLE LISTS | X - 1 |
| XI. | APPOINTMENTS | XI - 1 |
| XII. | REINSTATEMENT | XII - 1 |
| XIII. | REAPPOINTMENT | XIII - 1 |
| XIV. | RESIDENCY | XIV - 1 |
| XV. | CITIZEN COMPLAINT PROCEDURE | XV - 1 |
| XVI. | TRIAL PROCEDURES | XVI - 1 |

Note: Dates in parentheses indicate the date of the most recent amendment to the section. Refer to the Appendix for specific information on amendments.

## RULE IV.

### BOARD PROCEDURE

Section 1.  Rules of the Board or of the Fire or Police Departments may be prescribed, amended, or repealed by a majority vote of the Board pursuant to the following procedure:  Notice of the proposed rule, amendment, or repeal shall be given and recorded in the minutes of a regular or special meeting, and action shall be deferred to at least the next regular or special meeting, provided that at least ten (10) calendar days have elapsed before final action is taken. (Rev. 7/26/01)

Section 2.  The Board shall be provided with any rule change proposed by a Chief at least thirty (30) calendar days prior to its anticipated effective date.  All proposed rule changes provided to the Board shall be in writing.  The Board shall then follow the procedure outlined in Section 1. (Rev. 7/26/01)

Section 3.  The Board shall be provided with any modification of a standard operating procedure, standard operating instruction, standard operating guideline, or other directive affecting the policies and standards of the Fire or Police Departments, in writing at least twenty (20) calendar days prior to its proposed effective date.  A requested change, if not material, may go into effect with the approval of the Chair of the Board and the Executive Director; otherwise it shall go on the Board's Regular Agenda for approval.  Material change is one that creates an issue of legal consequence or controversy, or creates a change in the meaning or language of a document other than a routine update, or acknowledges changes in state certification standards.  Newly proposed standard operating procedures, standard operating instructions, standard operating guidelines, or other directives affecting the policies and standards of the Fire or Police Departments shall be placed on the Board's Regular Agenda for approval. (Rev. 7/27/17)

Section 4.  Immediate action may be taken on a proposed rule, amendment, or repeal provided that such action has approval of two-thirds of the Board members present. (Rev. 5/20/10)

Section 5.  The Board may, by a vote of two-thirds of those present and voting, but in no event by less than a majority of the Board, vote to suspend or waive any of its Rules or provisions contained herein. (Rev. 5/20/10)

Section 6.  Robert's Rules of Order shall be the official Rules of Order of the Board except as otherwise provided herein. (Rev. 5/20/10)