# City of Milwaukee Settlement Agreement

## FIRST ANNUAL REPORT
### SEPTEMBER 2019



**PREPARED BY THE CRIME AND JUSTICE INSTITUTE**



# CONTENTS

Executive Summary ........................................................................................................................... 4

    Notable Areas of Progress During Year One ...................................................................... 5

    Notable Challenges to Date ................................................................................................. 5

    The Year Ahead .................................................................................................................... 7

Introduction .................................................................................................................................... 9

    Background ........................................................................................................................... 9

    The Role of the Consultant .................................................................................................. 10

    The Crime and Justice Institute Team ............................................................................... 11

    How This Report Is Organized ............................................................................................ 13

Summary of CJI Year One Activities ............................................................................................. 14

Barriers to Reform ......................................................................................................................... 17

Assessment of Year One Items ..................................................................................................... 20

Policy Formulation ......................................................................................................................... 38

    Summary of Requirements in Settlement Agreement ...................................................... 38

    Progress in Year One .......................................................................................................... 38

    Challenges in Year One ...................................................................................................... 40

Data Collection and Reporting ...................................................................................................... 41

    Summary of Requirements in Settlement Agreement ...................................................... 41

    Progress in Year One .......................................................................................................... 42

    Challenges in Year One ...................................................................................................... 47

    The Year Ahead .................................................................................................................. 49

        Recommendations ........................................................................................................ 50

Training .......................................................................................................................................... 51

    Summary of Requirements in Settlement Agreement ...................................................... 51

    Progress in Year One .......................................................................................................... 51

    Challenges in Year One ...................................................................................................... 53

    The Year Ahead .................................................................................................................. 53

Supervision .................................................................................................................................... 55

    Summary of Requirements in Settlement Agreement ...................................................... 55

    Progress in Year One .......................................................................................................... 55

Challenges in Year One...................................................................................56

The Year Ahead ...........................................................................................58

Procedures for Complaints..................................................................................60

Summary of Requirements in Settlement Agreement ........................................60

Progress in Year One ....................................................................................61

MPD ...........................................................................................................61

FPC .............................................................................................................62

The Year Ahead ...........................................................................................62

Audits ...................................................................................................................63

Summary of Requirements in Settlement Agreement ........................................63

Progress in Year One ....................................................................................63

MPD ...........................................................................................................63

FPC .............................................................................................................65

The Year Ahead ...........................................................................................65

MPD ...........................................................................................................65

FPC .............................................................................................................66

Counseling, Re-training, and Discipline ..............................................................68

Summary of Requirements in Settlement Agreement ........................................68

Progress in Year One ....................................................................................68

Challenges in Year One..................................................................................70

The Year Ahead ............................................................................................71

Conclusion............................................................................................................72

3

# EXECUTIVE SUMMARY

On July 23, 2018, the U.S. District Court for the Eastern District of Wisconsin entered an order adopting a Settlement Agreement among the parties to *Charles Collins, et al. v. City of Milwaukee, et al.* The Plaintiffs in that case alleged that there had been racially disparate and unjustified stops, frisks, and other unconstitutional police actions. The Defendants denied those allegations, and maintain that denial in the Settlement Agreement. By the terms of the Agreement, the City of Milwaukee, the Fire and Police Commission (FPC), and the Milwaukee Police Department (MPD) (collectively, the "Defendants") are committed to implement significant changes to policies, training, supervision practices, and the use and sharing of data. The suit was filed on February 22, 2017 during the tenure of the immediate predecessor of current Chief Alphonso Morales. Chief Morales began serving as Interim Chief of Police on February 15, 2018 and was named Chief of Police on April 5, 2018.

As part of that Settlement Agreement a Consultant must prepare an annual report that addresses the City's compliance with the terms of the Settlement Agreement based on a review of MPD and FPC actions and an annual analysis of MPD data on traffic stops, field interviews, no-action encounters (NAE), searches, and frisks. After mutual agreement by the counsel for the Plaintiffs and the City, the Crime and Justice Institute (CJI) was contracted by the City to serve as the Consultant. Our role is to focus on compliance, and ways to achieve compliance, with the terms of the Settlement Agreement and to conduct prescribed data analyses. We also serve as a technical advisor and facilitator as the City, through the MPD and FPC, works toward providing effective, safe, and constitutional policing. We use the language in the Settlement Agreement to define the scope of our responsibilities.

It is worth noting that CJI, in our role as Consultant, is not a substitute for the City, MPD, or the FPC, as the major reforms outlined in the Settlement Agreement are the responsibility of the Defendants. CJI is providing assistance, support, and assessment but, ultimately, meeting the requirements of the Settlement Agreement is the responsibility of the City of Milwaukee. There are many requirements for the City and several are due in the first year. The language of the Settlement Agreement seems to appreciate that the culture change required by the Agreement takes time and relentless attention. The requirements of the first year are foundational—changing and creating policies, completing training, establishing processes for review and reporting, and designing methods for oversight and discipline. After building the foundation, in subsequent years expectations for compliance come with specific benchmarks for operational and behavioral changes.

This Annual Report is CJI's assessment of the Defendants' progress during the first year in implementing the reforms required by the Settlement Agreement.

4

## Notable Areas of Progress During Year One

To date, CJI has witnessed an authentic commitment on the part of MPD to the goals and tasks that are outlined in the Settlement Agreement. It is our opinion that MPD has been working in earnest to achieve the requirements and expectations of the Agreement. The MPD began working on the requirements of the Settlement Agreement soon after it was signed by the Parties, which was months in advance of CJI's engagement. When CJI's work got underway in the fall of 2018, MPD had already made notable progress in revisions to Standard Operating Procedures (SOPs) and developing new and revised training.

The first year of the Agreement is largely focused on policy formulation including revision, approval, communication to personnel, and training on the new policies. All of the policies itemized in the Settlement Agreement were revised and approved by the FPC and communication about and acknowledgement of the revised policies on the part of MPD personnel is nearly complete. Between January and June of 2019, nearly 1,800 members of MPD, line officers and supervisors, were trained on the requirements of the Settlement Agreement. Internal Affairs investigators received training on procedures for complaints.

The first year also saw progress in establishing mechanisms for oversight in supervision, audits, reporting, and the feedback loops to training. While there is much remaining work to be done in these areas, MPD has made progress in designing and implementing internal accountability mechanisms.

As will be discussed below, MPD has experienced notable challenges related to the data requirements of the Settlement Agreement. However, we witnessed a sincere effort on the part of MPD to build the infrastructure and tools needed to collect, extract, and deliver required data to the Plaintiffs, the FPC, and CJI.

The FPC staff similarly took on the task of reform with sincerity and we believe the current staff are committed to working toward compliance with the Settlement Agreement. The FPC staff are working in concert with the MPD on mutually appropriate training for audit staff as well as with CJI for resources and ideas for structural reform. With the recently confirmed new Executive Director and new Commission chairperson, more information will become available about the staffing and budget needs for the FPC to meet the aspirations of the Settlement Agreement.

## Notable Challenges to Date

CJI began this work with an expectation of cooperation from both MPD and FPC personnel and our expectation has been met. Concerns remain about the internal capacity and available financial resources of both MPD and FPC to fulfill all of the obligations of the Settlement Agreement. Vacancies or officials in an acting capacity

5

in the FPC made it difficult in the first year to assess the constellation of needs in the FPC. The FPC and the MPD both lack a detailed and prospective planning document with processes that includes delineated assignments and timetables for all of the remaining requirements. We hope this will be rectified as we launch into year two.

The Settlement Agreement has expectations for the FPC that far exceed its current role and its ability based on the current level of staffing. The FPC was already an operation with a full workload prior to July 2018; and the Settlement Agreement added an enormous responsibility to already overburdened staff. Additionally, the FPC has experienced repeated changes in staff leadership and the Commission itself has vacancies. The Settlement Agreement calls for the FPC as the lead conduit for data to the community and envisions a more robust oversight role on the part of the Commission and staff than appears to exist currently. With those expectations, the FPC staff are examining audit models from elsewhere to inform their future audit structure and staffing needs. It is expected that the FPC will need increased staff and fiscal resources or significant reorganization to achieve the expectations of the Settlement Agreement. And certainly, the FPC itself needs a full complement of engaged, active, deliberative, and efficient Commissioners and solid leadership for the staff.

While the individuals with whom we work in Milwaukee are cooperative and committed, presently, too few people are thinking about and working towards compliance with the Settlement Agreement across the City. It is true that the change activities rest in the MPD and the FPC, but the cultural, operational, and budgetary challenges require a full on effort by leadership at all levels in the City. This includes engagement and attention from the offices of the Mayor, City Attorney, Common Council, and the FPC Commissioners.

One of the greatest challenges during year one was developing the infrastructure and tools needed to collect, compile, and extract required data and the Defendants must create a concrete and specific plan to address these deficiencies. The changes to data collection and reporting needed to achieve the requirements laid out in the Settlement Agreement require a tremendous amount of work by the MPD. Given the scope and complexity of the work, challenges and delays were expected and experienced. MPD delivered data for the first quarter of 2019 on the agreed upon date of April 15, 2019 to the Plaintiffs' counsel and CJI. After receiving the data, our diagnostic assessment found a number of problems, including missing or incomplete data that prevented the use of data for analysis. MPD provided an improved second extraction of quarter one data on June 17, 2019 and data on the second quarter of 2019 was received on July 31, 2019, two weeks after the agreed-upon due date. Problems with the format and structure of the data remain and CJI continues to work with MPD to rectify these issues to improve the process and data delivery for future quarters.

The scope of change required in the Settlement Agreement by MPD and FPC is wide-sweeping.  It is challenging to instill, monitor, and enforce new policies, new activities, and new expectations for the police and FPC staff. Developing structures and changing behavior takes time.

## The Year Ahead

Much of the attention to date was on requirements with due dates within the first year of the Agreement. In the year ahead we expect progress to be made on items that were not due within year one. We believe a detailed, multi-year plan for MPD and FPC on how they are going to meet the remaining requirements is necessary. In year two we expect the focus to shift away from policy formulation, training development, and data extraction toward establishing protocols and oversight mechanisms. There will be a greater focus on audits and on how supervisors are performing now that policies are in place and in-service training is completed.

CJI has two quarters of data in hand and as of this writing expects a third quarter to be delivered in the upcoming weeks. In the upcoming months we will continue to assess the quality of the required data and begin analyzing the data as outlined in the Agreement.

Now that MPD personnel are trained and the policies are in place, emphasis is needed from the highest level of leadership, first line supervisors, and the officers who are working on the street. Providing quality training does not ensure changes to practice. Relentless attention to and discussion of data collection, as well as engaged supervisors—who provide coaching, ongoing training, and set expectations on the radio and the street—need to be the focus of the Department.

Vacant positions at MPD—patrol officers, detectives, and supervisors— impede the Department's ability to achieve successful compliance at the same time as the MPD is struggling to maintain effective operations while engaged with the complexities of preparation necessary to host the Democratic National Convention (DNC) in July 2020. Not only does the Department need substantial planning time, and the right staff at the appropriate levels, but also, preparation for the event will place additional, high demands upon all City departments, and this will be particularly true for MPD. The level of security, coordination, and collaboration with countless external stakeholders is something the Department knows how to do and, we believe, does well. In order to meet the requirements of the Settlement Agreement while meeting the needs of the DNC and continuing to do the regular day-to-day duties of policing the City of Milwaukee, MPD needs to be fully staffed with patrol officers and supervisors.

We recognize that the scope of change expected from the Settlement Agreement will take time and yet at the same time, there is an urgency to achieve the desired reforms.

7

We believe the Defendants have shown a good-faith effort in meeting the early requirements of the Settlement Agreement and notable progress has been made. However, a tremendous amount of work remains to be done and we have concerns about the current capacity of the involved agencies. It will take the commitment and attention of many in the City including the Mayor's Office, members of the Common Council, FPC Commissioners, the City Attorney's Office, as well as MPD and FPC staff to ensure the staffing levels are appropriate and that requirements of the Settlement Agreement are met moving forward.

# INTRODUCTION

## Background

On February 22, 2017, the American Civil Liberties Union (ACLU), along with counsel from Covington & Burling LLP, filed a class action lawsuit against the City of Milwaukee, the Milwaukee Fire and Police Commission (FPC), and the Chief of the Milwaukee Police Department (MPD). Six individuals brought the case *Charles Collins, et al v. City of Milwaukee* (2017) on behalf of a class of people who allege that MPD's policies and practices related to stops and frisks violate the protected rights of the Fourth and Fourteenth Amendments of the U.S. Constitution. In particular, the Plaintiffs alleged that the practices, policies, and customs of MPD authorize officers "to stop people without individualized, objective, and articulable reasonable suspicion of criminal conduct" and "to frisk people without individualized, objective, and articulable reasonable suspicion that the person is armed and dangerous", which are violations of the Fourth Amendment (SA I.A.1)[1]. The Plaintiffs also claim that MPD sustains "stops and frisks of Black and Latino people that involve racial and ethnic profiling, or are otherwise motivated by race and ethnicity, rather than reasonable suspicion of criminal conduct, in violation of the Fourteenth Amendment" as well as Title VI of the Civil Rights Act of 1964. (SA I.A.1).

On July 23, 2018, the U.S. District Court for the Eastern District of Wisconsin entered an order adopting a Settlement Agreement among the parties to *Charles Collins, et al. v. City of Milwaukee, et al.*[2] The Defendants denied the allegations, and maintain that denial in the Settlement Agreement. By the terms of the Agreement, the City of Milwaukee, the Fire and Police Commission (FPC), and the Milwaukee Police Department (MPD) (collectively, the "Defendants") are committed to implement significant changes to policies, training, supervision practices, and the use and sharing of data. The Settlement Agreement is a comprehensive agreement that outlines specific actions the Defendants must take to reform policing. The MPD and FPC are required per the Agreement to update stop-and-frisk policies, document stops and frisks appropriately, improve training, supervision, and auditing relating to stops and frisks, publish stop-and-frisk data, and allow the public to submit complaints against officers in a more streamlined and simplified process. Finally, they must utilize a consultant to assess whether the entities named in the lawsuit comply with the Settlement Agreement. The sunset of the Agreement is five years from the effective date.

---

[1] Citations to a specific paragraph of the Settlement Agreement follow the text that relies on that paragraph and appears in parentheses containing SA followed by the paragraph number.
[2] Order and Settlement Agreement (July 23rd, 2018). *Charles Collins, et al. v. City of Milwaukee, et al.,* (17-CV-00234-JPS) United States District Court Eastern Division of Wisconsin Milwaukee Division.

The Crime and Justice Institute (CJI) was selected to serve as the Consultant per mutual approval of the Parties. CJI entered into a contract with the City of Milwaukee on October 4, 2018 and began work immediately. As of the writing of this report we have been engaged and working collaboratively with the Parties for nearly a year.

Full compliance with the requirements of the Settlement Agreement will take a significant amount of time and effort from all Parties. Changes on this scale cannot and indeed will not happen overnight. A great deal of thoughtfulness and attention must go into these changes. The five-year timeline of the Settlement Agreement signals the amount of time this type of effort is estimated to take. This significant, multi-year initiative is not a Police Department effort, but rather a full City effort. While the majority of the required reforms outlined in the Settlement Agreement fall under MPD and FPC's purview, the support and engagement of entities throughout the City will be vital to successful reform and meaningful improvement.

## The Role of the Consultant

A major function of the Consultant role as outlined in the Settlement Agreement is to assess the City's compliance in an annual report. This annual report assesses the Defendants' efforts and hindrances towards compliance with the required reforms in the Settlement Agreement and includes results of required data analysis as outlined in the Agreement. For this first annual report, we have based our assessment of MPD and FPC progress during the first year of the Agreement through site visits, regular phone and email communication, and receipt and review of extensive documentation. Per the Settlement Agreement, if we find non-compliance on any requirement, we will work with the City to reach compliance and formally follow up within six months to determine whether they have in fact rectified the issues. The Settlement Agreement outlines some of the ways in which we shall measure compliance, including random reviews of incident reports and specific analyses using statistical methods. However, the Settlement Agreement does not lay out all compliance measures, and part of our work is to determine collaboratively what constitutes compliance for all of the requirements. The first draft report is due to the Parties no later than 12 months after entry into the Agreement. After a 60-day, non-public review and revision process, the final approved annual report will be filed with the court and published on the FPC website.

Other cities and police departments that have been under a court-ordered consent decree typically have a monitoring team that works for the court to assess compliance and plays a substantive role in shaping the reforms. We believe it is worth noting that in this instance the Consultant's role as outlined in this Settlement Agreement has a notably different and more limited role than a typical consent decree monitoring team. Most consent decree monitoring teams have a robust role in community engagement and our role as Consultant is more limited in that and other areas. CJI is not an agent

of the court, instead, we are an agreed upon consultant hired by the City. We will not be substantively participating in shaping departmental changes, such as policy language or training content. Rather, the consultant's main task is tracking and reporting on the compliance of the Defendants through review and data analysis. Our role with MPD and FPC, according to this Settlement Agreement, is to focus on compliance, adherence, and data quality and analysis.

## The Crime and Justice Institute Team

CJI brings decades of experience developing and evaluating evidence-based, data-driven policies, managing complex processes with diverse stakeholders, and driving organizational change within criminal justice agencies. CJI, based in Boston, works with local, state, and national organizations to improve public safety and the delivery of justice throughout the country. We have a national reputation for developing strong and lasting relationships with safety and justice organizations and stakeholders to improve policy and practice through system assessments, technical assistance, evaluation, research, and policy development and analysis with the goals of improving performance over the long term and building capacity for lasting change.

The project team is being led by CJI's Executive Director Christine M. Cole, who is serving as the overall project lead, providing strategic guidance, and liaising with key stakeholders in Milwaukee. Ganesha Martin, who is currently the Director of the Mayor's Office of Criminal Justice in Baltimore, is serving as a subject matter expert on several issues including training, audits, and supervision. Senior Policy Specialist Sarah Lawrence is managing the day-to-day operations of the project including project and staff management, compliance documentation and tracking, and operational liaising with MPD. Data and Policy Specialist Katie Zafft is leading the required data analysis, and Policy Analyst Joanna Abaroa-Ellison is playing a key role in the data analysis and overall research and operational support. Brief bios of the key staff members are below.

Christine Cole has worked for over 30 years in the safety and justice sector with a particular focus on policing. Prior to CJI, Ms. Cole served as Executive Director at the Harvard Kennedy School Program in Criminal Justice Policy and Management. In that capacity she participated in many research and technical assistance projects related to police-community relations leading numerous focus groups of police professionals and community members in research projects from Los Angeles, CA to Papua New Guinea. She also spent many years in police agencies in Massachusetts implementing community policing, best practices, and sound management habits. She currently works on the police monitoring team in Cleveland, Ohio and has done so since 2015. Ms. Cole has a national reputation of driving police reform through her work with experts in the field. Ms. Cole holds a Master's Degree in Public Administration from

11

Harvard University's John F. Kennedy School of Government and a BA from Boston College.

Ganesha Martin is an attorney contracted by CJI for her subject matter expertise in policing and compliance with court-ordered reforms. Ganesha Martin is the Director of the Mayor's Office of Criminal Justice (MOCJ) for the City of Baltimore. She leads collaborative criminal justice efforts that include the Baltimore Police Department, Baltimore State's Attorney's Office, Governor's Office of Crime Control and Prevention, U.S. Attorney's Office, the judiciary and several community groups. Ms. Martin led the federal court-ordered Consent Decree reform efforts at the Baltimore Police Department from 2015 to 2018. As Chief of the Department of Justice Compliance, Accountability & External Affairs Division, Martin collaborated with DOJ Civil Rights Division attorneys during a pattern or practice investigation that ultimately led to a consent decree. She played an integral role on a negotiation team that introduced structural reforms to the Baltimore Police Department in the areas of crisis intervention, relationships with youth, interactions with persons suffering from mental illness, use of force, de-escalation, body-worn cameras, mobile data computer technology, hiring and recruitment, community engagement, and officer wellness and early intervention. She holds degrees in Journalism and Asian Studies from Baylor University and a Juris Doctor from Texas Tech University School of Law.

Sarah Lawrence has nearly 20 years of experience working with law enforcement agencies and criminal justice executives in research and policy partnerships. Ms. Lawrence has significant experience managing applied research projects with law enforcement agencies. She has managed many multi-site, multi-year projects including an assessment of the DOJ's Collaborative Reform Initiative. Ms. Lawrence is a co-author on the after-action review for the Las Vegas Metropolitan Police Department's response to the 1 October mass shooting. Previously, while at the University of California, Berkeley School of Law, she served as research partner for the East Palo Alto Police Department as part of the Bureau of Justice Assistance Smart Policing Initiative and she collaborated with the Oakland Police Department in the publication of several policy briefs related to crime in Oakland. While at the Criminal Justice Center at Stanford Law School, Ms. Lawrence served as the research director for an Executive Session on California's Public Safety Realignment where she worked closely with many of the state's top criminal justice executives. She holds a Master's Degree in Public Policy from the University of California, Berkeley and a BS in Engineering from Cornell University.

Katie Zafft has over 10 years of experience working in criminal justice policy evaluation and implementation. Dr. Zafft's professional research experience includes both quantitative and qualitative data analysis at the local, state, and national level to evaluate a wide range of criminal justice topics, including the intersection of law enforcement and drug policy, community supervision strategies, drug court

implementation, sentencing guidelines, and felony theft statutes. Her work for The Pew Charitable Trusts' public safety performance project involved evaluating state criminal justice policy reforms to inform the national conversation about sentencing and corrections. In a part-time capacity, Dr. Zafft serves as a faculty member in the Department of Criminal Justice and Criminology at the University of Maryland where she teaches courses on crime prevention, courts, and sentencing. She holds a Ph.D. in Criminology and Criminal Justice from the University of Maryland, a Master's Degree in Criminology from the University of Minnesota-Duluth, and a BA in Psychology from St. Catherine's University in St. Paul, Minnesota.

Joanna Abaroa-Ellison has policy and data experience in various parts of the criminal justice system, including jails, courts, policing, and corrections. Prior to her work with CJI, Ms. Abaroa-Ellison served as the Data Integration Specialist and Research Analyst at the Middlesex Sheriff's Office (MA). There, she was able to extract, analyze, and visualize data as well as build capacity and provide counsel for implementing data-driven practices and policies. She holds a Master's of Social Work in Macro Practice from Boston College and BA in Criminology from the University of Pennsylvania.

## How This Report Is Organized

The organization of this report reflects the order of requirements as outlined in the Settlement Agreement. Below we begin with a discussion on our activities and work conducted as the Consultant to date. Next, we provide a high-level assessment on the status of all requirements due within the first year of the Settlement Agreement as well as items that are expected at quarterly, six-month or 12-month intervals. The subsequent chapters include discussions on the City's efforts toward compliance in the following seven areas: Policy Formulation; Data Collection and Reporting; Training; Supervision; Complaints; Audits; and Counseling, Re-training, and Discipline. Within each of these sections we include a summary of requirements in the Settlement Agreement, progress in year one, challenges in year one, and a look at the year ahead.

# SUMMARY OF CJI YEAR ONE ACTIVITIES

During the eleven months in our role as Consultant, we focused our attention towards understanding the organization, policies, and processes of the MPD and the FPC, understanding MPD's data systems and structures, helping to improve data quality, building relationships with the Parties and key stakeholders, and defining measures of compliance for the requirements laid out in the Settlement Agreement. All of the above activities are vital to laying a foundation of understanding of the City and the Settlement Agreement.

As of the writing of this report, we conducted site visits to Milwaukee on three occasions. Our first trip was on November 28 and 29, 2018 and provided us an opportunity to meet numerous key stakeholders, begin to establish relationships, and start the process of understanding roles and responsibilities within MPD and FPC and the systems that are relevant to the work of the Consultant. During those two days, we met with numerous individual from the MPD, FPC, Plaintiffs' counsel and the community, and Common Council. A second visit occurred in late February 2019, where we observed in-service training and provided feedback to MPD. A third site visit was conducted on March 27 and 28, 2019. On this trip, we met with numerous MPD personnel including Chief Morales and his Chief of Staff, staff from the Internal Affairs Division (IAD) and Audits Unit, staff from the Office of Management, Analysis, and Planning (OMAP), staff from the Administrative Bureau and IT department. We also met with the ACLU of Wisconsin, members of the FPC and FPC staff, and Common Council President Hamilton. We attended and presented at a special meeting of the FPC. These meetings served to increase our understanding of the City and various agencies involved in the Settlement Agreement as well as build relationships with the Parties. Each visit and meeting served to better prepare us to perform the work required by the Settlement Agreement. The following is a full list of individuals and entities that we have met with in person to date:

Milwaukee Police Department
- Chief Morales
- Executive Staff including Assistant Chief Raymond Banks, Assistant Chief Michael Brunson, Inspector Terrence Gordon, Inspector Timothy Heier, and Chief of Staff Nick DeSiato
- Administrative Bureau including Captain Jeffrey Point
- Information Technology including Director Deb Wilichowski and Sergeant Douglas Wiorek
- Internal Affairs Division including Captain Paul Kavanagh, Lieutenant David Feldmeier, and Sergeant Ruth Fishnick
- Office of Management, Analysis, and Planning including Director Regina Howard and Sergeant Mark Krowski
- Training Academy including Captain Nicole Waldner and Lieutenant Birch
- Patrol officers

Fire and Police Commission

- FPC Commissioners
- Former Executive Director La Keisha Butler
- FPC personnel including Clifton Crump

City of Milwaukee

- Mayor Tom Barrett and staff[3]
- City Attorney Grant Langley
- Deputy City Attorney Jan Smokowicz

American Civil Liberties Union of Wisconsin

- Karyn Rotker
- Jarret English

Other In-Person Meetings

- Plaintiffs Stephen Jansen and David Crowley
- Judge Lynn Adelman
- Common Council President Ashanti Hamilton
- Markasa Tucker, Collaborative Community Committee (CCC)
- Fred Royal, CCC
- Tom Klusman, Milwaukee Police Supervisors' Organization Labor Relations Manager
- Shawn Lauda and Sarah Polka, Milwaukee Police Association


We performed a variety of activities in addition to site visits to better understand the people, systems, and issues critical to our role as Consultant. We have a standing weekly call with MPD that involves several MPD personnel representing the many divisions impacted by the Agreement. We also have a standing monthly call with the Plaintiffs' counsel. These regular communications serve to keep us informed on the progress and challenges of complying with the Settlement Agreement, as well as to build trusting relationships. Thus far, we have found MPD and FPC personnel who are working on the Settlement Agreement to be actively embracing both the requirements as well as the intent of the Agreement and open to our suggestions and feedback on their internal processes and progress toward compliance. We received and reviewed a significant amount of documentation from MPD and FPC to help us understand the processes and systems relevant to the Agreement and to serve as certification and verification that changes are being made and made in a way that is in accordance with the Agreement. The CJI team has regular communication via phone and email with representatives of MPD, FPC, Plaintiffs' counsel, and the City Attorney's Office.

On March 27, 2019, we presented to FPC Commissioners and Alderman Pérez at a special meeting of the FPC. The meeting served as an opportunity for our team to

---

[3] While scheduling difficulties prevented an in-person meeting with Mayor Barrett, CJI had a lengthy telephone conversation with him and communicates regularly with his chief of staff.

introduce ourselves to the Commissioners and the public, explain our role as the Consultant per the Settlement Agreement, and provide an overview of the activities conducted to date. Our team members fielded questions from the Commissioners and Alderman Pérez about CJI's work and areas where the City was showing progress at that time.

The Public Safety and Health Committee, a Common Council subcommittee, as part of an agenda item at their April 5, 2019 meeting, requested an update on the Settlement Agreement. We submitted a letter to the Committee on CJI's role and MPD's observed progress as of that date. We also submitted a letter to the Steering and Rules Committee for their meeting on May 16 at the request of the Common Council President that provided an update on Settlement Agreement progress.

An important piece of the Consultant's role in assessing compliance involves data analysis of racial and ethnic disparities in police encounters. The MPD delivered data for the period January 1 through March 31, 2019 (quarter one) on the agreed upon date of April 15, 2019 to the Plaintiffs' counsel and CJI. However, our initial diagnostic assessment of the first quarter data revealed a number of problems, including missing or incomplete data that prevented the data from being used for analysis. We provided feedback on the identified issues regarding data quality to MPD based on our initial assessment of the data. The Department acknowledged our concerns and worked to correct errors and prepared a second extraction of quarter one data. On June 17, 2019, MPD provided the Plaintiffs' counsel and CJI with a second extraction of quarter one data.[4] A third data extraction was provided to CJI, Plaintiffs' counsel, and the FPC the first week of August 2019 that included quarter one and quarter two data, covering the period January 1 through June 30, 2019. A review of the quarter one and quarter two data shows that the Department delivered improved data, although outstanding issues with data quality that are described below remain and CJI continues to work with MPD to resolve these issues. We look forward to working with the IT Department and OMAP on the extraction and sharing; and expect command staff to work with street supervisors and patrol officers on improving the quality of the data reporting.

CJI has created a master tracking document to assist us in monitoring the status of all of the requirements of the Settlement Agreement. The internal tool includes details about responsible entities, timeframe, documentation needed, and current status. In many instances, the Settlement Agreement does not provide detail on what documentation or other evidence is required to demonstrate compliance and we have begun the process of defining standards for compliance for all elements of the Settlement Agreement that hold the Defendants to a high standard while maintaining realistic expectations of what is possible given time and resource constraints.

---

[4] The first quarter data was provided to the FPC on July 16, 2019.

# BARRIERS TO REFORM

CJI believes that the current FPC vacancies, if left unaddressed, and lack of clear timelines and policies governing the timeframes of decisions for the FPC impede effective governance and operations of MPD. As the oversight body, established in 1885 [5] by Wisconsin law and the Milwaukee City Charter, the civilian Board of Commissioners has a dual role of providing a venue for the public to comment on agenda items as well as providing oversight functions of both fire and police including approving policies, setting standards, and testing for hiring and promotions. The authority of the Commission includes all aspects of operational *oversight* of the Fire and Police Departments. The Commission also accepts complaints from the public and hears disciplinary appeals of Fire and Police Department members.

At the time of this writing, the FPC has positions within the Commission that have been vacant for an extended period, and some members are serving in expired terms. These vacancies not only limit the roles for active and interested community members and consequently limit points of access for the community, they also hamper FPC's ability to conduct business (specifically subcommittees) outside the twice-monthly meeting. The wide range of responsibilities of the FPC extend to hearing appeals from applicants who are rejected during a hiring process, participating on subcommittees (typically three Commissioners per committee) to hear items specific to policy, discipline, testing and research, and engaging with the community by attending public meetings at the invitation of neighborhood organizations. The ability of the Commission to fully deliver on its expectations is challenged without a full complement of members and clear guidelines for decision making. The Settlement Agreement envisions a more robust and effective FPC and the demands on the FPC will only expand. The part-time positions come with extensive expectations and efficiency depends upon a full complement of Commissioners. It is imperative that the Mayor and Common Council, as approving body, appreciate and act to fill these vacant positions.

Rules guiding the timing of decisions and processes for making decisions appear to be lacking. While MPD must provide policies to the FPC 20 days before enacting them, there is no guidance on the timing of decisions made by the FPC. The chair and executive director can make administrative decisions though they put many items on the agenda for the next meeting and these items often continue to the following meeting or a subcommittee for community input. In many circumstances, 50 to 60 days can pass before FPC makes a decision. More often though, votes are postponed for additional community input or referred to a subcommittee for further review before being placed on the agenda for the full Commission. The practice of sending Standard

---

[5] https://city.milwaukee.gov/fpc/About#.XSXVMWbsaM8 (accessed 7.10.19) also the Commission's authority and responsibility are specified in Wisconsin Statute section 62.50, and in the Milwaukee City Charter.

Operating Procedures (SOPs) to subcommittees rather than hold a hearing that includes public input seems to create further delays in the process. While getting input and comment from the community is of utmost importance, perhaps the Commission could formulate and vote on a process for public input, creating timelines and structure for public comment and timelines for decision making or postponement of rather than sending a policy through what feels like a repeated cycle between the Commission and subcommittee discussions without vote or action.

With the evident delays in the review, discussion, and approval of some policies, it seems to CJI that there is a larger inefficiency in the process for deliberation and decision making that could jeopardize the ability of the City to achieve compliance in real and effective ways. As of July 2019, 13 policies were before the Commission. MPD submitted six in June and these were within the 20-day review period; six were well past the 20-day review period with an average pending period of 162 days; one policy in particular, which we understand has been referred to a subcommittee, remains unresolved since April 2018, over 450 days. None of these policies is directly within the scope of the Settlement Agreement though the lack of action on the new or revised policies leaves the community, including those at MPD, wondering about the FPC's position and consequently, about expected behavior. The Commission acted in a more expeditious manner for the seven policies directly within the oversight of the Settlement Agreement, approving them on average within 51 days. At the lowest end, the Commission approved one policy 37 days from filing and, at the other end, the approval of two policies took 71 days. See the Policy Formulation section of this report for detailed information on the timeline for approval of the SOPs by the FPC under the direct purview of the Settlement Agreement.

We believe that a robust, fully engaged FPC is vital to the City's ability to achieve compliance with the Settlement Agreement. Our assessment to date is that significant inefficiencies at the FPC exist and that current vacancies prevent the Commission from fulfilling its policy-making roles and responsibilities effectively. The FPC must balance the very significant need for community input with its duty to ensure effective oversight, governance, and action on the issues before it. We believe FPC inefficiencies will become a barrier to reform and compliance with the Settlement Agreement should the City not address the above described issues with the Commission.

Budgetary appropriations, limitations, or cuts could also interfere with the City's otherwise robust work toward compliance. Inadequate staffing, in the present and the future, at both the FPC and the MPD are hardships for those agencies not only to achieve their core mission but also with the additional work required by the Settlement Agreement. The Settlement Agreement in section IV.E.3. anticipates the need for the FPC "to hire additional staff and/or employ experts or consultants to conduct the audits described…" and certainly, it would be difficult or impossible for either the FPC or the MPD to achieve compliance with less staff given the emphasis on supervision throughout the Settlement Agreement.

# ASSESSMENT OF YEAR ONE ITEMS

The table below includes a status update for Settlement Agreement requirements with specific delivery dates during the first year of the Agreement as well as items that are expected at quarterly, six-month or 12-month intervals. The relevant paragraph references where each requirement can be found in the Agreement, a description of the Settlement Agreement requirements, the deadline as outlined in the Settlement Agreement, the overall status of the requirement (compliant, in process, or non-compliant) as of the end of year one, and a brief description of the progress status, including documentation that was submitted to CJI as proof of compliance, are included below. Items have been classified in the following categories:

> ➢ Compliant: The Defendants have complied fully with the requirement and the requirement has been demonstrated to be adhered to in a meaningful way and/or effectively implemented.
> ➢ In Process: The Defendants have made sufficient, partial progress toward key components of a requirement of the Settlement Agreement but have not achieved or demonstrated full compliance. The Defendants may have made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Settlement Agreement but have not yet demonstrated effective implementation. This includes instances where an insufficient span of time or volume of incidents have transpired for effective implementation in a systemic manner. It may capture a wide range of states, from the Defendants having taken only very limited steps toward compliance to being nearly in compliance.
> ➢ Non-Compliant: The Defendants have not complied with the relevant requirement of the Settlement Agreement. This includes instances in which the Defendant's efforts may have begun but the Consultant has deemed those efforts insufficient.

Overall, the Defendants have demonstrated compliance with the majority of requirements that had explicit due dates within the first year of the Agreement. There are some areas in which Defendants have made notable progress on requirements, and they have missed the delivery date or some component resulting in an "in process" classification. There are some requirements for which we find the Defendants non-compliant.

| SA Paragraph: | IV.10.a |
|---|---|
| Settlement Agreement Requirement: | Defendants agree to amend MPD SOP 001 – Fair and Impartial Policing, as shown in the redlined document attached to the Agreement as Appendix A. |
| Deadline: | Within 90 days of entry into the Agreement |
| Status: | Compliant |
| Progress Status: | CJI received the final revised and published SOP 001. CJI received a memo that confirms the revised SOP 001 was reviewed during roll call. CJI received confirmation that all required personnel acknowledged the revised SOP through the Continued Education and Request Travel/Training (CERTT) system.[6] |
| SA Paragraph: | IV.10.b |
| Settlement Agreement Requirement: | Defendants shall prepare proposed revised policies for submission to FPC within ninety (90) days of entry into this Agreement. Defendants also agree to work with Plaintiffs to amend the following MPD SOPs within sixty (60) days of entering into this Agreement to reflect provisions of this Agreement that pertain to policies, procedures, guidelines, and standards addressed in these specific SOPs. Should the Parties be unable to reach agreement, they agree to submit their proposed changes to Judge Lynn Adelman for his recommendation. Any of the following are subject to the process prescribed by Wis. Stats. § 62.50(3) for FPC approval in accord with its rules:<br><br>SOP 085–Citizen Contacts, Field Interviews, Search and Seizure;<br><br>SOP 300–Directed Patrol Missions/Saturation Patrols;<br><br>SOP 440–Early Intervention Program;<br><br>SOP 450–Personnel Investigations;<br><br>SOP 730–Mobile Digital Video/Audio Recording Equipment;<br><br>SOP 747–Body Worn Camera; and |

---

[6] CERTT is a software system that certifies officers have read and signed new and revised policies. It provides a record of personnel who have and have not acknowledged policy changes.

| | |
|---|---|
| | SOP 990–Inspections. |
| Deadline: | Submission to FPC within 90 days of entry into the Agreement |
| Status: | SOPs 085, 300, 440, 730, 747 and 990: Compliant<br><br>SOP 450: In process |
| Progress Status: | CJI received the final revised and published versions for SOPs 085, 300, 440, 450, 730, 747. CJI received a memo that confirms these revised SOPs were reviewed during roll call and confirmation that all required personnel acknowledged the revised SOPs through CERTT, with the exception of SOP 450. MPD sent SOP 450 to the FPC for approval on 4/26/19 and FPC approved the revisions on 6/20/19. CJI is now awaiting CERTT documentation confirming that all personnel have acknowledged this policy. CJI received documentation that the Plaintiffs' counsel withdrew the request to amend SOP 990 on 10/31/18. |
| SA Paragraph: | IV.11 |
| Settlement Agreement Requirement: | To effectuate the principles and constitutional standards addressed in paragraphs IV. 1–8, Defendants agree to formally withdraw the following MPD policy document: Memorandum No. 2009-28, "Traffic Enforcement Policy," Mar. 3, 2009. *See* Appendix B. |
| Deadline: | None specified in Settlement Agreement |
| Status: | Compliant |
| Progress Status: | On 10/26/2017 the MPD rescinded and replaced Memorandum No. 2009-28 with the Traffic Enforcement and Crime Reduction Policy. CJI received the memo that communicates to members of the Department that the policy was rescinded and replaced, as well as evidence that this memo was shared on roll call and communicated to MPD personnel. |
| SA Paragraph: | IV.A.2.c |
| Settlement Agreement Requirement: | Defendants shall ensure that all no-action encounters are documented in CAD. |
| Deadline: | None specified in Settlement Agreement |

| | |
|---|---|
| Status: | Non-compliant |
| Progress Status: | The MPD is documenting no-action encounters in RMS, however, the Agreement states that no-action encounters are to be documented in CAD. Without input or agreement from the Plaintiffs, Defendants decided to document no-action encounters in RMS. While the reasons for such a change may be reasonable and represent the best course of action, Plaintiffs should have been consulted. CJI recommends Defendants communicate to the Plaintiffs the reasons for this change. |
| SA Paragraph: | IV.A.7 |
| Settlement Agreement Requirement: | The MPD database(s) of video footage from police-vehicle cameras and body-worn cameras shall be searchable by CAD number with video to be produced one incident at a time, with such searches available for both types of video within one year from the date of the Agreement. Video footage concerning traffic stops, field interviews, no-action encounters, frisks, and searches shall be easily and quickly made available to the Consultant upon request, and no later than 7 calendar days from the date of the request. |
| Deadline: | Within one year from the date of the Agreement |
| Status: | Compliant |
| Progress Status: | MPD provided CJI screenshots from evidence.com website that shows that MPD's body worn camera footage is searchable by CAD number. CJI cannot test this capability remotely and has plans to test in person when on site at MPD in September 2019. |
| SA Paragraph: | IV.A.10 |
| Settlement Agreement Requirement: | Defendants shall ensure that MPD provides, on a quarterly basis, the electronic, digitized data on all traffic stops, field interviews, no-action encounters, frisks, and searches described in paragraph IV.A.3, with the exception of any personally identifiable information, to the FPC, Plaintiffs' counsel, and the Consultant. Defendants shall also provide explicit identification of primary keys, foreign keys, constraints, and indices in order to identify how the TraCS, RMS, and CAD datasets or tables link together and what types of duplicates can be expected. To the extent that any unique identifier (i.e., primary key) includes personally |

| | |
|---|---|
| | identifiable information, that unique key shall be transformed so that it is not readily readable. |
| Deadline: | While no date is specified in the Settlement Agreement for when data extractions should begin, Parties agreed that the first data extraction, which included 2019 quarter one data, would be delivered on 4/15/19. Subsequent data extractions will occur on or about the 15th day of the month after the reporting quarter. |
| Status: | In process |
| Progress Status: | MPD provided the first quarter of data to the Plaintiffs' counsel and CJI on 4/15/19. After an initial evaluation of the data by CJI, it was discovered that the data were incomplete and in too poor quality to be used for analysis. The MPD corrected many of the errors and re-delivered the first quarter data to Plaintiffs' counsel and CJI a second time on 6/17/19. First quarter data was delivered to the FPC on 7/16/19. Second quarter data was due on 7/15/19. It was delivered to CJI and the FPC on 7/31/19 and to Plaintiffs' counsel on 8/2/19. A quality assessment of these data shows that the data are somewhat improved relative to the first extraction but issues with the data remain a problem. An assessment of these data can be found in the Data Collection and Reporting section of this report. CJI is continuing to work with MPD to resolve outstanding data issues. |
| SA Paragraph: | IV.A.11 |
| Settlement Agreement Requirement: | Defendants shall ensure that MPD provides to the FPC, Plaintiffs' counsel, and the Consultant the manuals for police officer and supervisor use of TraCS, RMS, and CAD including examples aimed at clarifying the procedure for inputting into each system all of the information identified in paragraph IV.A.3 about traffic stops, field interviews, no-action encounters, frisks, and searches recorded in the system. |
| Deadline: | None specified in Settlement Agreement |
| Status: | In process |
| Progress Status: | On 7/31/19 MPD provided CJI the TraCS User Guide and Tritech Manual (RMS). MPD asserted that the training materials for data entry in RMS and TraCS served as manuals for police officers and supervisors. CJI finds the documentation on TraCS data entry sufficient. CJI does |

| | |
|---|---|
| | not find the documentation on RMS data entry as described in the training materials as sufficient in serving as manuals for police officers and supervisors. The TriTech (RMS) manual provided to CJI includes nothing on the RMS field interview (FI) module. |
| **SA Paragraph:** | **IV.A.12** |
| Settlement Agreement Requirement: | Defendants shall ensure that MPD provides to the FPC, Plaintiffs' counsel, and the Consultant the codebooks and data dictionaries for users of TraCS, RMS, and CAD that clearly define every variable captured in records of traffic stops, field interviews, no-action encounters, frisks, and searches, as well as all values that each variable can be assigned. |
| Deadline: | None specified in Settlement Agreement |
| Status: | Non-compliant |
| Progress Status: | A first version of the data dictionary was delivered to CJI on 4/15/19 and a slightly revised version was delivered on 6/17/19. They did not include enough information about how the data files linked together and were missing variable definitions. We made recommendations for revisions and a third version of the data dictionary was delivered to CJI on 8/6/19. While some improvements were made, the dictionary still does not provide specific information about how data files link together and is missing variable definitions and descriptions. We have provided to MPD specific recommendations on how to improve the data dictionary and gain compliance. |
| **SA Paragraph:** | **IV.A.13** |
| Settlement Agreement Requirement: | Defendants shall ensure that the FPC will publish on its website, on an annual basis, the electronic, digitized data on all traffic stops, field interviews, no-action encounters, frisks, and searches described in paragraphs IV.A.1-3, with the exception of any personally identifiable information. The FPC will also post on its website any and all reports published by the Consultant pursuant to the Agreement. |
| Deadline: | On an annual basis but no date is specified in the Settlement Agreement for when the first digitized data should be published |
| Status: | In process |

| | |
|---|---|
| Progress Status: | The FPC did not publish on its website the electronic, digitized data by the one year anniversary of the signed Agreement, as the FPC did not receive data that was ready to be publicly posted. The Parties need to agree upon when the first digitized data publication should occur as well as the data quarters that should be included. |
| SA Paragraph: | IV.B.1.a |
| Settlement Agreement Requirement: | Defendants shall adopt procedures to ensure that all officers are able to articulate, verbally and in writing, the constitutional standards for individualized, objective, and articulable reasonable suspicion and probable cause in conducting a traffic stop, field interview, no-action encounter, frisk, and search, and will provide appropriate remedial training where any officer is unable to do so. MPD will develop a training bulletin for all MPD officers reinforcing the requirements for a traffic stop, field interview, no-action encounter, and frisk, including with respect to establishing reasonable suspicion for the stop, field interview, or any frisk, which shall be reinforced through roll call training conducted by supervisors. |
| Deadline: | None specified in Settlement Agreement |
| Status: | In process |
| Progress Status: | Defendants have demonstrated that systems and procedures are designed and in place since the completion of training to ensure that officers are able to articulate the constitutional standards and other factors for the several stop types. CJI has not yet reviewed the actual reports for quality to assess the specific actions of supervisors. MPD produced a training bulletin that reinforces the constitutional requirements for stops. |
| SA Paragraph: | IV.B.1.b |
| Settlement Agreement Requirement: | Defendants shall continue the training begun in 2013 in fair and impartial policing through a program developed by Lorie Fridell, Ph.D. and A. T. Laszlo. Plaintiffs' counsel shall review the substance of this training program within six (6) months of the execution of this Agreement and shall suggest revisions or additions to this training program. Said suggestions are to be incorporated into the training program only upon the approval of the aforementioned program developers, or by similarly-qualified individuals retained for that purpose by MPD. Similarly qualified individuals will include certified MPD trainers trained by |

26

| | |
|---|---|
| | Fridell or Laszlo. Similarly qualified individuals will also include trainers trained by Fridell or Laszlo, retained by MPD. |
| Deadline: | Plaintiffs' counsel shall review substance of this training program within six months of the execution of the Agreement |
| Status: | Compliant for year one |
| Progress Status: | CJI received confirmation that the Plaintiffs' counsel received training materials on 12/7/18 and observed the training in January 2019. The Plaintiffs' counsel provided comments on the fair and impartial policing (FIP) training and MPD provided responses to those comments. CJI received copies of the training materials and evidence that the trainer is a National Instructor for the Fair and Impartial Policing National Training team.

New MPD personnel are provided the full 8-hour training on fair and impartial policing. As part of the in-service training that ran from January through June 2019, MPD provided 5.5 hours of FIP refresher training with a nationally certified, in-house, trainer. The 5.5 hours is less than the full eight-hour training for patrol officers and supervisors, and more than the three-hour booster advertised on the website for Fair and Impartial Policing (www.fipolicing.com). The curriculum used by MPD is a shortened version of the official FIP curriculum which could compromise the pedagogical integrity of the training. In subsequent years, CJI recommends conferring with FIP about modifications to the curriculum and to secure updated materials. |
| **SA Paragraph:** | **IV.B.2.a-d** |
| Settlement Agreement Requirement: | Within twelve (12) months of the execution of this Agreement, and on an annual basis thereafter, MPD shall provide training for all MPD staff who conduct, supervise, document in TraCS, RMS, or CAD, and/or audit traffic stops, field interviews, no-action encounters, frisks, and searches. If Defendants show good cause for the need for an additional six months to complete this training, Plaintiffs will not unreasonably withhold agreement to such an extension. The topics of such annual training should include, but not be limited to:

the MPD databases (TraCS, RMS, and CAD) containing the information identified in paragraph IV.A.3 on all traffic |

|  | stops, field interviews, no-action encounters, frisks, and searches; |
|---|---|
|  | what information about each traffic stop, field interview, no-action encounter, as well as frisks and searches conducted in the course of those encounters, must be documented in TraCS , RMS, and/or CAD; |
|  | documentation and reporting responsibilities of officers who conduct traffic stops, field interviews, no-action encounters, frisks, and searches; and |
|  | how to retrieve data on traffic stops, field interviews, no-action encounters, frisks, and searches from TraCS, RMS, and CAD in order to review encounter reports for evidence of compliance with constitutional standards, this Agreement, and MPD policies concerning the conduct of traffic stops, field interviews, no-action encounters, frisks, and searches. |
| Deadline: | Within twelve months of the execution of the Agreement |
| Status: | Compliant for year one |
| Progress Status: | CJI received training materials on documenting traffic stops, no-action encounters, field interviews, frisks, and searches in TraCS and RMS. CJI also received the roster of all officers who attended in-service training between January and June 2019. |
| **SA Paragraph:** | **IV.B.3** |
| Settlement Agreement Requirement: | All training materials developed and/or approved by Defendants to comply with paragraphs IV.B.l and IV.B.2 of this Agreement shall be provided to Plaintiffs within six (6) months of the execution of this Agreement for review. |
| Deadline: | Within six months of the execution of the Agreement |
| Status: | Compliant |
| Progress Status: | CJI has confirmed that the Plaintiffs' counsel received training materials on 12/7/18 and updated training materials were sent to Plaintiffs' counsel on 3/1/19. |
| **SA Paragraph:** | **IV.B.4.b** |

| Settlement Agreement Requirement: | Plaintiffs shall observe training sessions identified in paragraph IV.B.2 to ensure that the training complies with the requirements of this Agreement and promotes the goals of lawful traffic stops, field interviews, no-action encounters, frisks, and searches. Defendants shall provide the training calendar to Plaintiffs as soon as it is available. Plaintiffs will make every effort to attend in-service training sessions within the first two weeks and will do so no later than the first month that such training is provided. Two observers on behalf of Plaintiffs shall be allowed to observe any training related to this Agreement. In the event that an observer witnesses and documents training that is not consistent with the requirements of this Agreement, Plaintiffs are to bring any such deficiency to the prompt attention of Defendants. Defendants shall then be allowed to correct the erroneous training within three months. In the event that the Defendants fail to do this, Plaintiffs may seek a remedial order from the Court and the Defendants shall be liable for all reasonable fees and expenses connected to any such motion. |
|---|---|
| Deadline: | Training Calendar: As soon as possible<br><br>Training Corrections: Within three months of receiving corrections |
| Status: | Compliant |
| Progress Status: | CJI has confirmed that MPD sent the training schedule to the Plaintiffs' counsel on 12/7/18. The Plaintiffs' counsel observed MPD in-service training on 1/7/19 and 1/8/19 and provided comments on MPD training on 1/11/19. MPD and Plaintiffs' counsel have had a few rounds of feedback on training and MPD's latest set of responses was sent to Plaintiffs' counsel on 5/7/19. |
| SA Paragraph: | IV.C.1.a |
| Settlement Agreement Requirement: | All reports of arrests, which are documented in the RMS system, will be reviewed and approved by a supervisor within the time period prescribed by SOP 263–Records Management [within 5 days]. The supervisor will review the reports for various matters, including the lawful basis for any traffic stop or field interview that led to the arrest, and the lawful basis for any frisk or search conducted during the encounter. |
| Deadline: | Within six months of the execution of the Agreement |

| | |
|---|---|
| Status: | Supervisor approval within five days: Compliant |
| | Supervisor review of lawful basis: Non-compliant |
| Progress Status: | CJI understands that MPD's current practice complies with a state law that requires supervisory approval within 48 hours so that the court commissioner or judge can conduct a probable cause hearing. |
| | Supervisor review of the lawful basis will be included as part of MPD's audits and cursory reviews. The MPD Audit Unit, contemporaneous with training, reviewed a subset of reports from the period January to June 2019 to assess supervisors' compliance with the Settlement Agreement requirements. Because training was ongoing at the time a full audit was not conducted. CJI expects to conduct a more rigorous assessment of the quality of the supervisor review in the next six-month period. |
| | MPD did not reach compliance in a demonstrable way by the anniversary date of the signed Agreement. Based on representations of MPD Command Staff, formal expectations on supervisory review were postponed until after the completion of training in late June 2019. While the MPD may have valid and understandable reasons for this, such delays were not communicated to or agreed upon by the Plaintiffs' counsel. Such a delay prevents CJI from having done a thorough, qualitative review of supervisory compliance with this requirement. |
| **SA Paragraph:** | **IV.C.1.b** |
| Settlement Agreement Requirement: | Within twelve (12) months of the date of this Agreement, MPD will achieve a practice of supervisory review, correction, and approval of 50% of all documentation of field interviews in RMS consistent with the timeframes set forth in SOP 085.20. Supervisors shall review for completeness, and shall review the stated basis for the field interview and any frisk and/or search conducted in the course of the field interview. Prior to approving reports for submission to RMS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented. |
| Deadline: | Within twelve months of the date of the Agreement |
| Status: | Non-compliant |

| | |
|---|---|
| Progress Status: | During the six-month period when over 1,700 officers were being trained, the Audit Unit conducted reviews of supervisors' reports.<br><br>MPD began conducting cursory reviews of supervisor review of traffic stops, field interviews, no-action encounters, frisks, and searches in March 2019 and CJI has received copies of summaries. Cursory reviews are a randomly selected representative sample of reports submitted in a specific time frame (see Counseling, Training, and Discipline section for full description). CJI has received the audit plan and methodology and the Compliance/Performance Testing Instrument used to conduct the audits.<br><br>MPD did not reach compliance in a demonstrable way by the anniversary date of the signed Agreement. Based on representations of MPD Command Staff, formal expectations on supervisory review were postponed until after the completion of training in late June 2019. While the MPD may have valid and understandable reasons for this, such delays were not communicated to or agreed upon by the Plaintiffs' counsel. Such a delay prevents CJI from having done a thorough, qualitative review of supervisory compliance with this requirement. |
| **SA Paragraph:** | **IV.C.1.c** |
| Settlement Agreement Requirement: | Within twelve (12) months of the date of this Agreement, MPD will achieve supervisory review, correction, and approval of every warning and citation issued by MPD officers in the course of a traffic stop or field interview, as recorded in TraCS within seven (7) days, consistent with the timeframe set forth in SOP 070. Supervisors shall review for completeness, and shall review the stated basis for the traffic stop, field interview, and any frisk and/or search conducted in the course of the traffic stop or field interview. Prior to approving reports for submission to TraCS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented. |
| Deadline: | Within twelve months of the date of the Agreement |
| Status: | Non-compliant |

| | |
|---|---|
| Progress Status: | During the six-month period when over 1,700 officers were being trained, the Audit Unit conducted reviews of supervisors' reports.<br><br>MPD has begun conducting cursory reviews of supervisor review of traffic stops, field interviews, no-action encounters, frisks, and searches in 3/19 and CJI has received copies of such reviews. CJI has received the audit plan and methodology and the Compliance/Performance Testing Instrument used to conduct the audits.<br><br>MPD did not reach compliance in a demonstrable way by the anniversary date of the signed Agreement. Based on representations of MPD Command Staff, formal expectations on supervisory review were postponed until after the completion of training in late June 2019. While the MPD may have valid and understandable reasons for this, such delays were not communicated to or agreed upon by the Plaintiffs' counsel. Such a delay prevents CJI from having done a thorough, qualitative review of supervisory compliance with this requirement. |
| SA Paragraph: | IV.C.1.d |
| Settlement Agreement Requirement: | Within twelve (12) months of the date of this Agreement, MPD shall achieve supervisory review, correction, and approval of every no-action encounter documented in CAD within fourteen (14) days. Supervisors shall review for completeness and shall review the stated basis for the no-action encounter. Prior to approving reports as complete, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented.[7] |
| Deadline: | Within twelve months of the date of the Agreement |
| Status: | Non-compliant |
| Progress Status: | During the six-month period when over 1,700 officers were being trained, the Audit Unit conducted reviews of supervisors' reports.<br><br>MPD has begun conducting cursory reviews of supervisor review of traffic stops, field interviews, no-action encounters, frisks, and searches in 3/19 and CJI has received copies of such reviews. CJI has received the audit |

---

[7] MPD is recording no-action encounter data in RMS not CAD.

| | |
|---|---|
| | plan and methodology and the Compliance/Performance Testing Instrument used to conduct the audits. |
| | MPD did not reach compliance in a demonstrable way by the anniversary date of the signed Agreement. Based on representations of MPD Command Staff, formal expectations on supervisory review were postponed until after the completion of training in late June 2019. While the MPD may have valid and understandable reasons for this, such delays were not communicated to or agreed upon by the Plaintiffs' counsel. Such a delay prevents CJI from having done a thorough, qualitative review of supervisory compliance with this requirement. |
| **SA Paragraph:** | **IV.C.3** |
| Settlement Agreement Requirement: | Defendants shall require MPD command staff to counsel, train, or to refer for re-training, any supervisor (*e.g.,* sergeant or lieutenant) who is found through supervisory review to have failed to properly review and correct patrol officers who conduct an unreasonable, race- or ethnicity-based, unreported, or insufficiently documented traffic stop, field interview, no-action encounter, frisk, or search, or to properly refer such officers to counseling, training, or re-training. Appropriately qualified trainers from the Police Academy shall provide such re-training to the officer within thirty (30) days of such a finding. Every six (6) months, Internal Affairs will prepare a report for command staff of allegations of policy violations described above and any corrective actions taken. |
| Deadline: | A report of allegations of policy violations will be prepared for command staff every six months |
| Status: | Non-compliant |
| Progress Status: | During the year since the Settlement Agreement was signed, the IAD has not produced a report on violations of policies related to supervisory matters. CJI expects details, including the release schedule, of this deliverable to be included in a six-month follow up report by CJI. |
| **SA Paragraph:** | **IV.C.6** |
| Settlement Agreement Requirement: | MPD shall complete a twice per year community policing status report and forward that report to the FPC. |
| Deadline: | Twice per year |

| | |
|---|---|
| Status: | Non-compliant |
| Progress Status: | The MPD has not developed a community policing status report. |
| **SA Paragraph:** | **IV.D.2** |
| Settlement Agreement Requirement: | MPD Internal Affairs investigators shall receive special training conducted within one year from the execution of this Agreement in the investigation of complaints by members of the public, including training on the amendments to SOP 450 required by this Agreement. The training shall be conducted by a supervisor of Internal Affairs with expertise in complaint investigation and shall be consistent with those provisions of this Agreement that relate to this subject. |
| Deadline: | Within one year from the execution of the Agreement |
| Status: | Compliant |
| Progress Status: | CJI has received documentation that MPD IA investigators received special training on complaint investigations. MPD did not have the capacity to conduct the trainings internally, as specified by the Settlement Agreement. Therefore, MPD participated in a training by Northwestern University instructors from the University's Center for Public Safety on IA investigations. Defendants did not but should have consulted Plaintiffs' counsel on having the training be conducted by Northwestern University rather than by an MPD Internal Affairs supervisor. |
| **SA Paragraph:** | **IV.E.1.a-d** |
| Settlement Agreement Requirement: | Defendant FPC shall audit data, dashboard camera footage, and body camera footage on traffic stops, field interviews, no-action encounters, frisks, and searches, every six (6) months to identify:<br><br>a. Officers who fail to conduct these encounters in compliance with constitutional standards and principles set forth in this Agreement;<br><br>b. Officers who fail to properly document these encounters in accordance with the terms of this Agreement;<br><br>c. Supervisors who fail to properly review subordinate officers' reports to identify officers who fail to conduct |

| | traffic stops, field interviews, no-action encounters, frisks, and/or searchers in compliance with constitutional standards and this Agreement, or to ensure that the encounters are properly documented in compliance with the terms of this Agreement; and |
|---|---|
| | d. Supervisors who fail to require re-training and/or discipline for subordinate officers who conduct unreasonable, unreported, or insufficiently documented encounters. |
| Deadline: | Every six months |
| Status: | Non-compliant |
| Progress Status: | The data were not available to the FPC to meet this requirement. |
| **SA Paragraph:** | **IV.E.2** |
| Settlement Agreement Requirement: | In order to ensure that complaints from members of the public are appropriately investigated, the FPC, including through the work of any retained consultants, shall conduct an audit every six (6) months of: (a) complaints submitted by members of the public to the MPD, and (b) complaints from members of the public to the FPC. |
| Deadline: | Every six months |
| Status: | In process |
| Progress Status: | The FPC auditor has reviewed and audited FPC complaints only. |
| **SA Paragraph:** | **IV.E.5** |
| Settlement Agreement Requirement: | Defendant FPC shall publish on its website, on a quarterly basis, data on civilian complaints received, under investigation, or resolved during the previous quarter, including the number of complaints from members of the public broken down by number relating to traffic stops, field interviews, no-action encounters, frisks, and searches without legal justification and traffic stops, field interviews, no-action encounters, frisks, and searches based on race or ethnicity and whether the complaints remain open or have been closed. |
| Deadline: | On a quarterly basis |

| | |
|---|---|
| Status: | In process |
| Progress Status: | The first complaint data upload was on 1/23/19, with subsequent data uploads occurring quarterly after that (4/22/19 and 7/19/19). The published complaint data includes complaints filed from January 2018 through June 2019. While the initial data published did not include the necessary tabulation broken down by categories outlined in the Settlement Agreement, FPC reformatted the published data which is now in compliance with the requirements. The published data to date only includes complaints received by FPC. FPC is working with MPD to incorporate data on complaints received by MPD as well. We will look for this addition in future data uploads. |
| SA Paragraph: | IV.E.6.a-d |
| Settlement Agreement Requirement: | Defendants shall ensure that the appropriate division within MPD audits data, dashboard camera footage, and body camera footage on traffic stops, field interviews, no-action encounters, frisks, and searches every six (6) months to identify:<br><br>a. Officers who fail to conduct these activities in compliance with constitutional standards and principles set forth in this Agreement;<br><br>b. Officers who fail to properly document these encounters in accordance with the terms of this Agreement;<br><br>c. Supervisors who fail to properly review subordinate officers' reports to identify officers who fail to conduct traffic stops, field interviews, no-action encounters, frisks, and searches in compliance with constitutional standards and this Agreement, or to ensure that the encounters are properly documented in compliance with the terms of this Agreement; and<br><br>d. Supervisors who fail to require re-training and/or discipline for subordinate officers who conduct unreasonable, unreported, or insufficiently documented encounters. |
| Deadline: | Every six months |
| Status: | In process |

| | |
|---|---|
| Progress Status: | CJI is aware of processes and systems to review these data and to follow on with retraining or discipline. The audits are not complete and CJI is not able, therefore, to review those audits. |
| **SA Paragraph:** | **VIII.2** |
| Settlement Agreement Requirement: | No amendments of this Agreement will be valid unless made in writing and signed by all of the signatories hereto. |
| Deadline: | No deadline specified |
| Status: | Non-compliant |
| Progress Status: | CJI finds that during the first year of the Agreement, the Defendants made some amendments to the Agreement without consulting with the Plaintiffs as required. Such substantive changes include:<br><br>• IV.A.2.c: No-action encounters not being documented in CAD.<br>• IV.C.1.a-d: Not feasible to achieve supervisory review thresholds within timeframes specified.<br>• IV.D.2: Training provided by Northwestern University rather than by an Internal Affairs supervisor with expertise in complaint investigation.<br><br>Moving forward, CJI strongly encourages the Defendants to consult with Plaintiffs prior to making decisions that can be considered amendments to the Settlement Agreement. |

37

# POLICY FORMULATION

## Summary of Requirements in Settlement Agreement

The Settlement Agreement requires changes to the MPD's Standard Operating Procedures (SOPs) to ensure that officers carry out all traffic stops, field interviews, no-action encounters, and frisks in accordance with the protected rights in the Constitution as well as with fairness and respect. Departmental policies must make clear that traffic stops, field interviews, and no-action encounters be supported by individualized, objective, articulable reasonable suspicion of unlawful conduct, and frisks must be supported by individualized, objective, articulable reasonable suspicion that a person is armed and poses a threat. Law enforcement officers may not rely on race, ethnicity, national origin, religion, gender, age, gender identity or expression, sexual orientation, immigration status, limited English proficiency, disability, or housing status as reasonable suspicion or probable cause in the absence of a specific suspect description. Moreover, officers cannot solely rely on a person's appearance or demeanor, the time of day, or inappropriate presence of a person in a neighborhood as evidence of reasonable suspicion. However, officers may use these factors in combination with other legally appropriate factors to establish reasonable suspicion or probable cause. MPD shall not have policies, trainings, or performance evaluations that use a quota system on the number of traffic stops, field interviews, no-action encounters, frisks, searches, or arrests. In order to ensure that MPD's policies and practices are consistent with the principles of the Settlement Agreement reviewed above, the Defendants have agreed to make changes to the Standard Operating Procedures listed in the table below.

## Progress in Year One

Many of the Settlement Agreement's requirements are predicated on the revision of MPD's Standard Operating Procedures. Therefore, revising MPD's SOPs was the City's first essential step towards MPD reform and reaching compliance with the Settlement Agreement. The Parties engaged in an iterative SOP revision process and agreed upon many of the changes prior to the start of CJI's work as the Consultant. In the first year, the City revised and published the seven Standard Operating Procedures required by the Settlement Agreement. The Department communicated changes to the SOPs to MPD personnel through roll call. All officers, except those who had a documented reason for leave such as military or extended medical leave, reviewed the revised SOPs through the Continued Education and Request Travel/Training (CERTT) web application.[8] CJI received final versions of the revised policies, evidence that MPD

---

[8] CERTT is a software system that certifies officers have read and signed new and revised policies. It provides a record of personnel who have and have not acknowledged policy changes.

Case 2:17-cv-00234-JPS   Filed 09/23/19   Page 38 of 72   Document 143

shared the revised policies via roll call, and evidence that all personnel without documented reasons for leave acknowledged the policies. SOP 450 — Personnel Investigations is the only revised SOP not fully acknowledged by members of the Department through CERTT at the time of this writing. The FPC approved SOP 450 on June 20, 2019 and MPD published the SOP and shared the updated SOP via roll call the following day. The Department needs reasonable additional time to ensure all personnel have acknowledged receiving and reviewing SOP 450 through CERTT. While the Settlement Agreement requires the City to revise SOP 990 — Inspections, the Plaintiffs withdrew the request to amend this SOP on October 30, 2018. Finally, the Settlement Agreement requires MPD to rescind Memorandum No. 2009-28 Traffic Enforcement Policy. On October 26, 2017, prior to the Settlement Agreement, the MPD rescinded and replaced Memorandum No. 2009-28 with the Traffic Enforcement and Crime Reduction Policy. CJI received evidence that MPD shared this memo via roll call via screenshots from their roll call system.

## Publication Timeline of Revised SOPs

| Standard Operating Procedure | Revised Policy Submitted to FPC | Revised Policy Approved by FPC | Revised Policy Published by MPD |
|---|---|---|---|
| 001- Fair and Impartial Policing | 11/13/2018 | 12/20/2018 | 12/21/2018 |
| 085- Citizen Contacts, Field Interviews, Search and Seizure | 12/13/2018 | 1/24/2019 | 1/25/2019 |
| 300- Directed Patrol Missions/Saturated Patrols | 11/13/2018 | 12/20/2018 | 12/21/2018 |
| 440- Early Intervention Program | 12/13/2018 | 1/24/2019 | 1/25/2019 |
| 450- Personnel Investigations | 4/26/2019 | 6/20/2019 | 6/21/2019 |
| 730- Mobile Digital Video/Audio Recording Equipment | 1/23/2019 | 4/4/2019 | 4/8/2019 |
| 747- Body Worn Camera | 1/23/2019 | 4/4/2019 | 4/8/2019 |

## Challenges in Year One

Although the City has published all of the revised SOPs in the first year, the Settlement Agreement required MPD to submit the revisions to FPC for approval within 90 days of entering into the Agreement. That 90 day deadline was not achieved due to the Collective Bargaining Agreement requirements of "meet and confer" on new or changed policies with the Milwaukee Police Association and the Parties in negotiations on changes to the policies. Review and approval of the proposed changes to the SOPs required in the Settlement Agreement by the FPC ranged between 37 and 71 days. The delay in the SOP revision and approval process meant that MPD was not able to revise and finalize all SOPs by the start of in-service training. The training began on January 2, 2019 as planned and the FPC approved the last policy relevant to the training on January 25, 2019 without substantial modification. Though the training began in advance of the approval of the final policy, MPD was able to train appropriately all officers according to the policies.

# DATA COLLECTION AND REPORTING

## Summary of Requirements in Settlement Agreement

The MPD is required to document every traffic stop, field interview, no-action encounter, frisk, and search as a digitized record in specified data collection systems. They must document traffic stops in Traffic and Criminal Software (TraCS), field interviews in Records Management Systems (RMS), and no-action encounters in Computer Aided Dispatch (CAD).[9] If a traffic stop or field interview results in a frisk and/or search, then staff will enter documentation and the outcome concerning the frisk and/or search into the TraCS and RMS systems, respectively. Police encounter reports should include the following information:

- Subject's demographic information
- Location of encounter
- Time and date of encounter
- Legal justification for the encounter
- Whether frisk and/or search was conducted and resulted in seized contraband and the type of contraband
- Legal justification if use of force was used and type/level of force
- Outcome of the encounter
- Relevant suspect description
- Names and identifying numbers of all officers on the scene[10]

The data entry systems must have a function that ensures all of the required information are in the "hard fields" (fields that must be entered) prior to the officer submitting the electronic record. Officers must submit reports prior to the end of their tour of duty. However, if an officer is unable to complete the report entry during their tour of duty, then the data must be entered in the report prior to the end of the next tour of duty.

In addition to the information required for police encounter reports, MPD must include information that allows for data management and analysis of police encounters. The datasets must contain a primary key that bridges information across the TraCS, RMS, and CAD systems. Every record should include a unique identifier associated with the subject involved in the police encounter. The individual's unique identifier should be the same within and across all datasets to track individuals who have repeat encounters with the police. The Defendants must also provide population and socio-economic data so that those conducting analysis can use them as control variables.

---

[9] While the Settlement Agreement stipulates that no-action encounters be recorded in CAD, this new data element is being recorded in RMS.
[10] See SA paragraph IV.A.3.a-l for further detail on required information for reporting police encounters.

The parties are expected to collaborate on determining the relevant socio-economic factors to be included in data analyses. If officers capture any of the above encounters through police-vehicle camera or body worn camera footage, then the encounter record must include a unique identifier that links the record with the associated footage. All video footage must also be searchable by CAD number.

MPD is required to share data and data-related documents to the FPC, Plaintiffs' counsel, and CJI on a quarterly basis. The Department should also provide to the FPC, Plaintiffs' counsel, and CJI detailed instructions on how the datasets link together, codebooks and data dictionaries for the datasets, and user manuals for TraCS, RMS, and CAD. On an annual basis, FPC must make publicly available via its website the electronic, digitized data on police encounters.

## Progress in Year One

A major requirement of the Settlement Agreement is for MPD to improve its data collection and reporting efforts allowing for analysis of racial and ethnic disparities in police encounters by the Parties and CJI. MPD worked in earnest to achieve compliance with the data collection and reporting requirements in year one. We acknowledge that updating and improving the data collection and reporting systems pursuant to the Settlement Agreement is a tremendous undertaking, and challenges and delays were to be expected. Indeed, MPD faced a number of issues in their efforts to improve their data systems that delayed the delivery of data to the Parties and CJI. Nevertheless, MPD gained a deeper level of knowledge about their data collection and reporting systems and practices through trial and error.

MPD made great strides in and continues to improve upon their data collection and reporting efforts. MPD decided to record no-action encounters in RMS, rather than through the CAD system.[11] The Defendants should have communicated with Plaintiffs' counsel in advance of making this change and should still provide the rationale for making the change from CAD to RMS to the Plaintiffs' counsel. The Information Technology (IT) Division updated the RMS data entry interface to require officers to enter all of the information required in the Settlement Agreement for field interviews and no-action encounters prior to submitting the report. The new interface will not allow officers to skip over required information when documenting a field interview or no-action encounter. TraCS, however, is a statewide system used for reporting traffic stops and MPD is not permitted to alter the system. MPD provided CJI with the software manuals for TraCS and RMS and in-service training materials regarding data entry in TraCS and RMS. The TraCS training materials sufficiently explain the process for entering traffic stops into the system and provides examples on how to do so. The

---

[11] Because MPD is not using CAD to track no-action encounters, many of the compliance requirements now only relate to RMS and TraCS systems.

RMS training materials, however, do not provide instruction on how to enter information into the system or provide examples and is not sufficient as a guide for using the RMS system as it relates to field interviews and no-action encounters. All police-vehicle and body worn camera footage is searchable by CAD number. As stated earlier in this report, we plan to take a random sampling of videos using the CAD number to verify that the CAD number links encounter records with the associated video footage.

The IT Division also created a data warehouse to store in a single location the data extracted from RMS, TraCS, and CAD systems. The data warehouse allows MPD to efficiently share data with the Parties and CJI. MPD delivered data for the first quarter of 2019 on the agreed upon date of April 15, 2019 to the Plaintiffs' counsel and CJI. After receiving the data, we conducted a diagnostic assessment and found a number of problems, including missing or incomplete data that prevented the use of data for analysis. We provided detailed feedback on the issues regarding data quality to MPD based on our initial assessment of the data. MPD took our concerns seriously and worked to correct errors and prepared a second extraction of quarter one data more fit for data analysis.

On June 17, 2019, MPD provided the Plaintiffs' counsel and CJI with a second extraction of quarter one data.[12] During the week of August 2, 2019, MPD provided the Plaintiffs' counsel, FPC, and CJI with a data extraction containing quarters one and two of 2019 along with an updated data dictionary. A review of the data files shows that it includes all of the required fields (i.e., variables), with the exception of relevant suspect description prior to field interviews. Some of the required information was not provided in a format we deem to be sufficient for analysis. The data dictionary includes some information about the primary keys linking the data files together and offers variable descriptions. We have provided MPD guidance about how the data dictionary should be improved, specifically regarding the primary keys that link data files together and more detailed explanation of variable descriptions.

Assessment of the data indicates that MPD improved the data quality in the second extraction. However, some issues with the data quality remain. In addition, CJI finds the data MPD provided on use of force in traffic stops to be inadequate at the present time. We have brought these issues to MPD's attention and they are actively working to implement solutions. Data extraction of the magnitude and specificity required by the Settlement Agreement was expected to be an iterative process in which improvements are made with each additional extraction attempt. MPD has risen to the challenge of this data undertaking and continues to improve upon their data input, organization, and extraction procedures. This learning process will improve the quality

---

[12]Quarter one data was provided to the FPC on July 16, 2019.

43

and completeness of subsequent quarterly data transfers, allowing for a robust data analysis in future annual reports.

Given the focus on creating a more complete and organized data extraction, we did not have sufficient time to fully analyze the data to assess compliance with the terms of the Settlement Agreement that pertain to whether MPD's policing practices were free of racial or ethnic bias. A six-month follow-up to this annual report will offer an update to all issues of non-compliance and a more detailed analysis of the data. This report assesses the extent to which data elements required by the Settlement Agreement are missing in the extraction we received the week of August 2, 2019.

Per SA V.1.d.i-iii, fewer than 14% of records of traffic stops, field interviews, and no-action encounters should be missing any of the information required by SA IV.A.3. The percent of missing data for required data fields is being reported in this year one report to serve as a baseline for future measurements. We also look to pre-litigation data in the Report of David Abrams (2018)[13] for an additional baseline, particularly as it relates to the number of CAD calls, field interviews, and traffic stops. This baseline may help illustrate changes that occur as a result of new leadership, policies, and the implementation of the Settlement Agreement. The table below details the content and quality of the data requirements for the first two quarters of data covering the period January 1, 2019 through June 30, 2019. A detailed discussion of the table is below in Challenges in Year One. The percentages in the table represent the extent to which data in that field was complete (i.e. not missing). The number of encounters (n) for field interviews, no-action encounters, and contact summary records are counted by the number of persons (non-officers) involved in the encounter.

---

[13] Abrams, D. (February 20th, 2018). "Report of David Abrams, Ph.D." *Charles Collins, et al. v. City of Milwaukee, et al.,* (17-CV-00234-JPS) United States District Court Eastern Division of Wisconsin Milwaukee Division. Retrieved from American Civil Liberties Union Website: https://www.aclu.org/legal-document/expert-report-david-abrams-phd.

| Paragraph | Requirement | CAD | Field Interview (RMS) | No-Action Encounter (RMS) | Contact Summary (TraCS) | ELCI (TraCS) |
|---|---|---|---|---|---|---|
| IV.A.1 | every encounter is documented | n = 35,085 | n = 2,490 | n = 133 | n = 34,389 | n = 25,713 |
| IV.A.2 | clear duplicates | Not clear | Not clear | Not clear | Not clear | Not clear |
| IV.A.3.a | (i) age; (ii) gender; and (iii) race and ethnicity | N/A | (i) 99.9%; (ii) 99.9%; (iii)[a] 99.6% and 94.2% | (i) N/A; (ii) 100%; (iii) 100% and 100%[b] | (i) 73.2%; (ii) 73.2%; (iii) 73.2%[c] | (i) 97.6%; (ii) 97.6%; (iii) 97.2% |
| IV.A.3.b | location (address; police district[d]) | 100%; 97.5% | 100%; 97.2% | 98.1%; 97.2% | 98.4%; 96.0% | 97.9%; 66.5% |
| IV.A.3.c | date | 100% | 100% | 100% | 100% | Data not received[e] |
| IV.A.3.d | start time | 100% | 100% | 100% | 100% | Data not received[f] |
| IV.A.3.e | written narrative / legal basis for the stop | Data not received | 88.1% for narrative, 99.7% for stop justification | 100% | 39.5%[g] | 97.0% |
| IV.A.3.f | whether a frisk was conducted; written narrative of legal basis | N/A | 99.9%; 87.7% | N/A | Not clear | Data not received |
| IV.A.3.g | whether a search was conducted; written narrative / legal basis | N/A | 99.9%; 92.3% | N/A | 73.3%; 99.9%[h] | Data not received |
| IV.A.3.h | whether any contraband was found; type of contraband seized | N/A | 99.9% | N/A | 100%; 99.8% | Data not received |

45

| Paragraph | Requirement | CAD | Field Interview (RMS) | No-Action Encounter (RMS) | Contact Summary (TraCS) | ELCI (TraCS) |
|---|---|---|---|---|---|---|
| IV.A.3.i | whether the encounter resulted in use of force; type/level of force used; stated justification | N/A | 99.8%; data not received; 87.0% | N/A | Data not received | Data not received |
| IV.A.3.j | result of encounter; violations, offenses, or crimes | N/A | 99.8%; 93.9% | N/A | 99.9%; 99.9% | Implicit[i]; 97.8% |
| IV.A.3.k | relevant suspect description received by police prior to encounter for any field interview | N/A | Data not received | N/A | N/A | N/A |
| IV.A.3.l | names; identifying numbers of officers involved | 99.1% | 99.6%; 99.6% | 100%; 100% | 96.2%; 100% | 95.1%; 98.0% |
| IV.A.3 | unique stop identification number | CAD number | CAD number (96.9% match to CAD data) | CAD number (90.7% match to CAD data) | CAD number (97.0% match to CAD data) | CAD number (68.8% match to CAD data) |

Notes: a. These are the percentages of known races and ethnicities. 99.9% if including "unknown."
b. While there is no NULL data, 2.3% of gender and race are "unknown", and 15% of ethnicity are "unknown".
c. Ethnicity is part of the race category in TraCS.
d. The percentages for police district reflect the number of records with a district specified, and does not include records coded as NULL. MPD has indicated that records with NULL police district are likely out of jurisdiction or other special circumstances. The Contact Summary and ELCI datasets require joining to CAD data to obtain police district information.
e. ELCI data could be merged with CAD data to find date, but not for all records.
f. ELCI data could be merged with CAD data to find start time, but not for all records.
g. This percentage represents written justifications that are not marked "NULL" in the data.
h. This represents a coded justification. There is another field with narrative justification, which contains data in 8.3% of records.
i. By being in the ELCI data, we know that a citation was issued.

46

## Challenges in Year One

The changes to data collection and reporting laid out in the Settlement Agreement require a tremendous amount of work by the MPD and, given the scope of work, challenges and delays were to be expected. Below we discuss in more detail the areas where data or elements of the data dictionary are missing or need to be improved:

**IV.A.1** – To develop a baseline for the expected number of calls, field interviews, and traffic stops, we compared the 2019 Q1 and Q2 data with the 2015 and 2016 data analyzed in the Report of David Abrams (2018). The number of records in CAD included in the data extract provided to CJI from the first half of 2019 represents 8% of the records in CAD from the first half of 2015 and 2016 as reported in Abrams (2018). It is unclear whether we only received CAD data as it relates to requirements of the Settlement Agreement, which may explain the difference in the number of records. The number of field interviews from the first half of 2019 represents 41% of the field interviews from the first half of 2015, and about 33% of field interviews from the first half of 2016. Contact summary records from the first half of 2019 represent about 50% of records from the first half of 2015 and 2016. ELCI record totals - which represent electronic citations that occur during police encounters - from 2019 appear consistent with historical data from 2015 and 2016. No-action encounters are a new type of police activity, so it is unclear how many should be expected.

While changes in the number and type of police encounters are expected with new leadership and policies, the large differences we see in the 2019 data compared to 2015 and 2016 may indicate the influence of something other than new leadership and policies. We continue to work with MPD to investigate the causes for the decrease in records from CAD, field interviews, and contact summary forms, and will implement a strategy to overcome any data collection, reporting, or extraction issues that may be present. Further, we will investigate the timing of leadership changes and policy implementation to gain a better understanding of whether these changes may explain the decrease in encounter totals.

**IV.A.2** – Duplicate records are not clearly indicated within data files or across linked data files. The CAD number appears to be the only unique encounter identifier across all data files. MPD must specify this in the data dictionary.

**IV.A.3.e** – Officers are trained to write the narrative explaining the legal basis for the traffic stop in a field called "agency space". As shown in the above table, only 39.5% of traffic stops have narrative data in this field. In some cases the narrative does not appear to include an explanation of the legal basis for the encounter (e.g. "DISPLAYED WI DL"). This is an issue MPD should investigate and remedy.

**IV.A.3.f** – For traffic stops, we believe it is likely that there are an unknown number of frisks not recorded as such because of the structure of the electronic data collection system, the state owned TraCS. MPD's review of the data revealed this collection issue, and possible definition and training issues around the collection of search and frisk data. Historically, MPD viewed searches and frisks as two distinct actions, and yet, TraCS recognizes frisks as a subcategory of searches. TraCS, which cannot be modified by the MPD, requires the user when entering a frisk, to first identify it as a search. This extra step, not consistently taken, could result in undocumented frisks. MPD needs to identify a solution so that data on searches and frisks during traffic stops can be reliably recorded and analyzed separately.

**IV.A.3.i** – Officers have been trained to write details about use of force in the narrative field of the contact summary form in TraCS. Searching narrative fields is an inefficient and unreliable method for data analysis. We appreciate the sensitivity around the AIM database because it includes personnel information as well as UOF data. MPD needs to identify a means for extracting UOF data from the AIM[14] database. We will work with MPD to obtain UOF data in a non-narrative format.

**IV.A.5** – There is a unique person identifier in the field interview and electronic citation data files called MasterPersonId. Through this variable we were able to see that some individuals were involved in both a field interview and received an electronic citation. However, there are no unique person identifiers in data extracted from CAD or TraCS. The Settlement Agreement requires a unique person identifier across all data files and MPD needs to develop a strategy to meet this requirement.

**IV.A.6 –** Based on communication with MPD we understand that the CAD number links police encounters with the associated body worn camera footage. As previously stated, we plan to take a random sampling of videos using the CAD number to verify that the CAD number links encounter records with the associated video footage.

**IV.A.10** – It is not clear from the data dictionary which primary keys link data files or what the linking relationship is between data files. MPD should improve the data dictionary based on recommendations listed in the following section.

**IV.A.12** – The data dictionary provided to us does not clearly describe every variable and does not define all values within each variable. MPD should improve the data dictionary based on recommendations listed in the following section.

Changes to data collection and reporting protocol for officers brought about a number of expected challenges. MPD conducted an in-service training of all officers that explained new requirements for entering data and the new data collection system in RMS for reporting field interviews and no-action encounters. However, MPD began

---

[14] Administrative Investigative Management System.

using the new data collection system prior to all officers completing in-service training. Consequently, there remains potential for data entry errors among officers not yet trained or those still becoming accustomed to the new data entry protocols and data entry system. This further supports the importance of retraining, feedback from the Audit Unit and supervisors, and regular attention to achieve compliance. Additionally, officers received training on what constitutes a no-action encounter during in-service training, which is a new classification of a police encounter for MPD. Not all officers received training on no-action encounters prior to MPD beginning to collect data on no-action encounters. MPD discovered through an internal review of no-action encounter reports that there is confusion among officers on what types of civilian engagements are no-action encounters. For instance, officers were incorrectly classifying field interviews as no-action encounters and erroneously entering interactions with community members as no-action encounters that do not qualify as no-action encounters. Given these challenges, it is crucial that no-action encounters, including the definition and recording protocols, are revisited in subsequent trainings. MPD used the findings from the initial reviews to clarify points of confusion during in-service training and to ensure that reports were reviewed and corrected throughout the chain of command. This review process has proven thus far to be a valuable feedback mechanism. If reviews show inconsistency in reporting or patterns of errors, the Audit Unit informs the Academy to incorporate into and improve training.

## The Year Ahead

The lessons learned during the first year of data collection and reporting will benefit MPD in subsequent years. They should be able to extract future quarterly data with greater ease and initiate timely data transfers to the Parties and CJI. Additionally, by mid-June 2019, all officers completed in-service training and now better understand data collection and reporting practices and what types of interactions qualify as no-action encounters. Moving forward, we expect fewer data entry errors or misclassifications of no-action encounters and improved reporting, in turn improving the reliability and validity of the data. Furthermore, by the second annual report, MPD will have collected and delivered several additional quarters of police encounter data, which will allow the Parties and CJI to analyze the data per the requirements outlined in the Settlement Agreement and draw more meaningful conclusions on racial and ethnic disparities and required levels of reasonable suspicion in police encounters. Finally, over the next year, as the Parties and CJI better learn about and prepare the data for analysis, additional data issues might be discovered that could require MPD to revise the ways in which data are collected and extracted to allow for robust data analysis.

## Recommendations

Based on a review of the data provided to us to date, which covers the period January 1, 2019 through June 30, 2019, the Crime and Justice Institute makes the following recommendations to (1) improve data extraction, (2) improve data joining, and (3) facilitate analysis of the data, including the required annual and semiannual analyses.

MPD should:

- Combine all data files that have direct (1:1) relationships with each other into one file instead of sending multiple files.
- Improve the data dictionary to be more descriptive of the data files and variables within the files by: defining value labels, describing the type of data for each variable (IV.A.12), explicitly stating how files are joinable across data files (IV.A.10), and explaining how encounter data is to be linked to associated video footage (IV.A.6).
- To the extent possible, remove dummy and void data from extraction before delivering to parties, (e.g., void data in ELCI records)
- Investigate areas where there is more than 14% of data missing and create a plan to work toward improvement in those areas (V.1.d)
- Investigate the differences in number of records from historical data, and if serious concerns about data entry are found, make efforts to rectify the problems (IV.A.1)
- Include in future data extracts:
  - Transcription of officer's communication with dispatch in CAD datasets (IV.A.3.e)
  - Use of force data for traffic stops (IV.A.3.i)
  - Use of force type for field interviews (IV.A.3.i)
  - Relevant suspect description for field interviews (IV.A.3.k)
  - Unique identifier that bridges CAD, TraCS, and RMS to allow analysis of a specific individual (IV.A.5)

50

# TRAINING

## Summary of Requirements in Settlement Agreement

The MPD is required to review and revise training materials on all policies and procedures relating to traffic stops, field interviews, no-action encounters, frisks, and searches. They must also consider in these revisions the ways that officers and supervisors can or cannot use race, ethnicity, national origin, and other characteristics as guided by their revised SOP 001 on fair and impartial policing (FIP). MPD must implement procedures that enable officers to be able to articulate the constitutional standards for reasonable suspicion and probable cause in their stops, field interviews, no-action encounters, frisks, and searches. If an officer is not able to do this, MPD must provide remedial training. To reinforce the requirements for stops, frisks, and other interactions, MPD shall create a training bulletin, which supervisors can share during roll call. Within six months of the Agreement, the Plaintiffs shall review the fair and impartial policing training and make suggestions, which MPD can incorporate if the developers of the program or qualified individuals approve them. The trainers will test officers to ensure that they are learning the content. MPD supervisors will receive training to be able to review documentation of police encounters for accuracy and proper practices. Supervisors will receive training on identifying trends that give rise to potentially biased practices.

MPD must hold annual training that covers data collection and reporting. MPD must train officers on TraCS, RMS, and CAD, the databases containing information on traffic stops, field interviews, no-action encounters, frisks, and searches. Officers must receive training on what information needs to be in each database and their responsibility for reporting that information. MPD must also train staff on methods for extracting encounter data in order to review reports for compliance with the Settlement Agreement, as well as constitutional standards and MPD policies.

MPD is required to provide training materials that comply with the Agreement to the Plaintiffs within six months of the effective date of the Settlement Agreement. Next, the Plaintiffs will review the training materials, observe training sessions, and make any recommendations they may have to ensure the training is consistent with the Agreement requirements. They shall bring any deficiency in the training to the attention of MPD, who should correct any errors within three months.

## Progress in Year One

Many departments struggle with creating or revamping training on new policies in a short amount of time. MPD met the task head on and was intentional in preparing the Academy staff and Department leadership to undertake this task. While not required by the Settlement Agreement, they began training with a communications course.

51

Knowing how to police constitutionally is mandatory, but knowing how to do so in a manner than maintains a positive relationship with the community can be challenging. The nature of police work is such that officers normally arrive to a scene under negative circumstances that are full of stress and contention. The ability to deescalate and manage those situations, while maintaining officer safety, is often times difficult and yet, one for which police officers can and should practice and be prepared. Beginning training on constitutional policing and data collection with the basics of professional and courteous communication laid the framework and expectation that respectful and professional communication is expected in all MPD interactions. Throughout the course material and during group discussions, trainers and officers generated ideas on ways to maintain positive interactions with the public. These included showing empathy, active listening, and understanding cultural differences in the community.

MPD provided training materials to the Plaintiffs' counsel in December 2018 and ACLU attorneys representing the Plaintiffs observed the training in January 2019. While the observations were positive overall, observers for the Plaintiffs raised concerns about perceived shortcomings in the training and lack of strict adherence to the Agreement in some instances. Of particular concern was their belief that the training did not discuss the factors around reasonable suspicion and probable cause (SOP 085.20). Under the Settlement Agreement, MPD has three months to review the feedback and make any changes. MPD and Plaintiff's counsel engaged in a few rounds of written responses to the feedback on the training. MPD made some of the suggested changes immediately, and did not make others. As of this writing, to CJI's knowledge there has been no comment from the Plaintiffs' counsel on the last MPD response provided in May.

As part of the in-service training that ran from January through June 2019, MPD provided five and a half hours of FIP refresher training with a nationally certified, in-house, trainer. Five and a half hours is shorter than the full eight-hour training for patrol officers and supervisors and longer than the three-hour booster advertised on the website for Fair and Impartial Policing. The curriculum used by MPD is a shortened version of the official FIP curriculum which could compromise the pedagogical integrity of the training. In subsequent years, CJI recommends conferring with FIP about modifications to the curriculum and to secure updated materials. New MPD personnel are provided the full 8-hour training on fair and impartial policing.

The in-service training covering the issues required by the Settlement Agreement began on January 2, 2019 and concluded on June 18, 2019. During that six-month period, 1,786 members of the Department completed the training. CJI received training materials used for in-service training, the full training roster of officers who completed the training, and the Wisconsin Law Enforcement Standards Board WI DOJ — Training and Standards Bureau certification for MPD's in-service instructors.

## Challenges in Year One

As mentioned previously, the Plaintiffs' counsel raised concerns about aspects of the training, and while MPD earnestly worked to resolve and discuss these issues, there were significant delays in the formal transfer of information between counsel for the Parties. We believe that it is crucial that the Defendants establish and maintain processes that ensure prompt and timely responses to Plaintiffs to minimize future delays in the transfer of information. There have been suggestions on ways to make this exchange more expeditious and given this is a legal process, issues of attorney-client privilege and communication present challenges. We encourage such conversations to continue, as we believe timely and constructive communication between the Parties is optimal for all involved and for MPD in particular. We fully expected that delays during the first year would occur despite best efforts, but we anticipate communication and information exchange to be improved upon as we move forward in the process as trust and protocols are further refined.

While MPD included group testing mechanisms for the material presented, there was no individual assessment to ensure that each participant could articulate, verbally or in writing, the constitutional standards. We believe MPD can improve this process with short quizzes for example. Police nationwide struggle with the ability to articulate individualized reasons for stops and frisks making individualized assessment of understanding in training all the more critical. Failure or inability to articulate the constitutional standards and then act in accordance with those standards is detrimental to the relationship with the community and can affect prosecution. It is of the utmost importance that we ensure that officers understand the importance of this skill and are able to demonstrate it during training.

Additionally, the Settlement Agreement requires supervisors to identify patterns of biased behavior. MPD created a process by which audits identify these patterns and trends. The Audit Unit subsequently generates a memo for supervisors advising them of issues in their command. We have advised, and the Department has agreed, to provide written guidance for supervisors to act on the memo. Review of bias in reports will become the subject of future reviews by the MPD and CJI.

## The Year Ahead

The next year for MPD will be critical. While policy development and training are essential, tracking officer behavior and compliance will act as another measure of the effectiveness of the training. Trainers should incorporate any trends and patterns identified into training. The Department should reinforce communication throughout the organization regarding expectations to adhere to training at every rank. Early assessment has shown officers are struggling with the classification and documentation of no-action encounters. Robust training on no-action encounters in

53

the next training cycle will be important. MPD will need to utilize and/or improve its internal methods for identifying and responding to trends of non-compliance with remedial training. MPD should track and formalize in writing this type of re-training. MPD should identify and address by progressive discipline repeated patterns of behavior not rectified by re-training. Certainly, audits will be helpful in assessing the effectiveness of the training though supervisory interaction and attention to the men and women on the street matters too. An established feedback loop from audits to the Academy to incorporate patterns and trends that led to re-training or discipline is critical. We will look to review the adherence to these systems of accountability for compliance with the Settlement Agreement.

54

# SUPERVISION

## Summary of Requirements in Settlement Agreement

Within six months of the effective date of the Settlement Agreement, the Milwaukee Police Department is required to create and implement policies regarding the supervision of officers who are conducting traffic stops, field interviews, no-action encounters, frisks, and searches. The Agreement requires that a supervisor review and approve all arrest records in the RMS database in a timely manner. Supervisors shall look for the lawful basis of the stop that led to the arrest, as well as the lawful basis for searches or frisks that occurred during the interaction. Within 12 months, MPD is required to review, correct, and approve—within set timeframes—at least 50% of all records of field interviews in the RMS database. In addition, supervisors are required to review, correct, and approve all warning and citation records in the TraCS database within seven days. Finally, MPD supervisors must achieve these same things for no-action encounter records within 14 days. In all of these databases, supervisors must ensure officers fill in information that may be missing from the original record. Supervisors shall document any non-compliance.

If a supervisor finds that an officer has performed an unreasonable or racially based stop or other encounter, MPD is required to provide counseling or training to that officer. The same is required for supervisors who have improperly or incompletely reviewed or corrected unreasonable or racially based encounters. Internal Affairs is required to prepare a report every six months of any violations of policies relating to supervisory matters. MPD must include in their performance review process compliance with legal requirements relating to stops and other encounters. MPD must include discussion of community policing in their command staff meetings. Twice annually, MPD will prepare a community policing status report and submit the report to FPC.

## Progress in Year One

Supervision is key for organizational change. Supervisors need to be trained, active, and responsive to policy. There also needs to be effective oversight and accountability of supervisors. The processes MPD is establishing for the Audit Unit will review not only the action of officers, but also the attention supervisors give to the content of the written reports, response to officers (e.g., corrections, re-training, or discipline), and follow through with officers by supervisors. The front line supervisors have a critically important role in MPD achieving the intent of the Settlement Agreement. They need support from the chain of command. That being said, they should also be re-trained in the event they do not meet expectations. During the first half of 2019, the supervisors, as well as other members of MPD, received training on the new policies, the new reporting forms, and with that the rationale and behavioral expectations that

55

accompany the revised policies.[15] Indeed, it is more than new policies that the Settlement Agreement intends; it is behavior and attitudinal change. The community wants to see and feel that officers understand their position and perspective. Through accurate record keeping, routine review, and regular reporting to the public, MPD as well as community based stakeholders can begin to assess if Department personnel understand and embrace the intent of the Settlement Agreement.

With the completion of training in June and the advent of the routine, scheduled, audits; not only will the feeling of supervision change, but also expectations on supervisors. Supervisory review of reports and any subsequent actions review will become evident and critical beginning in July 2019. Supervisors will similarly feel reviewed by the Audit Unit as regular audits of officer reports as well as supervisor assessments of all reports within the purview of the Settlement Agreement will be implemented.

Based on rosters of individuals who completed training and review of training materials, the Training Division and Audit Unit have demonstrated that they have trained all officers and supervisors in quality report writing and review. Supervisors should be looking for problem language, incomplete actions, or behavior inconsistent with the intent of the Settlement Agreement. MPD did not anticipate full and complete adherence to the new policies and therefore they did not vigorously enforce the Settlement Agreement requirements until the completion of the training schedule in June. It is impossible to have full compliance and is unreasonable and not practicable for MPD to fully enforce adherence until they have trained all officers.

## Challenges in Year One

MPD dedicated the first six months of the Settlement Agreement to creating an internal implementation plan, focusing on the revision, approval, and promulgation of policies, and developing training. During the second six months, MPD continued policy formulation and conducted training. The months it takes for any police department, let alone a police department of a major city, to train all personnel must be a consideration when one expects changes in practice and behavior to occur on a timeline. As stated elsewhere, MPD cannot hold people accountable to policies that are new or changed without the entire membership having gone through training of the content and intent of the policy as well as have an opportunity to practice the behaviors on the street and become accustomed to the reporting formats. Based on representations of MPD Command Staff, formal expectations on supervisory review were postponed until after the completion of training in late June 2019. While the MPD may have valid and

---

[15] Newly promoted supervisors receive three weeks of training that covers the requirements of the Settlement Agreement. MPD has conducted this training two times in 2019 as of September.

understandable reasons for this, such delays were not communicated to or agreed upon by the Plaintiffs' counsel.

The Settlement Agreement, as well as generally good policing, relies heavily on adequate officer to supervisor ratios. The current number of vacancies in MPD's supervisory ranks combined with the additional operational demands of the preparations for the DNC threatens quality supervision on the street. MPD understands the need for greater supervision and is operating with promotion lists that are old, have been extended, and in one case, an exhausted list. Because of the timeline associated with test announcement, administration, and certification, immediate action is necessary to support not only the effective operation of the MPD but also achieve compliance with the Settlement Agreement and effective planning and training for the DNC. The old and expired lists may be a casualty of the inconsistent leadership in the position of FPC Executive Director in the last three years. With the nomination (and appointment after the year one mark of July 23) of an Executive Director, CJI hopes that budget appropriators, with the FPC, Office of the Mayor, and MPD, can plan and budget costs for routine and regular recruitment and promotional exams. Having fresh promotional lists and scheduled examinations for both hiring and promoting is the responsibility of many City agencies together. Cooperation, coordination, and appropriation of reasonable and necessary funds are necessary.

Paragraphs in the Settlement Agreement have specific expectations for the behavior of supervisors. Without effective supervision, it will be difficult for MPD to achieve the behavioral changes that the Settlement Agreement intends. Within the first year, MPD trained supervisors on the new policies as well as their role on the street with officers relative to approving, remediating, and disciplining officers for failure to complete reports correctly as well as for not adhering to the new policies in practice. During the second half of the first year of the Settlement Agreement, January through June 2019, MPD completed training and observed officer and supervisor behavior. The observation and data collection period created an opportunity for officers and supervisors to learn the new ways and for the Audit Unit and data collection teams to ramp up their oversight and reporting capacity. This groundwork positions the Department well for the next six months when they will impose consequences for problems with report writing and behavior inconsistent with the policies within the purview of the Settlement Agreement.

The City must create and host an exam for promotions, and based on the current dates associated with the promotional lists, exams are years behind schedule. In addition to effectively limiting quality supervision on the street—the single most critical component to achieve the intent of the Settlement Agreement—and the inability to provide reasonable supervisor to officer ratios, this logjam creates risk management issues on the street and compromises the ability of the chief to promote to command ranks.

57

As with departments across the country, Milwaukee is experiencing and predicts continued high rates of retirement as the wave of officers hired by agencies in the 1990s with COPS[16] money reach retirement age. Presently, those retirements, many of which are in the supervisory and command ranks, impede the quality of supervision necessary on the streets of Milwaukee. Police Departments across the country are experiencing challenges recruiting.[17] The Department leadership in the last several months requested that the City establish both promotional and hiring exams. While technically the sergeant list is active until August 30, 2019, it is nearly three years old. Originally set to expire May 5, 2018, it has been extended twice. In our experience, and consistent with the practice in Milwaukee, without FPC approved extensions, promotional lists beyond two years in age are retired and considered out of date. The list for lieutenants expired after one extension a year ago in 2018 and the detective list is exhausted and expired March 31, 2018 after an extension. Achieving compliance with the Settlement Agreement is predicated on routine, robust supervision and positions staff with well-trained officers and supervisors are derived only from routine and regular exams.

## The Year Ahead

With the completion of the new and revised policies and training, the year ahead must focus on the activities of officers and supervisors on the street. Supervisors must engage with officers to ensure their actions are consistent with the intent of the Settlement Agreement and that they complete their reports in a fashion that meets constitutional standards as well as comports with the data requirements. The MPD will use data on a regular basis to understand what is happening on the street. Conversations about community policing, what that means to the Department, and how commanders and supervisors communicate that to the patrol officers should occur at the command staff meetings.

The accumulation of data over the next six months will make the audit function, as well as the analysis function, integral to operations. The data need to tell the story of the street and it is incumbent upon the supervisors and command to ensure that officers are doing the best they can with their reports. The Audit Unit will be informative, though based on the duration of audits, audit reports are a lagging and not a leading indicator. Commanders along with data analysts need to create a dashboard for real time assessment of the work on the streets.

---

[16] With the passage of the Violent Crime Control and Law Enforcement Act (H.R 3355) in 1994, Congress authorized $8.8 billion in funds for six years. The Community Oriented Policing Services (COPS Office) in the U.S. Department of Justice was created to distribute and oversee those funds. Since 1994, the COPS Office has awarded in excess of $14 billion to advance community policing. https://cops.usdoj.gov/aboutcops

[17] https://www.policefoundation.org/recruiting-selecting-and-retaining-law-enforcement-officers/ accessed 7/22/2019.

58

Department leadership, along with those leading the compliance effort, need to engage the entire Department to understand the importance of and necessary steps to achieve compliance. Now that MPD has solidified internal operations for review, the effort to reach compliance must be spread across many more individuals in the Department.

In addition to regular data reviews and quarterly analysis, the Audit Unit will check supervisory behavior with a full audit. Supervisors receive feedback from Audit Unit and supervisors must report action back to the Audit Unit.

Consistent with the terms of the Settlement Agreement, the Internal Affairs Division is required to prepare a report every six months of any violations of policies relating to supervisory matters. During the year since the Settlement Agreement was signed, the IAD has not produced a report on violations of policies related to supervisory matters. CJI expects details, including the release schedule, of this deliverable to be included in a six-month follow up report by CJI.

Also in the coming year, we will be reviewing the MPD performance review process to ensure that reviews include individual officer compliance with the legal and data collection requirements relating to stops and other encounters.

In accordance with the Settlement Agreement paragraph IV.C.6, MPD will prepare a community policing status report and submit the report to the FPC twice per year (in July and January). As noted above, we find the MPD non-compliant with this requirement and we look forward to seeing that report. There is a responsibility to the community, in addition to seeking their input on the community policing report, of the Defendants to maintain the Collaborative Community Committee (CCC).

While the CCC was tasked with producing a report with recommendations based on community input in response to the August 2017 leaked Department of Justice (DOJ) draft report, at this writing the report has neither been finalized nor published. It is unclear what intention the City has or what action it has taken to update, charge, or amend the membership of the CCC.

59

# PROCEDURES FOR COMPLAINTS

## Summary of Requirements in Settlement Agreement

The Settlement Agreement includes requirements related to complaints concerning MPD conduct both from members of the public and from within the Department. The requirements that apply to both MPD and FPC intend to improve the procedures related to complaints and to foster transparency around the nature of complaints received, the investigation process, and complaint resolution. Changes in policy, improved availability of complaint-related materials, enhanced supervisor and Internal Affairs Division (IAD) training, increased clarity around the personnel investigation process, and increased data sharing further these goals.

Pursuant to amendments to SOP 450 on Personnel Investigations, complaint forms as well as instructions for how to file complaints need to be available in English, Spanish, Hmong, and any other language the Parties determine appropriate. The forms and instructions need to be downloadable from both the MPD and FPC websites and available at libraries and police district stations. With some limited exceptions, MPD and FPC must accept all complaints, no matter the means of submission, and they are required to create an online submission portal. The Parties negotiated and agreed that complaints from juveniles, unaccompanied by a guardian, will be directed to the FPC via a hotline in district offices rather than accepted by MPD personnel. Supervisors will receive training on accepting all public complaints. MPD and FPC staff who accept complaints must not discourage members of the public from filing complaints.

The Settlement Agreement changes past practices and asserts that complaints do not need to be notarized, though identification may be verified at a later point in the process. If a personnel investigation results from a public complaint, Defendants must ensure that the complainant interview occurs outside the police headquarters, with few exceptions. MPD must create a protocol for the timeframe in which investigations of public complaints should be completed and require that supervisors review and approve anything open after 90 days, and every 30 days after that. Internal Affairs Division staff who are investigating complaints will participate in training with the intent of eliminating bias in favor of law enforcement.

MPD shall maintain a database containing all complaints about MPD conduct received by MPD. IAD must also maintain the number and outcome of all complaints received, regardless of the outcome. MPD must maintain the practice of the Early Intervention Program, providing notice to captains of an individual officer receiving three or more complaints within a 90-day period or three or more complaints over a rolling one year period. MPD will tally complaints into various groupings to improve understanding of staff performance and issues citywide and within each district or unit.

60

In addition to requirements about the way MPD handles complaints, the Settlement Agreement outlines requirements for FPC. They must investigate all reasonable complaints submitted to it, review all internal complaints relating to MPD conduct, and create a database of such complaints. The database should include the same information as the MPD database. The FPC must keep a list of complaints against each officer and provide the Chief with information about officers who receive three or more complaints within 90 days or within a rolling one-year period, as previously stated.

## Progress in Year One

Few of the Settlement Agreement requirements on improving procedures related to complaints came with specific year-one deadlines. Notable progress in this area will likely be documented in future annual reports. However, both MPD and FPC have made genuine efforts during the first year to satisfy and make progress on Agreement requirements related to complaints. Below are the ways in which MPD and FPC have made efforts in this area to date.

### MPD

As described in the Policy Formulation section, MPD published a revised SOP 450 – Personnel Investigations on June 21, 2019. The MPD has developed complaint forms and a pamphlet of instructions about the complaint process for members of the public that is available in English, Spanish, and Hmong as required in the Settlement Agreement and those forms and instructions are available online through MPD's website. The website provides information on how to file complaints in person, by phone, or by mail, as well as a link to the FPC's website for complaints. As of this writing, the website or pamphlet of instructions does not provide an email address directly to the MPD for the public to submit complaints as required by the Settlement Agreement. MPD should establish and communicate via its website and printed materials an email address by which complaints can be submitted. Complaints are no longer required to be notarized, a requirement of the Settlement Agreement, and this was specifically covered during in-service training.

During the in-service training conducted between January and June 2019, trainers instructed MPD officers to accept complaints from any members of the public and not to deter or discourage a citizen from filing a complaint. For example, the training materials note, "Non-supervisory members shall in no way attempt to deter a citizen from making a complaint and are prohibited from questioning citizens as to the nature of the complaint. Supervisors shall in no way attempt to discourage the filing of a complaint by any member of the public."

MPD has begun to develop a process for tracking supervisors contacting complainants including the date contacted, the location of the complainant interview, and a checklist of all requirements for case file contents and the components of investigative process.

61

MPD has begun developing a protocol for complaint investigations timeframes and accountability mechanisms.

IAD investigators attended training on complaint investigations in January 2019. The Center for Public Safety at Northwestern University provided this 16-hour training. Defendants did not but should have consulted Plaintiffs' counsel on having the training be conducted by Northwestern University rather than by an MPD Internal Affairs supervisor, as specified in SA IV.D.2.

### *FPC*

FPC also has complaint forms available in English, Spanish, and Hmong. Instructions on how to submit a complaint are available online and by a pamphlet in English but the FPC still need to provide instructions in Spanish and Hmong. The FPC accepts complaints from the public in person, by phone, mail, email, and through an online portal. Complaints submitted to FPC do not need to be notarized, consistent with a requirement in the Settlement Agreement.

## The Year Ahead

We did not witness any significant challenges during year one in the area of complaints but details about the format and content of complaint data were debated and refined. During the next year, MPD will finalize the protocols and procedures for complaint investigations and supervisory review. We will assess whether MPD is following the protocol of investigating complaints in the given timeframe, and review evidence that supervisors are reviewing and approving investigations that remain open after 90 days, and every 30 days thereafter. We will also be looking at whether MPD is tallying the number and outcome of complaints received and whether captains of officers who receive three or more complaints within a specified timeframe are notified. MPD also must tally complaints into groupings to understand staff performance and issues in their various districts, and we will assess whether they are doing this and the outcomes of their internal performance assessments.

In the year ahead, we will also be focusing on assessing the data and database where MPD and FPC store information about complaints in addition to understanding how the two agencies review and utilize the data. We will assess whether FPC is providing the Chief with information about officers who receive multiple complaints within a short time period outlined in the Settlement Agreement.

# AUDITS

## Summary of Requirements in Settlement Agreement

The FPC and MPD must audit data, dashboard camera footage, and body camera footage on all traffic stops, field interviews, no-action encounters, frisks, and searches every six months. The audit should identify the following:

- Officers who fail to conduct encounters with constitutional standards and principles put forth in the Settlement Agreement
- Officers who fail to properly document encounters, supervisors who fail to review subordinate officers' reports for constitutional standards and principles in the Settlement Agreement
- Supervisors who fail to review subordinate officers' documentation of encounters
- Supervisors who fail to re-train and/or discipline officers who conduct unreasonable, unreported, and insufficiently documented encounters

FPC and MPD will use audits to identify officers who need additional training on traffic stops, field interviews, no-action encounters, frisks, and searches and/or discipline for officers who conduct unreasonable, unreported, or insufficiently documented encounters. MPD is required to document FPC's findings in the AIM database. MPD is also required to incorporate the findings from the audits into MPD's Early Intervention Program.

The FPC must also conduct an audit of complaints submitted by members of the public to FPC and MPD to ensure that those responsible properly investigate complaints. FPC must publish data on all civilian complaints received by MPD and FPC on its website. The data must include the number of traffic stops, field interviews, no-action encounters, frisks, and searches without legal justification, whether the encounter was based on race or ethnicity, and whether the case is open or closed. They must include this data in aggregate form as well.

## Progress in Year One

### MPD

As it relates to auditing in police departments, MPD is ahead of the curve. While it likely could benefit from additional personnel, the MPD Audit Unit has established the foundation for conducting thorough audits. MPD conducts many of the current audits based on generally accepted government auditing standards (GAGAS), which are audit industry standard and rather rigorous.[18] MPD has additionally invested a great

---

[18] See Government Accountability Office website for more information on GAGAS at https://www.gao.gov/yellowbook/overview.

deal of thought into the workflow and tracking of stops and encounters from officer contact through timely supervisor review and remedial training. This has laid the groundwork for the required audits under the Settlement Agreement.

The Settlement Agreement requires MPD to audit data, dashboard camera footage, and body camera footage on traffic stops, field interviews, no-action encounters, frisks, and searches to identify officers who fail constitutional compliance, officers who fail to properly document, supervisors who fail to review documentation, and supervisors who fail to re-train or discipline. Therefore, the upcoming audits will focus on the revised policies and data collection practices that MPD has been developing since January 2019. Given that they completed training in June and that they have established a schedule for data extractions, MPD plans to begin audits in July. The Audit Unit examined a representative sample of stops commencing in March and throughout the first half of the year. Now that training is complete, the Unit will perform an audit on stops from the month of June 2019. MPD expects to deliver the first audit report late in calendar year 2019

The sergeant in charge of the Unit has already drafted audit-tracking forms for the Inspections Section. These documents intend to track and point out, in a timely fashion, alleged non-compliance with SOPs, Department training, and/or the Code of Conduct. Each form is completed after the Inspections Section conducts random reviews of field interviews, traffic stops, and no-action encounters based on data from TraCS, RMS, and any dash-cam or body-work camera video in order to ensure accountability and responsibility in accordance with standard operating procedure and training. The Audit Unit calls these random reviews cursory reviews and complete these on identified representative samples at regular intervals.

The tracking document guides the reviewer through a process verifying that all fields are completed and that the officer has documented reasonable suspicion. When issues arise, supervisors receive a notification form. The notification form was created to alert and direct the supervisor to address the issue, errors or areas of concern that are discovered during the reviews. Appropriate supervisory intervention allows for remedies that range from discussing with the employee the continued responsibility of conducting and documenting encounters in accordance with training, SOP, and the Code of Conduct, referral to remedial training (SOP 082.15) or an internal investigation.

As part of the audits that started in July, MPD sends out the notification after the second auditor has confirmed the error/concern.[19] The notification form must be returned to the Audit Unit communicating from the district/division a notification to the Audit Unit when and how an error is addressed. This process permits a continuous flow of notifications to increase compliance and reinforce training.

---

[19] CJI has received documentation from MPD as evidence that the audits have started.

## FPC

FPC staff has worked diligently to prepare for the additional duties resulting from the Settlement Agreement. The staff at FPC regularly consults with CJI to understand their auditing role per the Agreement and clarify any confusion related to audits. However, they have found it a challenge to comply with their duties with their current level of resources and the recent departures of both the Executive Director and the Commission Chair complicate their efforts. They have in the past year hired new staff but unfortunately, those new employees were planned to address the workload prior to the Settlement Agreement. The departing Executive Director was forward thinking and steadfast in her efforts to prepare the office for their additional duties. However, the gap in time between her departure and the appointment of a new Executive Director stalled the reform work further. On July 30, 2019, Griselda Aldrete was confirmed as the new Executive Director of the FPC. The learning curve for the new Executive Director will be significant and the resources will remain an issue. As it stands, FPC does not believe it has the staff to carry out the audits required by the Settlement Agreement. The Plaintiffs' counsel has indicated it understands the need for stability and time for the FPC to staff up for the increase in work requirements and CJI has suggested a workload study in order to gain insight into the additional resources that may be necessary to produce the audits in the way the Settlement Agreement intends. FPC needs to address the matter of staff resources with all speed and deliberateness. Certainly, should additional resources be necessary to meet the needs, the cooperative and collaborative spirit referenced elsewhere will be necessary to achieve the shared goal of compliance.

# The Year Ahead

## MPD

It appears that MPD is prepared to audit and report out on patterns, trends and problem officers based on current data collection efforts. In the coming months, we expect that they will finalize the process for how the district/division level counseling will be documented and tracked for analysis and auditing for compliance with the Settlement Agreement. MPD will also need to work to identify supervisors who receive counsel versus referral to IAD as well as how to track stops that go completely unreported by uniform and bureau members. They are currently working on these processes within MPD. We anticipate that next year we should begin to see analysis detailing patterns and trends regarding compliance. We should also be able to analyze the Department's response to lack of compliance. Given many entities within MPD need to work collaboratively to achieve this, we anticipate challenges as this becomes implemented, but it will be a very good indication of how the Department as a whole has adjusted to new policy and training and their nimbleness in responding in real time. We expect that MPD will begin incorporating audit findings into their Early Intervention Program or some other mechanism to address officer inaccuracies with data entry. CJI expects to obtain written documentation of how these processes will work and will

65

monitor the extent to which issues and problems are identified and how information feedback loops, to training in particular, are operating.

MPD will host a three-day Basic Law Enforcement Auditor Course from September 9-11, 2019 taught by the Los Angeles Police Department (LAPD). The course is designed to teach law enforcement professionals basic auditing skills to properly plan and conduct law enforcement performance audits. Dr. Jeffrey Phillips from LAPD will conduct a peer review of MPD's Inspections Section when he is on site in September. LAPD has a well-respected Audit Division created in 2001 as required by a consent decree. Since 2004, the Division has instructed other police agencies and affiliates on the basics of auditing police functions.[20]

There are several important members of this framework eligible for retirement based on years of service. MPD should work to ensure continuity in this work and engage in thoughtful and deliberate succession planning so that progress and knowledge is not lost through retirements. Rigorous auditing is a critical piece of the work, not only for operations but also for community trust and transparency. The consistency and integrity of the system is important for the rank and file to course correct in a manner that is not unduly disruptive to operations.

## *FPC*

In the year ahead, with a new Executive Director, we expect a thorough analysis of staffing assets and needs will be completed. We also expect that despite lack of resources, a comprehensive, prospective plan combined with management efforts that inspire work toward the requirements of the Settlement Agreement will be in place. MPD extended an invitation to FPC to join the LAPD led audit training. We hope that with the permanent leader in place, it will be easier to create the plan for reviews and audits.

FPC has been able to make some headway as it relates to publishing required data. They have successfully published complaint data on the website in the required categorizations; however, it does not currently report aggregate data. After some discussion with FPC leadership and staff, we are confident that FPC will be able to publish aggregate data in its second quarter posting. In addition, the Parties have agreed to ambiguous language from paragraph IV.E.5. and agreed that future data publications will include information regarding complaints received by the MPD as well as those received by the FPC. The FPC and MPD are working toward complying with this interpretation in future data postings.

---

[20] http://www.lapdonline.org/inside_the_lapd/content_basic_view/8772 accessed 7/16/2019.

One challenge for FPC in publishing the complaint data is that the complaint database lacks the complaint categories outlined in the Settlement Agreement. Therefore, currently, the analyst at FPC manually categorizes complaints to fit into the required categories based on the narrative of the complaint. In the event that the narrative field in the complaint does not contain sufficient information for the analyst to categorize the complaint, the analyst consults with the FPC investigator and/or refers to the hard copy of the complaint. However, the FPC analyst is not able to consult with MPD investigators as easily, and does not have ready access to the hard copies of complaints received by MPD. We anticipate that FPC and MPD will work together to make this process more efficient and effective and preserve the intent of complainants.

Case 2:17-cv-00234-JPS   Filed 09/23/19   Page 67 of 72   Document 143

# COUNSELING, RE-TRAINING, AND DISCIPLINE

## Summary of Requirements in Settlement Agreement

The Settlement Agreement requires that the MPD create and maintain benchmarks and an alert system for employees who may be involved in three insufficiently documented, legally unsupported, or racially based traffic stops, field interviews, no-action encounters, frisks, or searches over a rolling one-year period. MPD may discipline, counsel, re-train, suspend, or discharge the officer as appropriate. The Agreement requires that MPD issues discipline progressing in severity as the number of such sustained violations increases. MPD shall update SOPs to reflect the requirements of this Settlement Agreement in this area.

During training, MPD must ensure that officers understand the potential consequences of discipline, further training, or counseling, should an officer fail to conduct traffic stops, field interviews, no-action encounters, frisks, and searches in a lawful manner. Supervisors responsible for ensuring officers comply with constitutional standards shall be subject to investigations and the same consequences if they fail in their duties.

The Agreement states that if an officer, in a three-year period, is involved in four or more traffic stops, field interviews, no-action encounters, frisks, or searches not supported by reasonable suspicion or probable cause, or not properly documented, the supervisor must refer that officer for investigation. Internal Affairs shall then conduct an investigation. When command staff or supervisors are determining sanctions or solutions, they will take into consideration the amount and context of complaints lodged against a given officer.

## Progress in Year One

MPD is setting up the process for effective compliance consistent with the intent of the Settlement Agreement as it relates to officer adherence to new policies particularly around citizen contacts, field interviews, stops, and seizures. It is doing so through routine and repeated training, audits, supervisory review systems, and feedback loops. The process of counseling, re-training, and discipline relies on the adoption and distribution of, and training to the policies.

MPD revised SOP 085 Citizen Contacts, Field Interviews, Stops and Seizures and submitted it to the FPC on December 13, 2018. SOP 085 became effective and MPD distributed it to personnel on January 25, 2019. Over the course of training and the next several months, all officers certified their receipt and understanding of the revised policy. Not only are policies shared at roll call, MPD distributes revised policies via CERTT in both final and red lined versions. MPD routinely monitors the CERTT database to ensure that all affected parties (e.g., officers only or officers and civilians)

68

in the Department have accessed, read, and understood the new or revised policy. (See Policy Formulation section of this report for a more complete outline of this process.)

Comprehensive training on SOP 085 commenced on January 2, 2019. Officers completed at minimum 16 hours of training, which the Training section of this report more thoroughly describes. In order to hold officers accountable to policy, it is widespread practice, and the procedure followed by MPD, that all officers and supervisors first receive training in the new policy as well as the ramifications for failure to follow policy before being held accountable to a new policy. MPD did not complete training on SOP 085 of all officers and supervisory personnel until June 18, 2019.

Irrespective of the training schedule, as officers completed training, they were encouraged and expected to follow the articulated requirements for all citizen contacts that require documentation including field interviews, traffic stops, searches and seizures, and no-action encounters. Based on conversations with supervisors, auditors, and trainers, we are aware that supervisors have been reviewing reports in the spirit of the new policy and making on scene corrections with officers. In addition, the Audit Unit is reviewing a sample of all reports.

During the first half of 2019, the Audit Unit within the Inspections Section of the IAD planned and tested plans for the routine review of reports and the formal audits. Since March 2019, the Audit Unit has been conducting cursory reviews of field interviews and traffic stops on an alternating weekly basis. The Department defines a cursory review as "a limited assessment of partial data sources conducted for insight of a question or issue. A cursory review may lead towards the initiation of a formal audit of policy or procedures."[21] The Audit Unit conducts a cursory review of ten cases from all field interviews from a designated week running Sunday through Saturday. On the alternate week, the same process is used and they perform a cursory review of traffic stops. They conduct cursory reviews of no-action encounters weekly.

The Audit Unit shares the definition and expectations of a cursory review on every report written as a result of the review. If they identify issues during the reviews, they may conduct a full audit. Because they carried out cursory reviews contemporaneous with the training, not only were identified issues being reported to supervisors, they were addressed in training in real time. The weekly reviews also provide guidance to officers and supervisors with direct feedback on compliance with reporting issues overall, and serve as a routine oversight across individual officers and among groups of officers. Indeed, at least one internal investigation has been initiated as a result of the weekly oversight of the Audit Unit. This demonstrates that MPD, at the highest levels of the organization, is taking compliance seriously and communicating that

---

[21] Quote from Sergeant Fishnick, Internal Affairs Division, Inspections Section.

seriousness across the command. Moving forward, now that the formal training is completed, the Audit Unit will be communicating in writing to the Academy any issues that are detected and deemed a department-wide retraining issue.

From March to July 2019 the supervisory and cursory reviews focused on the counseling and re-training of officers and supervisors, not discipline. Commencing in July officers who submit or approve inappropriate, incomplete, or otherwise non-compliant reports will be subject to retraining, counseling, or discipline as appropriate. For every error found, the reviewer from the Audit Unit completes a form and sends it to the supervisor. Depending upon the nature of the error, the supervisor reviews and determines the next step – finding no error, or recommending counseling, re-training, or referring to internal investigation. The supervisor checks a box on the form and returns it to the Audit Unit. The Audit Unit created a system to track these forms to ensure full compliance – identification of error, action by the supervisor, and recording of both the action and the correction in the Audit Unit. There is also a form for a district to submit to the Internal Affairs Division when they discover and address an issue at that level.

Formal and routine audits will commence in July 2019. At that time, MPD will have fully trained all officers on the new policies—including the underlying legal standards and the expected practice on the street. In a January 15, 2019 memorandum to the Captain of the IAD, Sgt. Fishnick shared the planned audit schedule for the year showing the plan for audits of traffic stops, field interviews, and no-action encounters during the second half of calendar year 2019.

As individual case audits are completed, the Audit Unit will send out notifications after a second auditor confirms the error/concern. This process allows for a continuous flow of notification to the field to increase compliance and reinforce training.

After completion of the entire audit–team created Compliance/Performance Testing Instrument (CPTI), the Audit Unit will log and analyze findings.

## Challenges in Year One

Scheduling training in a police department is always a challenge. Keeping shifts sufficiently staffed, working around vacations, holidays, and other seasonal festivals and planning for the upcoming DNC is complicated. The training semester at MPD runs from January through the end of May. Training all officers in state requirements as well as the required training associated with the Settlement Agreement and new or changed policies in the allotted time was predicated on a start of January 2, 2019. This was before FPC voted on the policies and before the Plaintiffs' counsel reviewed and agreed to the training curricula.

The Plaintiffs' counsel observed training in mid-January. Comments—both positive and requests for modification—were shared with the Parties. MPD incorporated some changes and training was updated. CJI believes that the Plaintiffs' counsel are satisfied with most but not all of the adjustments. CJI observed the training and reviewed all curricula including updates. Operational issues extended the semester into June and by June 18, 2019 all personnel were trained in the new or revised policies and practices required in the Settlement Agreement.

Implementing change that follows training must precede the enforcement of policies. Because MPD did not complete training until June 18, 2019, holding supervisors and officers accountable is delayed, yet planned. Postponing full enforcement until July is not akin to ignoring the importance of and responsibility for accountability. Instead, the delay in enforcement actions is a conscious response to the training calendar and the challenges of implementation in a police agency. The Audit Unit conducted reviews contemporaneous with training providing real time feedback to trainers and auditors as well as data for administrative commanders about the take up of training for officers and supervisors. The administrative teams (training, audit, and inspections) demonstrated careful planning and structure and set up the patrol division, the men, women and supervisors on the street, with the foundation to follow the policy, with appropriate behavior, and report in accordance with requirements.

## The Year Ahead

MPD plans to commence its full audit function in July, a step that is crucial to the identification of officers, units, shifts or other groups that need counseling, re-training or discipline. The creation of the 2019 Terry Stop Frisk and Search Audit Work Plan Audit #19-03 sets the bi-annual plan to evaluate adherence with current MPD policies and procedures, specifically SOP 085. The Work Plan identifies and defines the criteria against which they will review and assess each type of report. The audit of each report (by type) begins with the review of the CAD, the RMS report, and/or the TraCS, the MPD Code of Conduct, the body worn camera (BWC) video, BWC logs, and Investigative Administrations Management (AIM) reports. The Audit Unit will similarly review the Wisconsin Probable Cause Statement and Judicial Determination forms (CR-215) and Milwaukee County Arrest and Detention Reports (PA-45) for all associated arrests. The first audit sample will be encompass the time period June 1 through June 30, 2019 and the Audit Unit will conduct the field work, data analysis, and report writing during quarters three and four of calendar year 2019. Commencing in January 2020, the audits will cover the six month periods July 1 through December 31 and January 1 through June 30.

With the backbone of training and audit functions strong and nimble, the work with supervisors and the men and women working on the street becomes the main objective. In the coming year, there needs to be an emphasis on and stated expectation

for effective review of all reports with immediate counseling, re-training, or discipline as determined by the behavior. Departmental personnel cannot rely on the Audit Unit to identify issues, officers and supervisors on the street must understand the importance and value of getting this right. Commanders at all levels must stress the need for behavior changes on the street and in the documentation of their actions. Officers as well as supervisors must understand and believe they are accountable for cutting corners or writing poor reports. The data, as well as the quality of the reports will be reviewed to ensure compliance with the expectations of the Settlement Agreement.

## CONCLUSION

This first annual report by CJI presents our detailed account of the efforts and activities that the Defendants have conducted during the first year of the Settlement Agreement. Much of the foundational work in the form of policy formulation and training has been done and establishing protocols and mechanisms for oversight is underway. This demonstrates good progress. We believe the personnel at MPD and the staff at the FPC working on these issues are committed to meeting the requirements of the Settlement Agreement in letter and in spirit. With any endeavor of this complexity and magnitude, challenges and delays are to be expected and were experienced. We will continue to work with the Defendants to address some of the challenges outlined above, particularly as they relate to data. We hope that in year two notable progress will be made on the oversight mechanisms currently being developed and that capacity issues both at MPD and FPC, including at the Commission level will improve. In order for this significant, multi-year initiative to be successful, the support and engagement of entities throughout the City are vital to achieving the desired reforms.