

# City of Milwaukee Settlement Agreement

# Six-Month Report on Non-Compliant Items



**Prepared by the Crime and Justice Institute**

MARCH 2023

Case 2:17-cv-00234-JPS   Filed 03/23/23   Page 1 of 20   Document 181



The photo on this cover depicts "Growing Gateways to Unity", 2018 Community Art Leaders mural program with artist Tia Richardson in collaboration with Milwaukee Christian Center. You can learn more about this mural on Tia Richardson's website, www.cosmic-butterfly.com/p/about-me.html. A picture of the full mural is included below for context.





## TABLE OF CONTENTS

Introduction ............................................................................................................................. 4

Areas of Progress and Challenges ........................................................................................... 5

Update on Non-Compliant Items ............................................................................................ 6

    SA Paragraph IV.A.1 ............................................................................................................ 6

    SA Paragraph IV.A.2.a ........................................................................................................ 7

    SA Paragraph IV.A.2.b ........................................................................................................ 8

    SA Paragraph IV.A.2.c ........................................................................................................ 8

    SA Paragraph IV.A.2.d ........................................................................................................ 9

    SA Paragraph IV.A.3 ............................................................................................................ 9

    SA Paragraph IV.C.1.a ...................................................................................................... 10

    SA Paragraph IV.C.1.b ...................................................................................................... 10

    SA Paragraph IV.C.1.c ...................................................................................................... 11

    SA Paragraph IV.C.1.d ...................................................................................................... 11

    SA Paragraph IV.D.1.i ....................................................................................................... 12

    SA Paragraph IV.D.2 ......................................................................................................... 12

    SA Paragraph V.1.d.ii ....................................................................................................... 13

    SA Paragraph V.1.d.iii ...................................................................................................... 15

    SA Paragraph V.1.d.v ....................................................................................................... 17

    SA Paragraph V.1.d.vi ...................................................................................................... 18

    SA Paragraph V.1.d.vii ..................................................................................................... 18

    SA Paragraph V.1.d.viii .................................................................................................... 19

    SA Paragraph V.1.d.ix ...................................................................................................... 19

    SA Paragraph V.1.d.x ....................................................................................................... 19

Conclusion ............................................................................................................................. 20



## INTRODUCTION

The Settlement Agreement among the Parties in *Charles Collins, et al. v. City of Milwaukee, et al.*[1] stipulates that a Consultant provide the Parties an annual report addressing compliance with the terms of the Agreement. In addition, the Agreement states:

> *Should the Consultant find that the Defendants are non-compliant with any of the requirements of this Agreement, the Consultant shall submit a report within six (6) months determining whether Defendants have rectified the issue(s). (SA V.A.1)*[2]

The Parties mutually agreed upon the Crime and Justice Institute (CJI) as the Consultant. In our [fourth annual report][3] released in September 2022, we reviewed all of the Settlement Agreement requirements for compliance. This six-month report provides an update on the progress and status of the items deemed non-compliant in our fourth annual report per SA V.A.1.

Over the past six months, we have worked closely with the Defendants to make progress in a variety of areas including, but not limited to, strengthening internal processes at Milwaukee Police Department (MPD) and Fire and Police Commission (FPC) to make continued progress toward compliance with the Settlement Agreement; determining documentation required to adequately demonstrate that compliance for individual requirements in the Settlement Agreement has been achieved; and working closely with MPD Command Staff and FPC leadership and staff on a weekly basis.

Over the last six months CJI conducted regular, virtual meetings with:

- MPD Chief Norman;
- Assistant Chief Waldner, Inspector Sarnow, and other MPD personnel responsible for requirements of the Settlement Agreement;
- FPC Executive Director Todd;
- FPC Deputy Director Gehling and other FPC staff who are responsible for compliance with the Settlement Agreement;[4]
- Assistant City Attorney Julie Wilson; and
- Plaintiffs' counsel and affiliated representatives.

The categories of compliance remain unchanged from previous reports and are as follows:[5]

---

[1] Order and Settlement Agreement (July 23, 2018). *Charles Collins, et al. v. City of Milwaukee, et al.*, (17-CV-00234-JPS) United States District Court Eastern District of Wisconsin, Milwaukee Division.

[2] Citations to a specific paragraph of the Settlement Agreement will appear in this report as SA followed by the paragraph number.

[3] https://city.milwaukee.gov/ImageLibrary/Public/ImageLibrary/Photos/CJIYearFourAnnualReporttoFile.pdf

[4] Throughout this report, FPC refers to the Executive Director and staff unless the language specifically includes the Commissioners.

[5] We also use a status of "unable to assess" for some items deemed non-compliant in the annual report. CJI did not re-assess selected items in this six-month report, as they will be part of the annual data analysis of 2022 traffic stops, field interviews, no-action encounters, frisks, and searches.

Case 2:17-cv-00234-JPS    Filed 03/23/23    Page 4 of 20    Document 181

4



- Compliant: The Defendants have complied fully with the requirement and the requirement has been demonstrated to be adhered to in a meaningful way and/or effectively implemented.
- In Process: The Defendants have made sufficient, partial progress toward key components of a requirement of the Settlement Agreement but have not achieved or demonstrated full compliance. The Defendants may have made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Settlement Agreement but have not yet demonstrated effective implementation. This includes instances where an insufficient span of time or volume of incidents have transpired for effective implementation in a systemic manner. It may capture a wide range of states, from the Defendants having taken only very limited steps toward compliance to being nearly in compliance.
- Non-Compliant: The Defendants have not complied with the relevant requirement of the Settlement Agreement. This includes instances in which the Defendants' efforts may have begun but the Consultant has deemed those efforts insufficient.

This report also provides reflections on areas of progress and challenges that the Defendants experienced since September 2022. A comprehensive report of the Defendants' efforts and status on all aspects of the Settlement Agreement will be included in our fifth annual report, which will be publicly released in September 2023.

## AREAS OF PROGRESS AND CHALLENGES

Similar to CJI's previous six-month reports, we take this report as an opportunity to highlight areas of progress and challenges since the publication of our fourth annual report in September 2022.

The Fire and Police Commission (FPC) hired a new Audit Manager in November 2022, which is encouraging for the FPC's ability and capacity to generate a full set of audits every six months as required by the Settlement Agreement. Over the last several months, the FPC has completed several audits of encounters and complaints and shared those audits and audit findings with MPD – a notable area of progress.

The stable leadership of the MPD Administrative Bureau has continued to demonstrate sustained commitment and efforts toward achieving compliance over the last six months. Their understanding of approaches to turn the aspirations of the Settlement Agreement into actions for officers and supervisors has grown. Their increased knowledge of the Settlement Agreement enhances progress toward compliance and efficiency of the work. At the same time, there has been turnover in both Inspections Section staff, who have been key to the work of the Settlement Agreement, and in the Risk Manager position. Weekly meetings between key MPD personnel and CJI representatives are generally productive with clear agendas and defined follow up.

MPD has continued to convene monthly Constitutional Policing Cursory Review meetings attended by Command Staff and District Commanders. Among other agenda items, the meeting serves as a regular venue for feedback about the Inspections Section's cursory reviews of field interviews for articulation and justification of individualized, objective, articulable, reasonable suspicion (IOARS). In recent months, Patrol Captains have presented on their community engagement efforts at these monthly meetings. We



think continuing meaningful engagement between Command and District staff at these monthly meetings is an area of progress.

Alder-based Community Oriented Policing Engagement meetings have continued on an approximate monthly basis. The Community Collaborative Commission (CCC), FPC, and MPD collaboratively plan and conduct those meetings. Information from those community meetings will help shape MPD's Community Policing Plan.

CJI is required to conduct a semiannual analysis of traffic stops, field interviews, no-action encounters, and frisks. Based on CJI's most recent analysis released in October 2022, all encounter types saw improvements in IOARS.[6] Field interviews occurring during the first half of 2022 achieved the desired IOARS threshold for the first time since our review of the second half of 2019. However, MPD is still not meeting the 15% IOARS threshold for no-action encounters and frisks. In addition, our latest review shows there are still citations and warnings with incomplete documentation in TraCS or RMS.

While the Defendants have continued to make progress toward compliance with the Agreement over the last six months, we believe for many personnel there is still a mindset that compliance with the Agreement is essentially a set of tasks to be completed. We will continue to work with personnel at all levels of MPD and FPC to reiterate that the work under the Settlement Agreement is ultimately endeavoring to improve policing in the City of Milwaukee.

## UPDATE ON NON-COMPLIANT ITEMS

In our fourth annual report, CJI found the Defendants to be non-compliant with regard to the paragraphs of the Settlement Agreement referenced below. For each of the items we include the relevant Settlement Agreement paragraph and requirement language, any progress that Defendants have made in the previous six months, or the lack thereof, and an updated compliance status as of the six-month mark.

### SA PARAGRAPH IV.A.1

*"Defendants shall ensure that every traffic stop, field interview, no-action encounter, frisk, and search conducted by any member of the MPD is documented in an electronic, digitized record regardless of the outcome of the encounter."*

**Progress Update:**

Two data sources inform our determination of whether every traffic stop, field interview, no-action encounter, frisk, and search has a corresponding record contained in an electronic system. First, we look to MPD's internal audits, and second, we evaluate information received from the quarterly extraction data.

---

[6] See Table 11 in Semiannual Review of Traffic Stops, Field Interviews, No-action Encounters, and Frisks from October 2022.



MPD's audits draw samples from Computer Aided Dispatch (CAD) assignments with the call types "traffic stop," and "subject stop," for traffic stops and field interviews, respectively. MPD draws the audit sample for no-action encounters from all CAD assignments with a disposition of C-21 and all No-Action Encounter reports in RMS. The most recent audits submitted to CJI cover traffic stops and field interviews occurring between January and June 2022 and no-action encounters occurring between July and December 2022.

From this set of audits MPD identified undocumented activities including field interviews, a single no-action encounter, and frisks and searches, thus demonstrating non-compliance with this Settlement Agreement requirement. We present details of the audit findings by encounter type below for SA IV.A.2.a, SA IV.A.2.b, SA IV.A.2.c, and SA IV.A.2.d.

CJI recognizes the high standard MPD must meet to ensure documentation of <u>every</u> encounter specified by the Settlement Agreement in a digitized record. We view MPD audits as an important tool to identify whether the Department is meeting this standard and yet, even with an audit sample, MPD identified undocumented encounters. As we have stated in previous reports, MPD's audits remain an important tool in identifying whether undocumented stops are happening.

In addition to reviewing MPD's audits, we also rely on our own review of the quarterly extraction data to assess compliance with this requirement of the Settlement Agreement. CJI continues to find information in the CAD file that does not match to information provided in the RMS or TraCS data files. We also review video footage as part of our semiannual review of traffic stops, field interviews, no-action encounters, and frisks. During this review we consistently have found frisks that are recorded on video but not documented in a digitized, electronic record. This indicates that police encounters continue to lack proper documentation specified by the Settlement Agreement, further supporting the MPD audit findings.

**Updated Status: Non-Compliant**

### SA PARAGRAPH IV.A.2.A

*"Defendants shall ensure that all traffic stops are documented in TraCS."*

**Progress Update:**

We look to two sources of information to determine whether Defendants are documenting all traffic stops in TraCS: MPD internal audits and information from the quarterly extraction data.

MPD's most recent audit of traffic stops (Audit Number 22-07), covering a random sample of encounters with a CAD call type "traffic stop" that occurred between January 1 and June 30, 2022, found that every encounter in the audit sample had an associated contact summary form in TraCS.

However, CJI's review of quarterly extraction data for quarters one and two of 2022 found 118 CAD numbers with a final CAD call type of "traffic stop" but no corresponding TraCS documentation. This demonstrates non-compliance with this requirement.

**Updated Status: Non-Compliant**



### SA PARAGRAPH IV.A.2.B

*"Defendants shall ensure that all field interviews are documented in RMS."*

**Progress Update:**

MPD's internal audits as well as information from the quarterly extraction data inform the compliance assessment for this requirement.

MPD's most recent field interview audits (Audit Number 22-03 and Audit Number 22-06), covering a random sample of subject stop encounters that occurred between July 1 and December 31, 2021 and stops that occurred between January 1 and June 30, 2022, found seven terry stops for which no FI report could be located in RMS (four found in Audit Number 22-03 and three found in Audit Number 22-06). The most recent audit of no-action encounters (Audit Number 22-08) also found an undocumented field interview. In this case, the officer submitted a no-action encounter report, but due to a use of force that took place during the encounter, it should have been documented as a field interview.

In addition, CJI reviewed quarterly extraction data for quarters one and two of 2022 and found 65 encounters with a final CAD call type of "subject stop" but no corresponding RMS documentation. This demonstrates non-compliance with this requirement.

**Updated Status: Non-Compliant**

### SA PARAGRAPH IV.A.2.C

*"Defendants shall ensure that all no-action encounters are documented in [RMS]."*

**Progress Update:**

We rely on two sources of information to determine progress toward whether Defendants are documenting all field interviews in RMS: MPD internal audits and information from the quarterly extraction data.

MPD has completed two audits of no-action encounters since compliance was assessed for the Year Four Annual Report. MPD's audit of no-action encounters that were documented between January 1 and June 30, 2022 found no undocumented no-action encounters (Audit Number 22-05). In MPD's most recent audit of no-action encounters that occurred between July 1 and December 31, 2022 (Audit Number 22-08), the Audit Unit found one no-action encounter where an RMS report could not be located. The audits include all CAD assignments with the C21 disposition code as well as any no-action encounter reports.

CJI reviewed quarterly extraction data for quarters one and two of 2022 and found some records of encounters with a C21 disposition code but no corresponding no-action encounter report. Thus, CJI observed encounters in the CAD file that did not have corresponding RMS documentation. This and the most recent audit demonstrate non-compliance with this requirement.

**Updated Status: Non-Compliant**



### SA PARAGRAPH IV.A.2.D

*"Defendants shall ensure that all frisks and searches are documented in either TraCS or RMS as appropriate, based on whether the circumstances of the frisk or search are appropriately characterized as a traffic stop or field interview."*

**Progress Update:**

To assess whether Defendants are documenting all frisks and searches, we review MPD internal audits and information from CJI's semiannual analysis of encounters.

In MPD's field interview audit of July through December 2021 (Audit Number 22-03), auditors discovered three undocumented frisks and six undocumented searches. In the most recent field interview audit, covering encounters occurring between January and June 2022 (Audit Number 22-06), auditors also found one undocumented frisk and four undocumented searches.

CJI's semiannual analysis of traffic stops, field interviews, no-action encounters, and frisks identifies any CAD call types that are likely to involve a frisk and determines whether the data extractions for the period under scrutiny reflect frisks for those encounters. The semiannual analysis published in October 2022 assessed a sample of encounter data from January to June 2022 and found three undocumented frisks out of a group of four encounters for which we deemed a frisk was likely.[7] Both data sources demonstrate non-compliance with this requirement.

**Updated Status: Non-Compliant**

### SA PARAGRAPH IV.A.3

*"Defendants shall ensure that each traffic stop, field interview, and no-action encounter documented pursuant to this paragraph…is assigned a unique stop identification number."*

**Progress Update:**

The CAD number has been established as the unique stop identification number. This is a nine-digit number assigned by dispatch when communicating with officers about a police encounter. While the CAD system automatically generates this number, officers manually input the CAD number when completing forms in RMS and TraCS. The diagnostic review of quarterly data extractions continues to show values in the CAD number field that are either eight or ten digits or are otherwise invalid CAD numbers, including blanks. The majority of the invalid CAD numbers come from TraCS forms rather than in data received from RMS. While MPD continues to make progress with ensuring valid CAD numbers serve as the unique stop identifier, we still find unmatched TraCS and RMS data with invalid information in the CAD field that we are unable to match with CAD files.

---

[7] Crime and Justice Institute. (October 2022). Semiannual Analysis of Traffic Stops, Field Interviews, No-action Encounters, and Frisks. https://city.milwaukee.gov/ImageLibrary/Public/ImageLibrary/Photos/CJISemiannualAnalysisOctober2022.pdf



**Updated Status: Non-Compliant**

---

### SA PARAGRAPH IV.C.1.A

*"All reports of arrests, which are documented in the RMS system, will be reviewed and approved by a supervisor within the time period prescribed by SOP 263—Records Management. The supervisor will review the reports for various matters, including the lawful basis for any traffic stop or field interview that led to the arrest, and the lawful basis for any frisk or search conducted during the encounter."*

**Progress Update:**

CJI relies on MPD's traffic stop and field interview audits to assess compliance with this requirement. Traffic Stop Audit 22-07 which covers the first half of 2022 included three arrests in the sample, all of which met the relevant criteria for review and approval. In terms of field interviews, FI Audit 22-03 covering the second half of 2021 included 39 arrests in the sample, 37 of which met the review and approval criteria. Because two arrests in the field interview audit did not meet the criteria, Defendants remain non-compliant for this requirement.

**Updated Status: Non-Compliant**

---

### SA PARAGRAPH IV.C.1.B

*"Within twelve (12) months of the date of this Agreement, MPD will achieve a practice of supervisory review, correction, and approval of 50% of all documentation of field interviews in RMS consistent with the timeframes set forth in SOP 085.20. Supervisors shall review for completeness, and shall review the stated basis for the field interview and any frisk and/or search conducted in the course of the field interview. Prior to approving reports for submission to RMS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented."*

**Progress Update:**

MPD issues roll call reminders to officers and supervisors to highlight the importance of accurate and timely documentation submission and the importance of supervisory review. MPD completed two audits of field interviews since the release of the fourth annual report in September 2022. Audit Number 22-03 sampled stops from the second half of 2021 and Audit Number 22-06 sampled stops from the first half of 2022. The audit of the latter half of 2021 found that only 34 of the 92 sampled field interviews (37 percent) met the standard for supervisory review set forth in the Settlement Agreement (SA IV.C.1.B), which is below the 50 percent threshold. Over half of the sampled stops that did not meet compliance with the supervisory review process were stops approved by supervisors that were found to have errors in officers' justification for making the stop. The most recent audit of the first half of 2022 demonstrated compliance with the supervisory review process in the sampled stops. Forty-seven of the 87 sampled stops (54 percent) met the standard for supervisory review. Again, the primary reason for failure to meet the standard was because supervisors approved reports that had errors in the officers' justification for making the stop. This is the first time that this threshold has been met for this requirement, coming in at 54



percent just over the 50 percent threshold. Based on the most recent audit, we deem the Defendants compliant for this requirement. While some progress with this requirement has been made over time, the percent of stops that are approved by supervisors with errors in the justification for the stop remains concerning. We will continue to track audit findings and assess whether this level of required supervisor review is maintained.

**Updated Status: Compliant**

### SA PARAGRAPH IV.C.1.C

*"Within twelve (12) months of the date of this Agreement, MPD will achieve supervisory review, correction, and approval of every warning and citation issued by MPD officers in the course of a traffic stop or field interview, as recorded in TraCS within seven (7) days, consistent with the timeframe set forth in SOP 070. Supervisors shall review for completeness, and shall review the stated basis for the traffic stop, field interview, and any frisk and/or search conducted in the course of the traffic stop or field interview. Prior to approving reports for submission to TraCS, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented."*

**Progress Update:**

MPD continues to fall short of the requirement that supervisors review, correct, and approve every warning and citation issued by officers within the seven-day timeframe set forth in the Settlement Agreement. The most recent traffic stop, frisk, and search audit *(*Audit Number 22-07) indicates that 93 of the 103 sampled traffic stops (90 percent) met the supervisory review standard for warnings and citations. One of the sampled traffic stops that did not meet the standard was approved with an incorrect CAD number. The other stops that did not meet the standard were approved beyond the seven-day time period or were approved with involved individuals missing from the documentation. In contrast to the issues found in the audits of field interviews (i.e., terry stops), proper supervisory review of the articulation of the stop justification does not appear to be the presenting issue in supervisory review of traffic stops. The presenting issue found in proper supervisory review of traffic stops is in the identification of incorrect CAD information and ensuring all officers present for the incident are accounted for in documentation.

We see in the quarterly data for the first half of 2022 (January through June) that there are citations and warnings in the files that do not match the CAD data we receive, further supporting the audit findings that officers and supervisors are not ensuring all citations and warnings have valid CAD information prior to submission and approval. As discussed in previous reports, MPD must focus on ensuring supervisors are reviewing every citation and warning and identifying or correcting errors in documentation.

**Updated Status: Non-Compliant**

### SA PARAGRAPH IV.C.1.D

*"Within twelve (12) months of the date of this Agreement, MPD shall achieve supervisory review, correction, and approval of every no-action encounter documented in [RMS] within fourteen (14) days.*



*Supervisors shall review for completeness and shall review the stated basis for the no-action encounter. Prior to approving reports as complete, supervisors shall ensure that officers provide any missing information to ensure all information required by paragraph IV.A.3 is documented."*

**Progress Update:**

MPD completed two no-action encounter audits since the fourth annual report (Audit Number 22-05 and Audit Number 22-08) that include a review of all no-action encounters that occurred in 2022. There were 19 no-action encounters conducted during the first half of 2022 and 11 no-action encounters during the second half. The Inspections Section reviewed every no-action encounter and determined whether supervisors reviewed, corrected, and approved no-action encounter reports based on the standards set forth in the Settlement Agreement (SA IV.C.1.d). Taken together, the audit findings indicate that half of the 30 no-action encounters documented in 2022 met the standards for supervisory review. Fourteen out of 15 of the no-action encounters that did not meet the standards were found to have errors in justification for the stop. The remaining stop that did not meet the requirements was approved by a supervisor with errors in the encounter identification number (CAD number). MPD continues to fall short of the requirement that supervisors review, correct, and approve <u>every</u> no-action encounter per SA IV.C.1.D.

**Updated Status: Non-Compliant**

### SA PARAGRAPH IV.D.1.I

*"Defendants shall ensure that MPD Internal Affairs investigators undergo training that addresses, and attempts to eliminate, biases in favor of police officers and against civilian complainants that arise in the course of complaint investigations."*

**Progress Update:**

MPD provided CJI training materials and documentation of training attendees, including a full roster of IA investigators and training certificates. At the time of review, two investigators had not yet completed this training and we find MPD in process for this requirement. Compliance will be achieved when all investigators have completed this training.

**Updated Status: In process**

### SA PARAGRAPH IV.D.2

*"MPD Internal Affairs investigators shall receive special training conducted within one (1) year from the execution of this Agreement in the investigation of complaints by members of the public, including training on the amendments to SOP 450 required by this Agreement. The training shall be conducted by a supervisor of Internal Affairs with expertise in complaint investigation and shall be consistent with those provisions of this Agreement that relate to this subject."*

**Progress Update:**



MPD provided training materials and sufficient documentation that all IA investigators have received this training. We now deem MPD compliant with this requirement.

**Updated Status: Compliant**

---

**SA PARAGRAPH V.1.D.II**

*"Analysis of RMS data demonstrating that fewer than 14% of records of field interviews, frisks, and searches documented in RMS during the previous six (6) months are missing any of the information required by paragraph IV.A.3 for inclusion in records."*

**Progress Update:**

Table 1 outlines the extent to which RMS data for field interviews are missing any of the required information listed in the Settlement Agreement. The period of assessment for this report encompasses quarters one and two of 2022. Previous data are included in Table 1 for comparison. During the first half of 2022, all but one of the required elements meet the threshold that fewer than 14 percent of field interview records are missing data. (The data element that does not meet the threshold is marked with an asterisk.) The information for use of force present in RMS includes whether a use of force occurred and the officer-written justification for the use of force. The information about the type of force used comes from the AIM system. Use of force type is the one element that does not achieve the required threshold. It is unclear whether the lack of information about the type of use of force is due to a disconnect between RMS and AIM data (which we connect using the CAD number) or data missing from use of force reports documented in the AIM system. Because Defendants did not achieve the threshold in one of the required data elements, we deem them non-compliant for SA V.1.d.ii.

**Table 1:** Percent of Field Interview Records Missing Data in TraCS

| IV.A.3 Subsection | Data Element | Q1Q2 2020 | Q3Q4 2020 | Q1Q2 2021 | Q3Q4 2021 | Q1Q2 2022 |
|---|---|---|---|---|---|---|
| a | Age (person) | 0.03% | 0.00% | 0.05% | 0.00% | 0.00% |
| a | Gender (person) | 0.03% | 0.00% | 0.05% | 0.00% | 0.00% |
| a | Race (person) | 0.03% | 0.00% | 0.05% | 0.00% | 0.00% |
| a | Ethnicity (person) | 0.03% | 0.00% | 0.05% | 0.00% | 0.00% |
| b | Address (encounter) | 0.02% | 0.00% | 0.08% | 0.00% | 0.00% |



| IV.A.3 Subsection | Data Element | Q1Q2 2020 | Q3Q4 2020 | Q1Q2 2021 | Q3Q4 2021 | Q1Q2 2022 |
|---|---|---|---|---|---|---|
| b | Police district (encounter) | 1.65% | 0.58% | 0.08% | 0.00% | 0.00% |
| c | Date of encounter (encounter) | 0.00% | 0.00% | 0.08% | 0.00% | 0.00% |
| d | Start time of encounter (encounter) | 0.00% | 0.00% | 0.08% | 0.00% | 0.00% |
| e | Narrative of legal basis (encounter) | 0.06% | 0.00% | 0.08% | 0.00% | 0.00% |
| f | Frisk Y/N (person) | 0.03% | 0.00% | 0.00% | 0.00% | 0.00% |
| f | Frisk legal basis (person) | 2.24% | 1.05% | 0.41% | 0.49% | 0.40% |
| g | Search Y/N (person) | 0.03% | 0.00% | 0.05% | 0.00% | 0.00% |
| g | Search legal basis (person) | 1.32% | 0.76% | 0.00% | 0.08% | 0.18% |
| h | Contraband found Y/N (person) | 0.03% | 0.00% | 0.00% | 0.00% | 0.00% |
| h | Contraband type (person) | 0.03% | 0.00% | 0.00% | 0.00% | 0.00% |
| i | Use of force Y/N (encounter) | 0.03% | 0.00% | 0.15% | 0.00% | 0.00% |



| IV.A.3 Subsection | Data Element | Q1Q2 2020 | Q3Q4 2020 | Q1Q2 2021 | Q3Q4 2021 | Q1Q2 2022 |
|---|---|---|---|---|---|---|
| i | Use of force type (encounter) | 0.45% | 0.92% | 30.60%* | 53.05%* | 59.45%* |
| i | Use of force justification (encounter) | 1.38% | 0.38% | 2.77% | 0.00% | 5.40% |
| j | Encounter outcome (encounter) | 0.03% | 0.00% | 0.15% | 0.00% | 0.00% |
| j | Violations, offenses, or crimes (encounter) | 0.06% | 0.00% | 0.15% | 0.00% | 0.00% |
| k | Relevant suspect description (encounter) | 1.56% | 1.82% | 0.08% | 0.00% | 0.00% |
| l | Officer names (encounter) | 0.03% | 0.00% | 0.08% | 0.00% | 0.00% |
| l | Officer IDs (encounter) | 0.03% | 0.00% | 0.60% | 0.08% | 6.34% |
|  | Unique stop ID number (match to CAD) (encounter) | 6.39% | 0.41% | 0.60% | 0.08% | 0.60% |

**Updated Status: Non-Compliant**

### SA PARAGRAPH V.1.D.III

"Analysis of CAD data demonstrating that fewer than 14% [of] records of no-action encounters documented in CAD during the previous six (6) months are missing any of the information required by paragraph IV.A.3 for inclusion in records."



**Progress Update:**

Table 2 outlines the extent to which RMS[8] data for no-action encounters are missing any of the required information listed in the Settlement Agreement. The period of assessment for this report encompasses quarters one and two of 2022. Previous data are included in Table 2 for comparison. Until this most recent set of data, MPD has struggled to achieve compliance because of one data element, the encounter outcome. For no-action encounters, this data element is represented by the CAD disposition code, which for no-action encounters must be C21. In the past, there have been no-action encounter records with codes other than C21. The data elements that do not meet the threshold are marked with an asterisk. For the first time, all of the required data elements exceeded the 14 percent threshold during an assessment period. We now deem Defendant's compliant with SA V.1.d.iii.

**Table 2:** Percent of No-Action Encounter Records Missing Data in RMS

| IV.A.3 Subsection | Data Element | Q1Q2 2020 | Q3Q4 2020 | Q1Q2 2021 | Q3Q4 2021 | Q1Q2 2022 |
|---|---|---|---|---|---|---|
| a | Gender (person) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| a | Race (person) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| a | Ethnicity (person) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| b | Address (encounter) | 3.03% | 2.70% | 0.00% | 3.45% | 0.00% |
| b | Police district (encounter) | 3.78% | 2.70% | 0.00% | 3.45% | 0.00% |
| c | Date of encounter (encounter) | 0.76% | 1.35% | 0.00% | 0.00% | 0.00% |
| d | Start time of encounter (encounter) | 0.76% | 1.35% | 0.00% | 0.00% | 0.00% |
| e | Narrative of legal basis (encounter) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |

---

[8] Although the Settlement Agreement calls for analysis of CAD data here, MPD documents no-action encounters in RMS. The Parties have agreed to this change.



| IV.A.3 Subsection | Data Element | Q1Q2 2020 | Q3Q4 2020 | Q1Q2 2021 | Q3Q4 2021 | Q1Q2 2022 |
|---|---|---|---|---|---|---|
| j | Encounter outcome (encounter) | 65.15%* | 60.81%* | 39.74%* | 42.86%* | 0.00% |
| l | Officer names (encounter) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| l | Officer IDs (encounter) | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
|   | Unique stop ID number (match to CAD) (encounter) | 3.03% | 2.70% | 0.00% | 3.45% | 0.00% |

**Updated Status: Compliant**

### SA PARAGRAPH V.1.D.V

*"Analysis of RMS data on field interviews demonstrates that fewer than 15% of field interview records documented during the previous six (6) months fail to show that the traffic stops and encounters were supported by individualized, objective, and articulable reasonable suspicion of criminal activity or a traffic or vehicle equipment violation."*

**Progress Update:**

CJI's semiannual analysis of traffic stops, field interviews, no-action encounters, and frisks assesses individualized, objective, and articulable reasonable suspicion (IOARS) for every six months of encounter data. The most recent IOARS analysis, published in October 2022, assessed encounters that occurred during the first half of 2022.

IOARS documentation for field interviews has increased over the last several reporting periods, and for the second time has met the required 15% threshold. In the most recent analysis, CJI found that 10.0% of field interviews in the sample failed to establish IOARS as justification for initiating the encounter.[9]

**Updated Status: Compliant**

---

[9] Crime and Justice Institute. (October 2022). *Semiannual Analysis of Traffic Stops, Field Interviews, No-action Encounters, and Frisks.* https://city.milwaukee.gov/ImageLibrary/Public/ImageLibrary/Photos/CJISemiannualAnalysisOctober2022.pdf



**SA PARAGRAPH V.1.D.VI**

*"Analysis of CAD data on no-action encounters demonstrates that fewer than 15% of records documented during the previous six (6) months fail to show that the traffic stops and encounters were supported by individualized, objective, and articulable reasonable suspicion of criminal activity or a traffic or vehicle equipment violation."*

**Progress Update:**

CJI's semiannual analysis of traffic stops, field interviews, no-action encounters, and frisks assesses IOARS for every six months of encounter data. The most recent IOARS analysis, published in October 2022, assessed encounters that occurred during the first half of 2022.

The number of no-action encounters that are documented is low compared to traffic stops and field interviews and has continued to decrease over time. Because of this, the percentage of no-action encounters that fail to meet the IOARS standard can fluctuate greatly. In the latest semiannual analysis, we found that 27.8% of no-action encounters in the sample failed to establish IOARS as justification for initiating a police encounter.[10] This is a great improvement from the previous reporting period where 73.7% failed to meet the standard but still higher than the 15% threshold.

**Updated Status: Non-Compliant**

---

**SA PARAGRAPH V.1.D.VII**

*"Analysis of TraCS and RMS data on frisks demonstrates that fewer than 15% of frisks records documented during the previous six (6) months fail to show that the frisks were supported by individualized, objective, and articulable reasonable suspicion that the stop subject was armed and dangerous."*

**Progress Update:**

CJI's semiannual analysis of traffic stops, field interviews, no-action encounters, and frisks assesses IOARS for every six months of encounter data. The most recent IOARS analysis, published in October 2022, assessed encounters that occurred during the first half of 2022.

The Defendants have not yet met the threshold for this requirement, but have demonstrated some improvement in the proportion of frisks failing to meet the IOARS standard to justify the frisk (from 53.6% during the second half of 2021 to 30.0% during the first half of 2022).[11]

**Updated Status: Non-Compliant**

---

[10] Ibid.

[11] Ibid.



**SA PARAGRAPH V.1.D.VIII**

*"Analysis of TraCS data on traffic stops demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to traffic stops after controlling for agreed upon benchmarks.*

**Progress Update:**

To determine compliance with this requirement of the Settlement Agreement we analyze 12 months of encounter data and publish the results in the annual reports each September. The next analysis will be based on encounter data for calendar year 2022 and will be presented in CJI's September 2023 annual data analysis report.

**Updated Status: Unable to Assess**

**SA PARAGRAPH V.1.D.IX**

*"Analysis of RMS data on [field interviews] demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to field interviews after controlling for agreed upon benchmarks."*

**Progress Update:**

To determine compliance with this requirement of the Settlement Agreement we analyze 12 months of encounter data and publish the results in the annual reports each September. The next analysis will be based on encounter data for calendar year 2022 and will be presented in CJI's September 2023 annual data analysis report.

**Updated Status: Unable to Assess**

**SA PARAGRAPH V.1.D.X**

*"Analysis of CAD data on no-action encounters demonstrates that there is no significant racial or ethnic disparity in the rate at which Black and white people, and Latino and white people, are subjected to no-action encounters after controlling for agreed upon benchmarks."*

**Progress Update:**

To determine compliance with this requirement of the Settlement Agreement we analyze 12 months of encounter data and publish the results in the annual reports each September. The next analysis will be based on encounter data for calendar year 2022 and will be presented in CJI's September 2023 annual data analysis report.

**Updated Status: Unable to Assess**



## CONCLUSION

This report presents an updated status of the non-compliant items from CJI's fourth annual report from September 2022. Of the 20 non-compliant items, three have moved to the status of compliant, one requirement is now in process, three were deemed unable to assess, and 13 remain in a status of non-compliance. Similar to previous reports, we note that several of the remaining non-compliant requirements are likely the result of the exceptionally high thresholds for compliance per the language in the Settlement Agreement. Requirements that specify that "every" or "all" encounters must meet a threshold means that if we identify a single encounter during the review period that does not meet an articulated threshold, then that requirement is deemed non-compliant for that reporting period.

The next semiannual IOARS report will be published in April 2023. Our fifth annual report, to be published in September 2023, will reassess the totality of the Settlement Agreement requirements. In September 2023 we will publish our annual data analysis of traffic stops, field interviews, no-action encounters, and frisks from 2022.