

# City of Milwaukee Settlement Agreement
Semiannual Analysis of Traffic Stops, Field Interviews, No-action Encounters, and Frisks

The Crime and Justice Institute

March 2025



# Table of Contents

Introduction     **1**

**Population & Sample Characteristics**     **2**

   Encounter Type & District Breakdown     **2**

   Sampling Strategy     **4**

   Decision Rules     **5**

   Encounter & Frisk Sample Characteristics     **6**

**Stop Sample Analysis**     **8**

   IOARS for Stops     **9**

   Documentation of Frisks     **10**

**Frisk Sample Analysis**     **11**

   IOARS for Stops & Frisks     **12**

   Outcomes of Insufficiently Justified Stops     **14**

   Hit Rates     **15**

**Progress Benchmarks**     **18**

**Summary of Findings**     **19**

**Contributors**     **20**

**Appendix A: Categorization of Relevant CAD Call Types**     **21**

**Appendix B: CAD Call Types Likely to Involve Frisk**     **23**



# Introduction

On July 23, 2018, the U.S. District Court for the Eastern District of Wisconsin entered an order adopting a Settlement Agreement (SA) among the Parties to *Charles Collins, et al. v. City of Milwaukee, et al.*[1] The Plaintiffs in the case alleged that there had been racially disparate and unjustified stops, frisks, and other unconstitutional police actions. As required by the Settlement Agreement, the Milwaukee Police Department (MPD) revised their Standard Operating Procedures (SOPs) to reflect constitutional policing standards specific to the Fourth Amendment's protection against unreasonable searches and seizures. SOP 085 ("Citizen Contacts, Field Interviews, Search and Seizure") defines reasonable suspicion as "individualized, objective, and articulable facts that, within the totality of the circumstances, lead a police member to reasonably believe that criminal activity has been, is being, or is about to be committed by a specific person or people." Additionally, for a frisk to be warranted during a stop, "the police member must be able to articulate specific facts, circumstances, and conclusions that support individualized, objective, and articulable reasonable suspicion that the person is armed and dangerous."[2]

The Settlement Agreement stipulates that MPD must show sustained and continuing improvement in constitutional policing based in part on whether the legal basis for encounters is sufficiently articulated (SA V.1.d.iv-vii[3]). Overall, MPD must be able to demonstrate that fewer than 15 percent of reported traffic stops, field interviews, and no-action encounters fail to show individualized, objective, and articulable reasonable suspicion (IOARS) of criminal activity. Additionally, MPD must be able to demonstrate that fewer than 15 percent of documented frisks fail to show IOARS that the subject of the stop was armed and dangerous.[4]

To measure MPD's compliance with the Fourth Amendment in conducting traffic stops, field interviews, no-action encounters, and frisks, the Settlement Agreement calls for the Crime and Justice Institute (CJI), as the Consultant, to conduct a review of a randomly selected sample of encounter data no less often than semiannually (SA V.A.3.a-e). The unit of analysis is a discretionary police encounter, in that the sample consists only of stops wherein the officer had discretion to initiate the stop, rather than stops conducted to fulfill arrest warrants or in which the officer was otherwise directed to conduct the stop. Through random selection, only one person in multi-person stops is included in the sample. Additionally, only forcible frisks are included in the sample, defined in this report as frisks not conducted as part of a search incident to arrest, or to convey or temporarily seat a person in a squad car.

This report details the analysis of a randomly selected sample of stops and a randomly selected sample of frisks representing police encounters that took place between January 1 and June 30, 2024. As a part of the Settlement Agreement, MPD is required to provide encounter data to CJI on a quarterly basis (SA IV.A.3), which include the electronic, digitized records for traffic stops, field interviews, no-action encounters, frisks, and searches. We base the findings in this report on the data MPD provides.

---

[1] Order and Settlement Agreement (July 23, 2018). *Charles Collins, et al. v. City of Milwaukee, et al.*, (17-CV-00234-JPS) United States District Court, Eastern District of Wisconsin, Milwaukee Division.

[2] Milwaukee Police Department Standard Operating Procedure 085 "Citizen Contacts, Field Interviews, Search and Seizure." Effective September 6, 2022.

[3] Citations to a specific paragraph of the Settlement Agreement will appear in this report as SA followed by the paragraph number.

[4] Numerical thresholds are referenced in SA V.1.d.i-vii.



The first section of this report provides an overview of the population of encounters from which the sample is drawn, the sampling procedure, and an overview of the sample characteristics. Subsequent sections detail the analysis of IOARS for stops and frisks, analysis of hit rates for contraband, including by race and ethnicity, and a comparison of findings from this reporting period to findings published in previous semiannual reports.[5]

This report is CJI's ninth review in this series and final report as the Consultant to the ongoing Collins, et al. Settlement Agreement work. CJI commends MPD's efforts over the past six years and looks forward to continued progress towards more equitable policing practices in the City of Milwaukee.

## Population and Sample Characteristics

### Encounter Type and District Breakdown

Data for the first half of 2024 represent 14,341 police encounters involving 15,324 people.[6] Officers record and document traffic stops, field interviews, no-action encounters, and frisks in two databases—Traffic and Criminal Software (TraCS) and Records Management System (RMS)—depending on the nature of the encounter and the type of work assigned to officers during specific tours of duty. Most encounters in the TraCS database involve traffic stops; non-traffic pedestrian stops initiated by officers from their police vehicles are also included. The RMS database primarily holds data on pedestrian encounters categorized as field interviews or no-action encounters.

Table 1 shows a breakdown of encounters by type and police district. Each "encounter" represents a unique person involved in a documented police interaction where multiple people can be involved in a single event. There were 13,304 traffic stops documented during the first half of 2024 with District 2 documenting the largest proportion of total traffic stops for the period (22.3 percent). District 7 documented the most field interviews with 348 of the 1,288 falling within the district (27.0 percent). There were 22 no-action encounters documented during the period with District 1 documenting the largest number of no-action encounters among all the districts (6 no-action encounters). As with other previous semiannual reviews, the data includes citations and warnings that do not have corresponding RMS or TraCS forms (N=710). These citations and warnings lack the necessary information for us to properly categorize them as field interviews or traffic stops and thus we analyze them separately from the other stop categories.

For encounters documented in the TraCS database, the district is identified by cross-referencing data with information from the Computer Aided Dispatch (CAD) system.[7] Encounters represented by only citation or warning forms suffer from the highest degree of missing district data because of an inability to correlate with CAD data. For such encounters where the data does not include district information, we use latitude and longitude information present in the TraCS data files or other address information to map encounters onto MPD

---

[5] Settlement Agreement reports published by CJI can be found on our website: https://www.cjinstitute.org/city-of-milwaukee-settlement-agreement/ or on the FPC website: https://city.milwaukee.gov/fpc/Reports/Crime-and-Justice-Institute-Reports.htm

[6] This total omits 509 CAD entries that did not have associated TraCS or RMS forms. These may represent additional encounters.

[7] CAD data represent information drawn from the dispatch record for each encounter, including the location of the encounter, communication between officers and dispatchers, and the call type for the encounter.



police districts. This compensates for the lack of district information due to uncorrelated CAD data and offers a more complete picture of where these encounters occurred.[8]

**Table 1. Police encounters by type and district. January – June 2024**

|  | TRAFFIC STOP-TRACS | FIELD INTERVIEW-RMS | NO-ACTION ENCOUNTER-RMS | CITATION/ WARNING ONLY | TOTAL |
|---|---|---|---|---|---|
| **DISTRICT 1** | 594 (4.5%) | 39 (3.0%) | 6 (27.3%) | 41 (5.8%) | 680 (4.4%) |
| **DISTRICT 2** | 2,972 (22.3%) | 261 (20.3%) | 3 (13.6%) | 135 (19.0%) | 3,371 (22.0%) |
| **DISTRICT 3** | 1,709 (12.8%) | 176 (13.7%) | 0 (0.0%) | 122 (17.2%) | 2,007 (13.1%) |
| **DISTRICT 4** | 1,371 (10.3%) | 129 (10.0%) | 3 (13.6%) | 90 (12.7%) | 1,593 (10.4%) |
| **DISTRICT 5** | 2,274 (17.1%) | 288 (22.4%) | 4 (18.2%) | 101 (14.2%) | 2,667 (17.4%) |
| **DISTRICT 6** | 1,934 (14.5%) | 44 (3.4%) | 1 (4.5%) | 82 (11.5%) | 2,061 (13.5%) |
| **DISTRICT 7** | 2,226 (16.7%) | 348 (27.0%) | 5 (22.7%) | 122 (17.2%) | 2,702 (17.6%) |
| **NULL/OUT** | 224 (1.7%) | 3 (0.2%) | 0 (0.0%) | 17 (2.4%) | 244 (1.6%) |
| **GRAND TOTAL** | 13,304 (86.8%) | 1,288 (8.4%) | 22 (0.1%) | 710 (4.6%) | 15,324 (100.0%) |

Notes:
[1] The numbers in this table represent the number of encounters per person that was involved in the encounter. For example, if there were two field interviews in District 1 which involved two individuals each, the total for field interviews in District 1 would be four.
[2] "NULL/OUT" refers to encounters in which the data indicated "NULL" or "OUT" in the police district field or could not be geolocated to a district.
[3] The percentages for the grand totals are the percentages for that type of encounter out of the total encounters. The percentages for the districts are the percentages for that district out of the total number of the type of encounter in the column.

**Table 2** shows the breakdown of frisk types for the first half of 2024. The majority of the 257 frisks documented during this period were considered forcible frisks (73.2 percent). Manual data review of officer narratives regarding reasons for a frisk indicated 49 frisks were conducted specifically to seat someone in a squad car during the encounter, three encounters that were searches incident to arrest, and eight frisks specifically so the officer could convey a person to another location. Reasons for nine frisks were not clearly documented.

**Table 2. Frisks by type. January – June 2024**

|  | NUMBER OF FRISKS | PERCENT OF TOTAL FRISKS |
|---|---|---|
| **FORCIBLE** | 188 | 73.2% |
| **INCIDENT TO ARREST** | 3 | 1.2% |
| **FOR CONVEYANCE** | 8 | 3.1% |
| **SQUAD CAR DETENTION** | 49 | 19.1% |
| **UNCLEAR** | 9 | 3.5% |
| **TOTAL** | 257 | 100.0% |

**Table 3** provides a breakdown of the forcible frisks by type of encounter and district. Most frisks occurred during field interviews (91 percent). Districts 5 and 7 conducted the largest share of frisks among the police districts (25.5 percent and 26.6 percent, respectively).

---

[8] Python software was used to geocode latitude and longitude for encounters that were missing district information but had location information present in other files. Using this process, we were able to identify district information for 779 encounters. We used the MPD police district shapefile available on the City of Milwaukee Open Data Portal to obtain police district boundaries.



**Table 3. Forcible frisks by encounter type and district. January – June 2024**

|  | TRAFFIC STOP-TRACS | FIELD INTERVIEW-RMS | CITATION/WARNING ONLY | TOTAL FRISKS |
|---|---|---|---|---|
| **DISTRICT 1** | 0 (0.0%) | 3 (1.8%) | 0 (0.0%) | 3 (1.6%) |
| **DISTRICT 2** | 1 (6.3%) | 30 (17.5%) | 0 (0.0%) | 31 (16.5%) |
| **DISTRICT 3** | 2 (12.5%) | 35 (20.5%) | 0 (0.0%) | 37 (19.7%) |
| **DISTRICT 4** | 6 (37.5%) | 10 (5.8%) | 0 (0.0%) | 16 (8.5%) |
| **DISTRICT 5** | 5 (31.3%) | 43 (25.1%) | 0 (0.0%) | 48 (25.5%) |
| **DISTRICT 6** | 0 (0.0%) | 3 (1.8%) | 0 (0.0%) | 3 (1.6%) |
| **DISTRICT 7** | 2 (12.5%) | 47 (27.5%) | 1 (100.0%) | 50 (26.6%) |
| **NULL/OUT** | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| **GRAND TOTAL** | 16 (8.5%) | 171 (91.0%) | 1 (0.5%) | 188 (100.0%) |

Notes:
[1] The percentages for the grand totals are the percentages for that type of encounter out of the total encounters.
[2] The percentages for the districts are the number of encounters in that district out of the total number of the type of encounter.
[3] "NULL/OUT" refers to encounters in which the data indicated "NULL" or "OUT" in the police district field or could not be geolocated to a district.

## Sampling Strategy

We drew two random samples from collected data to complete the required IOARS analysis. The sample size is a statistically significant representation of encounters and frisks, with a confidence level of 95 percent and a margin of error of five percent. An encounter is defined as a discretionary stop by police, categorized as a traffic stop, field interview, or no-action encounter. Citations or warnings that lack additional corresponding information in TraCS or RMS are also considered encounters. A frisk is an action that occurs during a police encounter and is sampled separately.

Because officers record most encounters in TraCS (86.8 percent), we stratified the stop sample to oversample field interviews, no-action encounters and encounters with only citations or warnings for documentation, allowing us to gain a better understanding of these encounters. The resulting sample included 373 encounters: 231 traffic stops (61.9 percent), 111 field interviews (29.8 percent), 14 citation/warnings (3.8 percent), and 17 no-action encounters (4.6 percent).[9]

We did not stratify the frisk sample by encounter type. Frisks occur more frequently during field interviews, but the proportion of frisks documented in TraCS was substantial enough to have confidence in a non-stratified random sample. As with the encounter sample, we randomly select one frisk per encounter when multiple subjects are frisked during an incident.

---

[9] Previous to the October 2022 analysis, the stratification included approximately 55 percent traffic stops, 20 percent field interviews, 20 percent citation/warnings only, and 5 percent no-action encounters.



## Decision Rules

The Settlement Agreement does not specify decision rules for determining IOARS. We consulted MPD training materials, SOPs, previous research, and subject matter experts to establish decision rules to determine whether officers sufficiently documented IOARS in the encounter and frisk samples.[10] These decision rules are consistent with previous semiannual analyses.

***Decision Rule #1: "Speed Violation" stops demonstrate IOARS.***
Stops occurring because of speeding violations meet IOARS and no further documentation is necessary to justify the stop. This is because speeding represents visual and observable cues that the person has engaged in a traffic violation.

***Decision Rule #2: "Vehicle Registration Violation" and "Vehicle Equipment Violation" stops demonstrate IOARS if officers document the observable registration or equipment violation that prompted the stop.***
Officers must indicate in narrative fields the specific nature of the vehicle registration or equipment violation. Examples include expired registration, missing registration, improperly affixed registration, and brake light, headlight, plate, tinted window, or muffler violations. We coded encounters marked as vehicle registration or equipment violations that do not have supporting text regarding the registration or equipment violation observed prior to initiating the stop as a failure to document IOARS.

***Decision Rule #3: Stops that are not speed, vehicle registration, or vehicle equipment violations are examined to judge whether IOARS was present prior to initiating the stop.***
We determine IOARS to be sufficiently documented if narrative text indicates an observable and legally justified reason for the stop. Examples include stop sign violations, traffic light violations, blocking traffic, open intoxicants, and seatbelt violations. If an officer documents that loitering was the stop justification, the narrative needs to include details about the violated loitering ordinance, such as "loitering in area where 'no loitering' signs posted."

***Decision Rule #4: Field interviews documented in RMS must include narrative that specifies IOARS was present prior to initiating the stop.***
Examples that meet the IOARS threshold include truancy, traffic violations or rules of the road, illegal loitering as violation of ordinance, vehicle registration infractions, and matching description of a suspect. If officers specify the reason for the stop as matching the description of a suspect, they must provide specific information about how the person matched the suspect description.

***Decision Rule #5: No-action encounters must include narrative that specifies IOARS was present prior to initiating the stop.***
No-action encounters are interactions in which officers briefly question a person about that person, or that person's own actions or behavior but do not obtain the subject's personal information or conduct any other police action such as a frisk. The examples listed above apply to no-action encounters as well.

---

[10] For traffic stops, when officers indicate several violations as the reasons for initiating the stop, the decision rules prioritize reasons for stops and the necessary IOARS documentation needed to justify the stop. For example, if an officer indicates "speeding" and "other rules of the road" as the reason for the stop, Decision Rule #1 determines that the officer provided adequate IOARS documentation to make the stop without further explanation of the "other rules of the road" violation.



***Decision Rule #6: Frisks must meet the guidelines of SOP 085 and include narrative about the IOARS that the person is armed and immediately dangerous.***

SOP 085 indicates that "members may not use only one of the below factors on their own to justify a frisk as more than one of these or other factors must be present":

- The type of crime suspected – particularly in crimes of violence where the use or threat of deadly weapons is involved.
- Number of subjects vs. police members present.
- Police member vs. subject factors (age and gender considerations).
- Factors such as time of day, location, or neighborhood where the stop occurs.
- Prior knowledge of the subject's use of force and/or propensity to carry deadly weapons.
- The appearance and demeanor of the subject.

As articulated in SOP 085, if the following condition alone is present, the frisk is justified: "Visual indications that suggest that the subject is carrying a firearm or other deadly weapon." Boilerplate language such as "officer safety" is not considered adequate to meet the IOARS standard for this condition.

## Encounter and Frisk Sample Characteristics

**Figures 1, 2,** and **3** provide an overview of the characteristics of the individuals that police officers stopped from January through June 2024. Young adults (18 to 29 year-olds) represent 36.2 percent of individuals involved in encounters and 47.3 percent of frisks (**Figure 1**). **Figure 2** presents the breakdown of encounters and frisks by gender and illustrates that males represent most encounters and frisks (67.6 percent and 84.8 percent, respectively). **Figure 3** shows the percent of police encounters and frisks in the sample by race and ethnicity. Approximately two-thirds of the subjects of police encounters are Black (66 percent), and Black individuals make up an even greater proportion of individuals that are frisked (83.9 percent).

**Figure 1. Percent of encounters and frisks by age group. January – June 2024**



Notes:
[1] Age represents the person's age at the time of the encounter, given date-of-birth information. Encounter totals exclude no-action encounters because information about subject age is not documented during no-action encounters. "Missing" refers to encounters



where numerical age could not be computed because encounter date or date of birth information were missing. For field interviews, the age_code variable in the Inform_FieldinterviewPerson file (2024 Quarter 1) or Inform_FieldInterview file (2024 Quarter 2) was used when a numerical age could not be computed.

**Figure 2. Percent of encounters and frisks by gender. January – June 2024**



Notes:
[1] "Missing/Unknown" refers to instances in which the gender information was either blank or officers documented it as "unknown."

**Figure 3. Percent of encounters and frisks by race and ethnicity. January – June 2024**



Notes:
[1] "Other" includes subjects that are Asian or Indigenous, or documented as an unknown race or ethnicity. "Missing" refers to instances in which the race and ethnicity information was blank.



**Table 4** provides information about the original CAD call type for the police encounter (see **Appendix A** for a categorization of relevant CAD call types). Unsurprisingly, a substantial proportion of both samples are subject or traffic stops (87.4 percent of encounters and 70.5 percent of frisks). Information about call types by sample include the percent with a missing call type.

**Table 4. CAD call types by sample. January – June 2024**

|  | ENCOUNTER SAMPLE | FRISK SAMPLE |
|---|---|---|
| **SAMPLE TOTAL** | N=373 (100%) | N=112 (100%) |
| **CRIME SUSPECT/SUBJECT** | 4 (1.1%) | 6 (5.4%) |
| **DRUG-RELATED** | 1 (0.3%) | 0 (0.0%) |
| **INVESTIGATION** | 9 (2.4%) | 8 (7.1%) |
| **OTHER REASON** | 5 (1.3%) | 1 (0.9%) |
| **PROPERTY CRIME RELATED** | 2 (0.5%) | 2 (1.8%) |
| **SUBJECT/TRAFFIC STOP** | 326 (87.4%) | 79 (70.5%) |
| **VIOLENCE-RELATED** | 0 (0.0%) | 1 (0.9%) |
| **WEAPON/FIREARM RELATED** | 4 (1.1%) | 1 (0.9%) |
| **WELFARE CHECK** | 0 (0.0%) | 0 (0.0%) |
| **MISSING CALL TYPE** | 22 (5.9%) | 14 (12.5%) |

Notes:
[1] Specific call types for each of these groupings can be found in Appendix A.
[2] "Missing call type" denotes that no information was listed for call type; they represent forms that did not match to the CAD files.

## Stop Sample Analysis

Our approach for analysis of IOARS for discretionary police stops focuses on the officer-written narratives present in TraCS or RMS that represent the reporting officer's justification for initiating the stop. The first analysis in this series (covering the period January to June 2019) showed that failure to meet IOARS was most often due to the absence of officer-written narratives for stops, specifically traffic stops. Over time, MPD has improved in their stop documentation, in that officer-written narratives are missing less often. Of the sample covering January through June 2024, one encounter categorized as a traffic stop and two encounters categorized as no-action encounters were missing narratives, while five field interviews in the sample failed to meet IOARS because of missing narratives. Six of the 14 stops categorized as citation or warning only failed to meet IOARS because of missing officer-written narratives regarding the nature of the stop. Most failures to meet IOARS were due to lack of detail necessary to justify the stop.

The findings for this semiannual review of IOARS documentation for traffic stops, field interviews, no-action encounters, and frisks are inherently limited to police actions that are documented in the CAD, TraCS, and RMS databases. This review includes an analysis of body-worn camera footage for select calls for service based on a CAD call type that did not have corresponding documentation of a frisk but where a frisk could be expected (see **Appendix B**). Review of the video is limited to determine whether there was a frisk conducted during the police stop.



## IOARS for Stops

Of the sampled encounters, 335 out of 373 encounters show sufficient IOARS documentation (89.8 percent). **Figure 4** indicates the percentage of encounters with IOARS documentation by encounter type and offers a comparison to previous reporting periods. When broken down by encounter type, traffic stops meet the required threshold of 85 percent for the current reporting period (January through June 2024). Officers sufficiently documented IOARS for all but seven traffic stops in the sample (97 percent). Documentation of field interviews for the current reporting period is also above the required 85 percent threshold for IOARS documentation standards (87.4 percent). IOARS for no action encounters was met in only 47.1 percent of stops (eight out of 17 stops). Just over half of citations/warnings did not meet the threshold, with six of 14 citations/warnings meeting the IOARS standard.

**Figure 4. Percent of encounters with IOARS by encounter type and time period**



Seven out of 231 encounters (3 percent) documented in TraCS (with a contact summary form) failed to meet the IOARS threshold. The stops that did not meet the IOARS standard lacked clarity and sufficient detail about the equipment or moving violation that prompted the officer to make the stop. For example, officers may indicate the stop was due to observing a vehicle "without properly displaying registration" or "with registration displayed that was hard to see" but failed to indicate what was improper about the registration display or why the registration was hard to see. Additionally, officers may indicate that the driver "passed [their] moving squad" without specifying the type of moving violation or providing additional context to establish the nature of the road safety concern.

Fourteen out of 111 field interviews documented in RMS failed to provide sufficient documentation for IOARS (12.6 percent). Narrative data was not provided in five of the field interviews. Of the remaining nine field interviews failing to provide sufficient documentation for IOARS, officers included narratives that did not provide the specific, observable facts that the officer used to establish IOARS prior to initiating the stop. Most of the documentation failures were because officers did not provide sufficient descriptions of the suspect(s), indicate the suspected crime for which the individual was being questioned, or sufficiently articulate the facts that led officers to stop the person for the crime they were investigating.



No-action encounters continue to be the least frequently documented type of encounter. Among the 17 no-action encounters in the sample, nine failed to include sufficient IOARS for the stop (52.9 percent). Of these encounters, two did not provide narrative data. Most of the stops that did not meet the IOARS standard did not articulate the offense the subject was suspected of and lacked sufficient detail in suspect descriptions.

Just over half of encounters where a citation or warning was documented without a corresponding contact summary in TraCS or field interview information in RMS failed to meet the IOARS standard (eight out of 14 encounters). Six of the encounters in this group were missing a narrative about the reason for initiating the stop, likely due to lack of corresponding documentation in TraCS or RMS with a matching encounter identifier (i.e., CAD number). The remaining two encounters did not articulate the reason for the stop in sufficient detail.

**Table 5** displays the stops in the stop sample by district with the percentage of stops in that district that met the IOARS documentation standard. The percentage of encounters with documented IOARS occurring in each district (among Districts 1 through 7) ranged from 81.9 percent (District 5) to 97.7 percent (District 4).

**Table 5. Stops by IOARS justification and district. January – June 2024**

|  | NUMBER OF STOPS | PERCENT OF STOPS WITH DOCUMENTED IOARS |
|---|---|---|
| **DISTRICT 1** | 16 | 87.5% |
| **DISTRICT 2** | 76 | 90.8% |
| **DISTRICT 3** | 42 | 90.5% |
| **DISTRICT 4** | 43 | 97.7% |
| **DISTRICT 5** | 72 | 81.9% |
| **DISTRICT 6** | 48 | 93.8% |
| **DISTRICT 7** | 72 | 90.3% |
| **NULL/OUT** | 4 | 75.0% |
| **GRAND TOTAL** | 373 | 89.8% |

Notes:
[1] "NULL/OUT" refers to encounters in which the data indicated "NULL" or "OUT" in the police district field or could not be geolocated to a district.

## Documentation of Frisks

The Settlement Agreement stipulates an investigation of the consistency and reliability of frisk documentation by requiring analysis of "cases in which an officer marks 'no frisk' and 'no search' in cases in which a frisk or search was highly likely to have occurred (e.g., stop for a robbery investigation)" (SA V.A.3.e). Based on established knowledge of police encounter protocols and in consultation with policing experts, we created a list of CAD call types likely to involve a frisk. **Appendix B** includes a list of the 22 CAD call types designated as cases in which an officer is likely to conduct a frisk. Call types flagged for this purpose generally involve firearms or other weapons, including subject with a gun, shots fired, armed robbery, or domestic violence battery. When we find encounters in the stop sample that fit the criteria, but are not reported as including a frisk, we request video footage from MPD to determine if a frisk occurred but was not documented. As our analysis is focused on one random person in multi-person encounters, we review documentation and video footage specific to that individual to determine whether there is proper documentation based on what is found in the video review. This request is based on the guidelines of the Settlement Agreement (SA III.A.7.).

As context for this reporting period, we review the findings from prior reporting periods. CJI has requested and received videos for stops likely to involve a frisk for every six-month reporting period. In the three reporting



periods prior to this analysis, CJI found zero instances of undocumented frisks in our review. **Table 6** provides summary details for the number of encounters for which we requested videos and the number of encounters for which we observed undocumented frisks during video review.

**Table 6. Frisk documentation by time period**

|  | VIDEOS REQUESTED | UNDOCUMENTED FRISKS |
|---|---|---|
| **JANUARY TO JUNE 2019** | 10 | 1 |
| **JULY TO DECEMBER 2019** | 11 | 5 |
| **JANUARY TO JUNE 2020** | 6 | 1 |
| **JULY TO DECEMBER 2020** | 10 | 4 |
| **JANUARY TO JUNE 2021** | 9 | 2 |
| **JULY TO DECEMBER 2021** | 4 | 2 |
| **JANUARY TO JUNE 2022** | 4 | 3 |
| **JULY TO DECEMBER 2022** | 2 | 0 |
| **JANUARY TO JUNE 2023** | 3 | 0 |
| **JULY TO DECEMBER 2023** | 5 | 0 |
| **JANUARY TO JUNE 2024** | 8 | 1 |

Notes:
[1] Further detail regarding the analysis for each reporting period are available in the associated semiannual reports that can be found on the FPC website (https://city.milwaukee.gov/fpc/Reports/Crime-and-Justice-Institute-Reports.htm) or CJI's website (https://www.cjinstitute.org/city-of-milwaukee-settlement-agreement).

For the current period, we requested and received video footage for eight encounters where we determined a frisk was likely but was not documented. One of the eight encounters involved an undocumented frisk. We found that six of the eight stops involved searches of individuals or vehicles, with five of the searches being documented and one going undocumented. Of the eight encounters, two encounters stood out that involved an undocumented search or frisk. In the first incident, a search with intent to arrest occurred when officers approached an individual suspected of breaking out windows nearby. Officers neglected to document the occurrence of a search that happened prior to the arrest. In the second incident officers detained an individual they saw reckless driving within the area of a ShotSpotter incident. After being detained, officers searched and then frisked the suspect. Officers documented the search but failed to document the frisk. Finally, CJI identified one CAD in which no associated videos were available due to the responding officers being a detective and a sergeant. This lack of footage is congruent with MPD policy, which does not require detectives or sergeants to be equipped with body cameras.

# Frisk Sample Analysis

The first semiannual analysis involved encounters occurring from January through June 2019, a period when the Department was in the process of conducting training for all officers on constitutional policing practices and other Settlement Agreement requirements. That first analysis provided a baseline for the extent to which officers document IOARS to justify frisks during police encounters. Since then, the Department has completed training on these topics annually.



## IOARS for Stops and Frisks

For encounters that involve frisks, two levels of IOARS documentation are needed: 1) IOARS that the person has, is, or will engage in a crime for officers to justify the stop, and 2) IOARS that the person is armed and dangerous for officers to justify the frisk. The Settlement Agreement (SA V.1.d.vii.) calls for "analysis of TraCS and RMS data on frisks [that] demonstrates that fewer than 15 percent of frisk records documented during the previous six (6) months fail to show that the frisks were supported by individualized, objective, and articulable reasonable suspicion that the stop subject was armed and dangerous."

**Table 7** presents a breakdown of the frisks in the frisk sample by district along with the percent of frisks in that district that are supported by documented IOARS for conducting the frisk. The fewest number of frisks occurred in Districts 1 and 6 (three in each district). Districts 5 and 7 reported the highest number of frisks (26 in each district) with 57.7 and 80.8 percent of those frisks meeting the IOARS standard, respectively. District 5 was least likely to meet the IOARS documentation standard to justify frisks.

The primary reason for our determination of insufficient IOARS justification is the lack of information supporting the objective and reasonable circumstances for why the officer(s) suspected the subject was armed and why they suspected the person was immediately dangerous. In most cases officers indicate a safety concern but do not provide necessary detail linking the subject or current circumstances to the concern that the subject was armed and immediately dangerous. For example, officers may indicate a person was frisked because they were observed exiting a vehicle that contained firearms. However, this description lacks information describing how the person's actions are indicative of a person immediately armed and dangerous. Officers may also indicate a person was possibly concealing firearms but did not describe what it was about the person's appearance that indicated concealment of an immediately dangerous weapon versus something else like drugs. In drug-related incidents, officers should indicate why concealment actions are unique to a weapon versus potentially concealing contraband.

Other insufficiently justified frisks lacked information about the proximity of the stop in time and location to a previous incident, while those that did include proximity information did not include separate reasonable articulable suspicion to justify the frisk. For example, officers may indicate a person was frisked because they were occupying a wanted vehicle from a shots fired complaint that occurred over two weeks prior, but did not include the separate reasonable articulable suspicion required to justify the frisk. Wanted vehicle stops that occur days or weeks after an incident have a heavier IOARS burden to justify frisking occupants than an immediately unfolding, fresh event.

For a portion of frisks with sufficient IOARS justification, an observed trend in the first half of 2024 is that squad car detentions that occurred during an investigation were the only justification for performing a frisk. While the primary reason for the frisk was not specifically to seat someone in a squad car, detentions appear to be used as a backstop to justify a frisk when insufficient reasonable, articulable suspicion exists to otherwise justify the action.



**Table 7. Stops involving forcible frisks by IOARS justification and district. January – June 2024**

|  | NUMBER OF STOPS INVOLVING FORCIBLE FRISKS | PERCENT OF FRISKS WITH DOCUMENTED IOARS |
|---|---|---|
| DISTRICT 1 | 3 | 100.0% |
| DISTRICT 2 | 20 | 60.0% |
| DISTRICT 3 | 25 | 92.0% |
| DISTRICT 4 | 9 | 77.8% |
| DISTRICT 5 | 26 | 57.7% |
| DISTRICT 6 | 3 | 100.0% |
| DISTRICT 7 | 26 | 80.8% |
| NULL/OUT | 0 | N/A |
| GRAND TOTAL | 112 | 75.0% |

Notes:
[1] "NULL/OUT" refers to encounters in which the data indicated "NULL" or "OUT" in the police district field or could not be geolocated to a district.

Figure 5 presents a breakdown of the frisk sample, including whether officers documented IOARS for the stop or for the frisk, and whether officers found contraband. After assessing the documentation officers provided for each encounter in the sample, all 112 stops met the IOARS documentation needed to justify the stop. However, officers did not document the IOARS necessary to justify the frisk 25 percent of the time.

**Figure 5. Stops involving forcible frisks by IOARS justification and contraband seizure. January – June 2024**



Notes:
[1] Dark blue boxes represent sufficient justification and within acceptable thresholds. Red boxes represent insufficient justification and not within acceptable thresholds.



## Outcomes of Insufficiently Justified Stops[11]

The presence or lack of IOARS documentation in a given encounter can influence criminal procedure in a court of law, especially if officers find contraband during that encounter. IOARS documentation also becomes important during investigations of complaints against officers. Proper documentation of the justification for stops and frisks, or lack thereof, influences the credibility of officers in the eyes of the community and can contribute to an erosion of trust and legitimacy. This section of the report examines outcomes of stops and frisks that lack proper documentation of IOARS and are therefore insufficiently justified stops and frisks.

We explore outcomes in a few ways. First, we consider the frisk as an outcome of a stop without IOARS documentation, acknowledging that frisks are an intrusive police action potentially violating the constitutional rights of members of the public. We reviewed the stop sample (N=373) for documented frisks to assess whether any documented frisks occur during stops that were found to have insufficient IOARS documentation. In the stop sample analysis of 373 randomly selected encounters, 15 forcible frisks occurred during the encounters (4 percent). All 15 frisks occurred during sufficiently justified stops.[12]

The second outcome of insufficiently justified stops and frisks involves seizure of contraband. We reviewed the frisk sample (N=112) for documentation of seized contraband to assess the degree to which contraband seizure resulted from stops or frisks that have insufficient IOARS documentation. In the sample of 112 stops where a forcible frisk occurred, 34 resulted in finding contraband – a "hit rate" of 30.4 percent. In the instances where officers found contraband, nine stops lacked proper IOARS documentation for the frisk (see **Figure 5**). When considering only stops and frisks with appropriate justifications, the contraband hit rate is 22.3 percent (25 of 112 frisks).

**Table 8** details the type of contraband obtained during frisks where officers found contraband, broken down by whether the stop and/or frisk was sufficiently justified by IOARS. The contraband obtained during the stops fall into only a few categories, mainly weapons and drugs, with an "other" category that includes items such as stolen property. Overall, weapons and drug contraband are most likely to be found during frisks. Of the 17 stops and frisks where weapons were found, three occurred during frisks that lacked IOARS; the remaining stops and frisks where weapons were found had documentation meeting the IOARS standard. Six of the 17 stops and frisks where drugs or "other" contraband was found occurred during frisks that lacked IOARS.

**Table 8. Type of contraband found by IOARS determination. January – June 2024**

|  | WEAPON(S) | DRUGS | OTHER | TOTAL |
|---|---|---|---|---|
| **ALL FRISKS WITH CONTRABAND IN SAMPLE** | 17 | 10 | 7 | 34 |
| **STOP AND FRISK WITH IOARS** | 14 | 5 | 6 | 25 |
| **STOPS WITH IOARS & FRISKS WITHOUT IOARS** | 3 | 5 | 1 | 9 |
| **STOPS WITHOUT IOARS & FRISKS WITH IOARS** | 0 | 0 | 0 | 0 |
| **STOPS AND FRISKS WITHOUT IOARS** | 0 | 0 | 0 | 0 |

---

[11] Section V.A.3.c of the Settlement Agreement calls for an analysis of "fruit of the illegal stop" where a frisk, though proper given the officer's observations, was made pursuant to a traffic stop or field interview conducted without IOARS. Based on this language, the "fruit" is the frisk. However, conventionally in this type of analysis "fruit of an illegal stop" considers contraband and/or weapons as the "fruit." We provide a discussion of both interpretations for this report.

[12] Four of the 15 forcible frisks in the stop sample had insufficient IOARS documentation to justify the frisk (26.7 percent).



## Hit Rates

In the sample of 112 stops where a forcible frisk occurred, 34 resulted in finding contraband – a "hit rate" of 30.4 percent. **Table 9** provides an overview of hit rates by type of stop indicated by the originating CAD call type that is generated when a stop is initiated. Frisks that occur during the most common call types in the sample - subject and traffic stops - had a contraband hit rate of 27.8 percent.

**Table 9. Contraband hit rates by CAD call type. January – June 2024**

|  | NUMBER OF FRISKS | CONTRABAND HIT RATE |
|---|---|---|
| SAMPLE TOTAL | 112 | 30.4% |
| SUBJECT/TRAFFIC STOP | 79 | 27.8% |
| INVESTIGATION | 8 | 37.5% |
| WEAPON/FIREARM-RELATED | 1 | 100.0% |
| PROPERTY CRIME-RELATED | 2 | 50.0% |
| OTHER REASON | 1 | 0.0% |
| CRIME SUSPECT/SUBJECT | 6 | 16.7% |
| VIOLENCE-RELATED | 1 | 0.0% |
| MISSING CALL TYPE | 14 | 42.9% |

Notes:
[1] Percentages represent the proportion of all frisks within each CAD call type that result in obtaining contraband, regardless of whether the IOARS documentation standard was met.
[2] "Missing call type" denotes that no information was listed for call type; they represent forms that did not match to the CAD files.

Section V.A.3.d of the Settlement Agreement calls for hit rate analysis disaggregated by race and ethnicity. As we discuss in previous reports, research from jurisdictions across the country indicates that the threshold of suspicion used by officers to initiate a stop or frisk varies by race, and hit rates are often lower for non-white individuals.[13] This may be an important indicator, though not definitive proof of racial or ethnic bias in policing.

In this sample, 10 of the frisks represent encounters documented in the TraCS database. When recording race and ethnicity in TraCS, officers must choose from a dropdown menu giving the options "Asian," "Black," "Hispanic," "Indian," or "White."[14] The remaining frisks are documented in RMS as Field Interviews. The RMS database includes a field for race ("American Indian or Alaskan Native," "Asian," "Black/African American," "Native Hawaiian or Other Pacific Islander", "Unknown," or "White") and a field for ethnicity ("Hispanic/Latino," "Not Hispanic/Latino," or "Unknown"). To analyze the hit rate by race or ethnicity for all frisks, we recoded race and ethnicity for stops documented in RMS into White (Not Hispanic/Latino), Black (Not Hispanic/Latino), Hispanic/Latino, and Other.

---

[13] Crime and Justice Institute. (February 2020). *Semiannual Analysis of Traffic Stops, Field Interviews, No-action Encounters, and Frisks* pp. 16-17 https://www.cjinstitute.org/city-of-milwaukee-settlement-agreement/.
[14] "Black" denotes Black/African American; "Asian" includes Native Hawaiian or Other Pacific Islander; and "Indian" denotes American Indian or Alaskan Native. For reporting purposes, we refer to individuals categorized as "Indian" in TraCS and "American Indian or Alaskan Native" in RMS as "Indigenous".



**Table 10** details the hit rates for all frisks, disaggregated by race, ethnicity, and type of contraband. Because Black subjects represent most individuals involved in frisks, the contraband hit rate for frisks of Black subjects is the only rate where we can have any confidence in whether the hit rate reflects a pattern. There were 94 frisks of Black subjects in the sample during this period (83.9 percent of frisks in the sample), with a contraband hit rate of 31.9 percent. Weapons are expected to be the most likely type of contraband found during frisks as the constitutional basis for conducting a frisk is because the officer believes the person is armed and dangerous. Approximately 16 percent of frisks of Black individuals and 13.3 percent of frisks of Hispanic/Latino individuals resulted in officers finding weapons. None of the three frisks of white individuals resulted in weapons contraband.

**Table 10. Hit rate by type of contraband and race or ethnicity. January – June 2024**

|  | | | CONTRABAND HIT RATE | | |
|---|---|---|---|---|---|
|  | FRISKS | TOTAL | WEAPONS | DRUGS | OTHER |
| **ALL FRISKS** | 112 | 30.4% | 15.2% | 8.9% | 6.3% |
| **BLACK** | 94 | 31.9% | 16.0% | 9.6% | 6.4% |
| **HISPANIC/LATINO** | 15 | 26.7% | 13.3% | 6.7% | 6.7% |
| **WHITE** | 3 | 0.0% | 0.0% | 0.0% | 0.0% |



**Figure 6** presents an overview of the contraband hit rate for all frisk subjects and Black frisk subjects specifically, over the eleven reporting periods for which we have conducted this analysis.[15] Black individuals are involved in the most frisks and therefore are the racial or ethnic group where we may be able to identify a trend over time.

The contraband hit rate for Black individuals who are frisked during a police encounter generally increased from 2019 through 2021 (18.1 percent to 30.6 percent). There was a distinct backslide in hit rates during the first half of 2022 where both the overall hit rate and hit rates for Black individuals dropped to its lowest percentage since we began reporting on this metric. The latter half of 2022 showed improvement along with the current reporting period, reflecting hit rates commensurate with the latter half of 2021.

**Figure 6. Contraband hit rates for Black frisk subjects. January 2019 – June 2024**



| | Jan.-June 2019 | July-Dec. 2019 | Jan.-June 2020 | July-Dec. 2020 | Jan.-June 2021 | July-Dec. 2021 | Jan.-June 2022 | July-Dec 2022 | Jan.-June 2023 | July-Dec. 2023 | Jan.-June 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All Frisks | 20.1% | 18.9% | 15.8% | 21.1% | 25.8% | 30.2% | 13.3% | 28.2% | 23.6% | 25.2% | 30.4% |
| Black Subjects | 18.1% | 18.8% | 16.7% | 21.6% | 26.8% | 30.6% | 14.3% | 27.6% | 24.2% | 28.6% | 31.9% |

Notes:
[1] For January to June 2019: 199 frisks in the sample involving 160 Black subjects. For July to December 2019: 260 frisks in the sample involving 208 Black subjects. For January to June 2020: 266 frisks in the sample involving 222 Black subjects. For July to December 2020: 242 frisks in the sample involving 208 Black subjects. For January to June 2021: 213 frisks in the sample involving 164 Black subjects. For July to December 2021: 192 frisks in the sample involving 160 Black subjects. For January to June 2022: 120 frisks in the sample involving 98 Black subjects. For July to December 2022: 103 frisks in the sample involving 87 Black subjects. For January to June 2023: 106 frisks in the sample involving 91 Black subjects. For July to December 2023: 111 frisks in the sample involving 91 Black subjects.

---

[15] Semiannual reports for each reporting period can be found on the FPC website (https://city.milwaukee.gov/fpc/Reports/Crime-and-Justice-Institute-Reports.htm) or CJI's website (https://www.cjinstitute.org/city-of-milwaukee-settlement-agreement/).



# Progress Benchmarks

The purpose of the semiannual analysis of IOARS is to determine, in part, whether MPD is meeting the Settlement Agreement's stated thresholds for justification of traffic stops, field interviews, no-action encounters, and frisks.

Table 11 lists the proportions of each sample of stops and frisks that fail to show that the encounters meet the IOARS standard. The highlighted cells represent when MPD has met the threshold. For the first half of 2024, MPD met the IOARS threshold of fewer than 15 percent for traffic stops and field interviews. No-action encounters and frisks continue to remain below the compliance threshold.

**Table 11. Percent of encounters without IOARS by encounter type and time period**

| | TRAFFIC STOPS | FIELD INTERVIEWS | NO-ACTION ENCOUNTERS | FRISKS |
|---|---|---|---|---|
| **PERCENT OF ENCOUNTERS WITHOUT IOARS** | | | | |
| **Jan.-June 2019** | 36.5% | 42.1% | 50.0% | 79.4% |
| **July-Dec. 2019** | 8.3% | 8.5% | 15.8% | 80.8% |
| **Jan.-June 2020** | 6.1% | 48.6% | 50.0% | 91.4% |
| **July-Dec. 2020** | 7.8% | 37.9% | 63.2% | 86.8% |
| **Jan.-June 2021** | 4.1% | 20.9% | 52.6% | 48.8% |
| **July-Dec. 2021** | 2.9% | 17.3% | 73.7% | 53.6% |
| **Jan.-June 2022** | 2.7% | 10.0% | 27.8% | 30.0% |
| **July-Dec. 2022** | 0.7% | 17.3% | 55.6% | 35.0% |
| **Jan.-June 2023** | 3.2% | 11.1% | 26.7% | 31.1% |
| **July-Dec. 2023** | 1.9% | 10.1% | 64.7% | 31.5% |
| **Jan.-June 2024** | 3.0% | 12.6% | 52.9% | 25.0% |

Notes:
[1] Encounters with only citations or warnings that lack corresponding contact summaries in TraCS and/or RMS forms are not represented in this table. It is unclear from available data whether these encounters are traffic stops or field interviews and as such are excluded from the percentages.
[2] The Settlement Agreement language and paragraph references for the above table columns are as follows: Fewer than 15% of traffic stop records fail to show that the stops were supported by IOARS (SA Paragraph V.1.d.iv); Fewer than 15% of field interview records fail to show that the field interviews were supported by IOARS (SA Paragraph V.1.d.v); Fewer than 15% of no-action encounters fail to show that they were supported by IOARS (SA Paragraph V.1.d.vi); and Fewer than 15% of frisk records fail to show that the frisks were supported by IOARS (SA Paragraph V.1.d.vii).
[3] Teal cells represent when MPD has met the threshold.



## Summary of Findings

This report offers an assessment of the Milwaukee Police Department's progress in implementing changes to police procedures in accordance with the requirements of the Settlement Agreement of *Charles Collins, et al. v. City of Milwaukee, et al.* The encounters detailed in this report occurred during the first half of 2024. The following summarizes the major findings based on our review of these data.

- **The Department has remained steady in meeting the requirement that fewer than 15 percent of traffic stops fail to show individualized, objective, and articulable reasonable suspicion.** Analysis of traffic stops for this report finds that three percent of traffic stops fail to show sufficient IOARS documentation. The Department consistently meets the threshold for traffic stops and has done so since the latter half of 2019.

- **The Department meets the requirement that fewer than 15 percent of field interviews fail to show individualized, objective, and articulable suspicion.** Analysis of field interviews for this report finds that 87.4 percent of field interviews show appropriate IOARS documentation, placing the department above the compliance threshold of 85 percent for the first half of 2024.

- **The Department continues to fall short of the requirement that fewer than 15 percent of no-action encounters fail to show individualized, objective, and articulable reasonable suspicion to support the stop.** Analysis of no-action encounters for this report finds 52.9 percent of no-action encounters fail to provide proper IOARS documentation. However, this is a decrease from the previous reporting period.

- **The Department has shown progress since 2019 but continues to fall short of meeting the requirement that fewer than 15 percent of frisks fail to show individualized, objective, and articulable reasonable suspicion that the stop subject is armed and dangerous.** Analysis of officer-written narratives indicates 25 percent of justifications for frisks do not meet the IOARS standard. Between 65 and 75 percent of frisks have met the IOARS standard since the first half of 2022.

- **All contraband seized during frisks was obtained during stops that were sufficiently justified. Some contraband was seized during sufficiently justified stops but insufficiently justified frisks.** Of the 112 sampled frisks, 17 resulted in weapons retrieval, all of which were obtained during sufficiently justified stops. Of the weapons seized, three were obtained during insufficiently justified frisks. Drugs or other contraband were obtained during six frisks that were not sufficiently justified in the sample (17.6 percent of all contraband found).

- **The contraband hit rate increased from the previous reporting period.** The current reporting period showed a hit rate of 30.4 percent, showing a slight increase in officers' decisions about when to frisk individuals during a police encounter as compared to the previous reporting period (25.2 percent).



# Contributors

**Erica Bower** joined CJI in June 2023, prior to which she worked in academic roles in sociology, criminology, and criminal justice. In the academic setting, Erica conducted research related to school discipline and racial disparities; instructed courses in youth justice, corrections, and social inequality; and connected undergraduates with professionals in the field. Erica also led a collaborative effort to implement and evaluate community-based trainings in mental health and adverse childhood experiences (ACEs) in rural Tennessee, has previously worked on bail reform evaluation in Norfolk, Virginia, and her work has been published in peer-reviewed journals including *American Journal of Criminal Justice* and *The Social Science Journal*. Erica leads the quantitative data analysis for CJI's policing and youth justice portfolios, contributing to several projects aimed at improving these systems. Erica is committed to advancing the field by using data-driven solutions to address critical issues in adult and youth justice. Erica holds a Ph.D. in Criminology and Criminal Justice from Old Dominion University.

**Dondre Jefferson** joined CJI in July 2023, prior to which he worked in local government roles within Louisville Metro. These various roles included performance management and analysis for various departments such as Louisville's Youth Detention center and Parks and Recreation Department. Dondre was also the program manager for Louisville's Group Violence Intervention effort working with local and federal law enforcement as well as local nonprofit organizations and local governmental agencies to address group violence through targeted intervention and resource allocation. On the Milwaukee team Dondre contributes to monitoring and review of proofs that are submitted for compliance and assessment of IOARS. Along with being on the policing team Dondre' also contributes to various projects within CJI's Policy and Youth Justice team's as well.

**Theron Bowman** is a policing professional contracted by CJI for his subject matter expertise in policing and compliance with court-ordered reforms. He is a police and city management professional and consultant with more than 30 years of experience leading and managing some of the most complex and sophisticated police and public safety operations in the world. In addition to 30 years with the Arlington TX Police Department, Dr. Bowman's consulting experience includes serving as a Federal court-appointed monitor; police practices expert and investigator on use of force, internal affairs, misconduct complaints, community policing, bias-free policing, stops, searches and arrests; and recruitment for the U.S. Department of Justice in several jurisdictions. He earned a Ph.D. in urban and public administration from the University of Texas at Arlington and has more than 25 years' experience teaching college and university courses. His experience also includes international policing, community affairs, workforce diversification, public finance, construction oversight, policing strategies, technology, and inspections and accreditations. He has written extensively on policing topics for industry publications and is a graduate of the FBI National Executive Institute and the FBI National Academy.



# Appendix A: Categorization of Relevant CAD Call Types

| CALL CATEGORY | CAD CALL TYPE DESCRIPTION \| EVENT TYPE DESCRIPTION |
|---|---|
| **Crime Suspect/Subject** | Foot Pursuit \| Subject Pursuit |
| | Subj Wanted \| Subject Wanted |
| | Trb w/ Juv |
| | Trb w/ Subj |
| | Vehicle Pursuit |
| **Drug-Related** | Drug Dealing |
| **Welfare Check** | Welfare Citizen |
| | Injured Person/Sick |
| | Missing Report Critical |
| | Mental Observation |
| **Investigation** | Additional Info |
| | Investigation |
| **Other Reason** | 911 Abuse/911 Abuse Confirmed |
| | Accident Property Damage Only |
| | Accident Unknown Injury |
| | Assignment |
| | Business Check |
| | Call for Police |
| | Citizen Contact |
| | Contribute to Delinquency of Minor |
| | Documented Call |
| | Esp Target Escort |
| | Fire |
| | Follow Up |
| | Gambling |
| | Hostage Situation |
| | Indecent Exposure |
| | MPD Associated Event |
| | Non Pursuit |
| | Noise Nuisance |
| | Out |
| | Parking Trouble |
| | Patrol |
| | Reckless Vehicle |
| | Send Squad/Meet |
| | Special Assignment |
| | Susp Pers/Auto \| Suspicious |
| | Traffic Hazard |
| | Truant |
| | Vacant House Check |
| | Violation of Restraining Order |



| Property Crime-Related | Burglar Alarm - Bus |
| | Entry \| Entry-Building or Structure; Entry-Vacant Building or Structure |
| | Entry to Auto \| Entry-Vehicle |
| | Holdup Alarm |
| | Property Damage |
| | Shoplifter |
| | Stolen/Abandoned Property |
| | Stolen Vehicle |
| | Theft/Theft from Person/Theft from Vehicle \| Theft |
| Subject/Traffic Stop | DUI \| Driving Under the Influence |
| | Subj Stop \| Subject Stop |
| | Traffic Stop |
| Violence-Related | Battery \| Battery/Fight/Assault |
| | Battery Domestic Violence \| Battery/Fight/Assault – DV Related |
| | Bomb Threat |
| | Fight |
| | Robbery |
| | Threat |
| Weapon/Firearm-Related | Armed Robbery |
| | Reckless Use of a Weapon |
| | Shooting |
| | Shots Fired |
| | ShotSpotter |
| | Subj With Gun |
| | Subj With Weapon \| Subject With a Weapon |

Notes:

[1] MPD transitioned to the new Hexagon CAD system during Quarter 1 on February 20, 2024. From January 1, 2024, to February 20, 2024, Quarter 1 data included files generated from the Tiburon CAD system. From February 20, 2024, to July 1, 2024, the Quarter 2 data only included files generated from the Hexagon CAD system. As a result, some CAD call type codes and descriptions in the Quarter 2 data changed based on new table structures and column names within the Hexagon CAD system. New CAD event descriptions are reflected here as applicable using "|" to distinguish a change from Quarter 1 to Quarter 2. For example, "Theft from Person" and "Theft from Vehicle" (Quarter 1) are now captured as "Theft" (Quarter 2) in the new Hexagon CAD system. The CAD call types reflected in this Appendix are only reflective of the encounters in the stop and frisk samples; they are not encompassing of all CAD call types in the Tiburon or Hexagon CAD systems.



# Appendix B: CAD Call Types Likely to Involve Frisk

| CALL TYPE CODE \| EVENT TYPE CODE | CALL TYPE DESCRIPTION \| EVENT TYPE DESCRIPTION |
|---|---|
| AS \| ACTIVEATTACK | ACTIVE SHOOTER/ATTACK |
| 1344 | BATTERY CUTTING |
| 1344D | BATTERY CUTTING – DV |
| 1345 \| BATTERY-DV | BATTERY DV \| BATTERY/FIGHT/ASSAULT-DV RELATED |
| 1523 | BB GUN COMPLAINT |
| 1810 \| DRUGDEALING | DRUG DEALING |
| 1952 \| EXPLOSIVES | EXPLOSIVES |
| 1613 | FIGHT |
| FP \| SUBPURSUIT | FOOT PURSUIT \| SUBJECT PURSUIT |
| 1820 \| HOSTAGE | HOSTAGE SITUATION |
| 1349 | OFFICER SHOT |
| 1733 \| TRANSPORT | PRISONER TRANS \| TRANSPORT |
| 1351 | RECK USE OF WEAP |
| 1352 | ROBBERY ARM |
| SW \| WARRANT | SEARCH WARRANT \| WARRANT |
| 1356 \| SHOOTING | SHOOTING |
| 1357 \| SHOTSFIRED | SHOTS FIRED |
| 1358 \| SHOTSPOTTER | SHOTSPOTTER |
| 1632 | SUBJ WITH GUN |
| 1634 \| WEAPON | SUBJ WITH WEAPON \| SUBJECT WITH A WEAPON |
| 1847 \| SUICIDEATTEMPT | SUICIDE ATTEMPT |
| WS \| WARRANT | WARRANT SERVICE \| WARRANT |

Notes:
[1] MPD transitioned to the new Hexagon CAD system during Quarter 1 on February 20, 2024. From January 1, 2024, to February 20, 2024, Quarter 1 data included files generated from the Tiburon CAD system. From February 20, 2024, to July 1, 2024, the Quarter 2 data only included files generated from the Hexagon CAD system. As a result, some CAD call type codes and descriptions in the Quarter 2 data changed based on new table structures and column names within the Hexagon CAD system. New CAD event type codes and descriptions are reflected here as applicable using "|" to distinguish a change from Quarter 1 to Quarter 2. For example, the call type code "AS" (Quarter 1) and event type code "ACTIVEATTACK" (Quarter 2) both describe "ACTIVE SHOOTER/ATTACK."

